# EXPERT REPORT
## LOUIS G. FEY JR, CPCU, CIC, AIC
## FEY CONSULTING LLC

2136 N Woodchase Ct., Baton Rouge, LA.  70808          (225) 362-0018

---

SJB Group and Catlin Specialty Insurance Company v TBE Group, Inc,
No 3:12-cv-00181-BAJ-RLB, United States District Court for the Middle
District of Louisiana (Judge Jackson, Magistrate Judge Bourgeois)

---

Occupation:
Risk Management and insurance consultation - insurance
underwriting, agency operations, policy placement, claims,
coverage analysis, and contract review.

Field of Expertise:
Agency operations, insurance company operations, insurance
industry standards, customs, practice, and procedures, with regard
to insurance claim adjustment, coverage placement, underwriting,
policy drafting (as to manuscript policies), and coverage analysis.
Licensed insurance producer and adjuster.

DATE OF REPORT:  ___May 7, 2013___

I will act as an expert witness. I have been retained by TBE Group, Inc. (hereafter referred to as TBE) to consult on matters involving the standard practice and custom of the insurance industry with regard to providing additional insured (AI) status to higher tiered General Contractors (GC's), and design professionals or engineers, in Professional Liability, General Liability, and Umbrella / Excess Liability policies, by lower tiered Professionals.

It is important to note that I am not trying to reach any legal conclusions with regard to any issue discussed in this opinion. I am discussing the issues from an insurance perspective, analyzing the issues based upon industry standards, practice, custom, and intent, from an insurance industry point of view.

I have been asked, based upon my investigation and review, and with the benefit of my qualifications and expertise, whether I have certain opinions as more fully set forth below. Where I do in fact have such an opinion or opinions, I state what the opinion(s) is and explain the basis for that opinion(s). Where such an opinion is stated, it is provided based upon my personal knowledge of the event in question and information provided to me which I consider being reliable and of the type of information reasonably relied upon by one in my profession. All of my opinions set forth herein are given to a reasonable degree of certainty based upon that standard which applies to the property casualty insurance industry.

I offer this report in compliance with F.R.C.P. 26(a)(2)(B). I am familiar with and understand the Federal Rule of Civil Procedure 26(a)(2)(B).

**My qualifications in the field of insurance:**

- B.B.A. Bachelors of Business Administration – University of Cincinnati

2

- Certificate in General Insurance - INS
- Associate in Claims - AIC
- Chartered Property Casualty Underwriter - CPCU
- Certified Insurance Counselor – CIC
- Licensed adjuster
- Licensed Property Casualty Producer
- Licensed Life & Health Producer
- FEMA Certified Flood Adjuster
- Certified WIND umpire
- Member of the State Board of the Professional Insurance Agents (PIA) of Louisiana
- Member of the PIA of Louisiana Governmental Affairs committee
- Member of the Louisiana Insurance Commissioner's Advisory Counsel
- Member of the Louisiana Property and Casualty Commission

Each of the above designations is the result of countless hours of study and classroom participation.  For example, the Chartered Property and Casualty Underwriter (CPCU) designation is awarded upon completion of ten (10) courses of study covering every facet of the property casualty insurance industry.  The classes are very comprehensive and the CPCU designation is the highest and most respected designation in the industry.  The Certified Insurance Counselor (CIC) designation is a five (5)-course program encompassing very technically advanced studies of commercial property and casualty insurance coverage and agency operations. The Associate in Claims (AIC) designation is a multi-course program whose course work includes property and casualty coverage and claim handling.

3

I have over thirty (30) years of practical experience handling complex property casualty claims and related litigation, directing and overseeing insurance company defense counsel, managing and directing claim, underwriting, and agency operations. I have also spent these years instructing and training insurance company, and insurance agency personnel, as well as reviewing, auditing, and both conducting, and supervising, multi-line claim investigations and operations.

As it relates to this case, I helped establish, mentor, and train the Travelers Construction Claim Division with an emphasis on the analysis of construction agreements. This training focused largely on the application and interaction of those agreements with regard to various insurance issues such as additional insured, defense and indemnification, waiver of subrogation, and statutory employer, as they interact with insurance coverage, limitations, and exclusions. I was a member of the committee that drafted Travelers' additional insured endorsements used in its construction related insurance policies. I have given seminars on additional insured coverage and concepts. I assist clients with contract language related to additional insured, various other contractual issues, and in regard to coverage compliance resulting from project contracts, on a daily basis.

I am a member of the Louisiana Insurance Commissioner's Advisory Counsel, the State Of Louisiana Property and Casualty Commission, the State Board of the Professional Insurance Agents (PIA) of Louisiana, and the PIA of Louisiana's Governmental Affairs committee. I have given numerous seminars on insurance coverage and related issues as outlined on my CV.

I assisted in authoring the Claims Manual for Ohio Casualty's Claim Department in the mid 1980's. I have been involved in the development and drafting of various other coverage endorsements over the last 30 years for various insurers. I currently serve as a

member of AIG's Claim Advisory Counsel, as well as the Travelers Insurance Company Services Agency Advisory Counsel.

In my current role at Fey Consulting LLC, I act as a liaison between my clients (insureds or insurers), and consult with their respective attorneys where appropriate. I advise and assist with regard to the defense of insurance claims, coverage issues or disputes, improper denials, claim handling, and a variety of other insurance related issues and concerns including but not limited to tenders of defense and indemnification, and tenders for additional insured status.

My opinions are based upon a broad spectrum of education, training, experience, and research. I have access to various industry resources such as Sage, Silver Plume, FC&S, West Law, and IRMI. I research industry writings, case law, and textbooks, and apply actual practical underwriting, agency, and multi-line claim handling experience and practice.

**My Opinion(s) was also based on the following:**

My opinion was based upon the information gleamed from my review of the following documents:

- The 2009 TBE – James agreement

- The 2009 TBE – SJB agreement

- The underlying complaint in this matter

- The amended complaint in this matter

- SJB's Professional Liability Insurance policy effective 12/23/2010 to 12/23/2011 #AED-199721-1211

- The broker copy of SJB's Professional Liability Insurance policy effective 12/23/2010 to 12/23/2011 #AED-199721-1211

- SJB's Professional Liability Insurance policy effective 12/23/2008 to 12/23/2009 #AED-93698-1203

- The broker copy of SJB's Professional Liability Insurance policy effective 12/23/2012 to 06/30/2014 #AED-199721-1213

**OPINION:**

**<u>BACKGROUND</u>**

This case is related to a Louisiana Department of Transportation and Development project involving the widening of a 1.91 mile stretch of Interstate 12 from O'Neal Lane in East Baton Rouge Parish, Louisiana, to Range Road in Livingston Parish, Louisiana, known as the: I-12 Widening O'Neal to Range, State Project No. 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.

James Construction Group, LLC (James) was the design-build contractor on the Project. As such, James entered into a General Services Agreement dated April 29, 2009 with TBE (the James-TBE Contract). In that contract TBE agreed to provide certain subsurface utility engineering and related services for the project which included locating and identify underground utilities that might impact the Project. The contract included surveying operations.

TBE in turn subcontracted out this work to SJB. TBE and SJB entered into a "Subcontract for Professional Services" dated

6

April 29, 2009 wherein SJB agreed to provide certain surveying services in connection with TBE's work on the Project.

On or about April 4, 2011, James discovered that a section of the sewer main, within the limits of the Project, was in a different location than was shown on the data provided to James. James immediately advised TBE that work on the Project had been suspended due to this discrepancy. This case is related to the damages resulting from this discrepancy in SJB's survey, which arises directly from SJB's work under the SJB - TBE "Subcontract for Professional Services".

## ANALYSIS

One of the questions posed to me was whether or not, based upon the standard practice in the insurance industry, SJB should have caused both James and TBE to be covered as additional insureds under SJB's - Catlin Professional Liability/Errors and Omissions Insurance policy. I was also asked to opine on whether or not this type of contractual obligation is common practice, customary, and whether or not such coverage was available in the insurance market at the time these contracts were signed. Further, I examined Catlin's subrogation potential from an insurance perspective.

## ANALYSIS OF THE CONTRACTS

Section 3. of the SJB to TBE "Subcontract For Professional Services", outlines on the second page (numbered at the bottom as TBE 014), that SJB agrees to name TBE as an Additional Insured on its General Liability (GL) and Professional Liability (PL) policies. While the contract refers to the PL policy as an errors and omissions policy, these terms are used interchangeably in the industry, and refer to the same thing, a PL policy. The limits

specified in the contract was $1,000,000 for each policy (PL & GL).

Likewise, by virtue of the flow down provision, item 5. of form TBE 014 in the SJB to TBE "Subcontract For Professional Services", SJB assumed the same obligations towards James (James was defined in the SJB – TBE contract as the "prime client") and TBE, as TBE assumed towards James in the "James - TBE Contract".

As outlined in the General Services Agreement between James and TBE (the "James - TBE Contract") in item 9., TBE, and therefore SJB (as a result of item 5. mention above), were both required to name James as an additional insured on its GL, Umbrella, and PL (since the contract included surveying or engineering services – according to item 1. Description of Services) polices. The GL limit was required to be $500,000. The Umbrella and PL limits were required to be $1,000,000 each.

Therefore SJB was required to name James as an additional insured on SJB's GL, Umbrella, and Professional Liability policies. SJB was also required to name TBE as an additional insured on SJB's GL, and Professional Liability policies. SJB was required to provide $1,000,000 in GL and PL coverage to TBE and $1,000,000 PL and $1,000,000 Umbrella coverage to James. In addition, TBE was to provide $500,000 GL coverage to James.

Notably, section 9. of the James contract, via the flow down provision of the TBE – SJB contract (again, section 5. mentioned above), also requires waiver of subrogation in SJB's Professional Liability policy in favor of both James and TBE.

Lastly, both contracts required SJB to defend and indemnify TBE for losses arising from SJB's work.

## SJB'S PROFESSIONAL LIABILITY POLICY

While I reviewed a number of Catlin policies covering SJB for Professional Liability during various policy terms, they are all basically the same. Regardless, it appears that the claim in question would have been reported during the SJB's Professional Liability Insurance policy effective 12/23/2010 to 12/23/2011, #AED-199721-1211 which is subject to a $1,000,000 policy limit applicable to Professional Services.

On page 1 of 11 of form DPAE 050 0908, the policy states:

I. INSURING AGREEMENT

*"**The Company will pay on behalf of the Insured all sums in excess of the deductible that the Insured becomes legally obligated to pay as  damages and  claims expenses as a result of a wrongful act** or  pollution condition anywhere in the world, provided that: "*

*"A. **The claim arising out of the wrongful act** or  pollution condition **must first be made against the  Insured during the policy period** or any applicable  optional extension period. A claim is considered first **made when the Insured receives notice of the claim** or when the  Insured reports a circumstance in accordance with Section VII.B., Reporting A Circumstance;"*

In other words, this is a "claims made" policy (as opposed to an occurrence policy), which is the standard in the industry for professional liability exposures. The policy period that responds to any claim is the policy in effect at the time the claim is first made.

On page 4 of 11 of the same form, the policy outlines certain exclusions;

*"IV. EXCLUSIONS*

***This insurance shall not apply*** *to and the Company will not defend or pay under this policy for damages or claim expenses arising out of:*

*"B. Any Insured's alleged liability under any contract, agreement or express warranty or guarantee,* ***except where such liability would have existed in the absence of such contract or agreement****."*

Further, the Catlin policy at issue recognizes SJB's right to waive subrogation on form DPAE119 1108 entitled "Louisiana Changes". This form amends page 9 of 11 of form DPAE 050 0908, Section VIII. Conditions, B. Subrogation, on page 3 of 3 of form DPAE119 1108, to the following:

*"III. It is hereby and agreed that Section VIII. CONDITIONS B. Subrogation is deleted in its entirety and replaced with the following:*

*B. Subrogation*
*In the event of any payment of any claim under this policy, the Company will be subrogated up to the amount the Company has paid out under the policy. The Insured must do everything reasonably necessary to secure these rights and must do nothing after a claim is made to jeopardize them.* ***The Company hereby waives such subrogation rights against*** *any Insured under this policy, and also against* ***the Insured's client to the extent that the Insured had, prior to the claim  or circumstance, a written agreement to waive such rights."***

It should be pointed out that this form is statutorily required to be added to Louisiana insurance policies. Therefore this language is in accordance with Louisiana statutes, mandating this exact language be added to the policy.

One last item I want to point out in the policy, is form number DPAE 449 0210 entitled *"ADDITIONAL INSURED(S)"*:

*"This endorsement modifies insurance provided under the following:*

***PROFESSIONAL** AND POLLUTION **LIABILITY POLICY FOR DESIGN PROFESSIONALS***

*It is understood and agreed that the following entities are included as an Additional Insured(s), but solely as respects to liability arising out of professional services. ADDITIONAL INSURED(S)."*

From my review of the policy I can state the following:

The policy provides coverage for liability assumed in a contract or agreement that SJB would have in the absence of the contract or agreement. This provision is a standard policy provision and is intended to provide coverage for the vicarious liabilities of TBE, imputed upon TBE, as a result of the negligent acts of its sub-consultant, SJB. While this is the generally accepted custom and application of this provision by the insurance industry, it will be up to the court to determine its applicability to this case.

**The Catlin policy at issue recognizes SJB's right to waive subrogation in favor of TBE**, as was required by the project's written contracts. **Catlin is prohibited by the insurance policy from subrogating against TBE for moneys paid by Catlin on behalf of SJB on the underlying claim**. I will again point out that the application of this provision to this case is for the court to determine. My opinion is based on industry standards with regard to the common practice and custom in the insurance industry with regard to the application of such provisions. **Such waivers of subrogation are very common** in construction related claim scenarios and contracts.

11

**The policy does not list TBE as an additional insured as was required of SJB by the contracts for this project. Therefore SJB may have violated its obligation under the project contracts.** The question as to whether or not SJB breached the contract will be for the court to determine, however from an insurance perspective, the Catlin policy did not provide the required coverage.

The policy does have three Additional Insureds listed on the above discussed form number DPAE 449 0210, however SJB was not one of them. Therefore, for Catlin to argue that it does not add parties as additional insureds on its Professional Liability policies, is not quite accurate.

One listed additional insured is SJB Group, Inc. / Owen & White, Inc. Owen & White Inc. is clearly a separate corporate entity, unaffiliated with SJB. While there may be a partnership between the two corporations for a project or projects, Owen & White, Inc. is still named as an AI on SJB's policy as a separate and distinct corporate entity.

I can also state from first hand experience that Catlin does in fact add unaffiliated entities as AI's when pressed to do so. To support this opinion, I have attached a Catlin Additional Insured endorsement which is used by Catlin to add AIs, which is in addition to the previously outlined AI form number DPAE 449 0210 contained on the policy at issue. I have also attached another Catlin coverage form number: EGEO 050 0610. This form is one that Catlin uses for engineers to provide Professional Liability Coverage. It can be used as an alternative to form DPAE 050 0908. Interestingly, this form provides the following, on page 5 of 12:

*"SECTION II - WHO IS AN INSURED*

*3. **The client for whom the named insured performs "professional services**" solely with respect to "claims" arising*

*from your "professional services" and **only when required per written contract."***

Had Catlin used this form on the policy, TBE would have automatically been added as an Additional Insured, due to the project's contractual language requiring AI status for TBE. This alternative form is used by Catlin to provide Professional Liability coverage for engineers who are routinely required to add entities as AI's in their contracts.

For example, I have seen this in Catlin Professional Liability policies for engineers that worked regularly in refineries. Refineries are well known for requiring such coverage of its design professionals. If the engineer cannot provide such coverage, the refinery will not allow that engineer to work in its facility.

Catlin writes it own manuscript coverage forms. If Catlin does not add other entities as AI's, as is Catlin's position in this case, why would Catlin put such language in its forms? Why would it have multiple AI endorsements?

Another option for SJB would have been to obtain a Project Professional Liability Policy, which would have covered both SJB and TBE.

I can state with certainty, that had SJB come to me for insurance for this project, I could have provided AI coverage on SJB's Professional Liability policy. It should be noted that surveying is one of the less risky professional exposures, as opposed to designing a hospital or stadium, at the opposite end of the spectrum.

Short of providing the AI coverage required by the contract, SJB should have merely negotiated it out of the agreement.

## INDUSTRY STANDARDS

As applied to Catlin's Professional Liability Insurance policy by the industry, additional insured protection would at a minimum trigger Catlin's duty to defend TBE for any claims arising out of SJB operations, and for any liability imposed on TBE as a result of SJB's wrongful acts.

Requiring subcontractors to add higher tiers as additional insureds in Professional Liability policies is a common practice. Insurers insist on proper contractual risk transfer when underwriting construction accounts. This includes design professionals and engineers. Premium reductions or preferred rates are available to insureds that make proper use of these Risk Management tools.  In fact, as an example of how prevalent this practice is, I recently attended a seminar addressing this exact topic entitled: "Additional Insureds in Professional Liability" which examined issues related to this risk management practice, both pro and con. I have attached a copy of this presentation to this opinion.

I have been involved in complex construction claims for many years. Those claims all begin and end with contract and coverage analysis as they interact with various insurance issues. As a Director of Major Case Claims in the Travelers Construction Claims Division, I helped set up the construction division, as well as train and mentor the construction claim staff on proper contractual risk transfer practice. This included instruction on how to interpret contracts with regard to insurance matters, and on how the insurance policy interacts with those contractual issues.

I have handled countless large complex exposure (excess of $1,000,000) claims, and mentored adjusters in the proper handling of such matters. One of the most important steps in the construction claim handling process (once sufficient information regarding the claim has been obtained) is to review the project contracts and tender the claim to the appropriate insurer or entity,

14

pursuant to the contractual defense and indemnity provision. Tenders are also made at the same time to the appropriate insurers for AI status on behalf of the insured, under the terms of those same contracts. This process often includes tenders to professional liability insurers.

As a licensed P&C producer, claims adjuster, and as a Risk Manager, I assist our clients daily to ensure insurance compliance with regard to construction agreements. I also assist with enhancing their subcontract agreements to ensure proper contractual risk transfer (CRT) techniques are being utilized in order to reduce the client's risk of loss, and to make the client's operations more attractive to underwriters. I review contracts with regard to insurance issues on a daily basis. CRT by way of additional insured (AI) status is a common practice in professional liability insurance and this coverage is widely available in the insurance market. I've attached a number of AI endorsements used by various Professional Liability insurers as examples of how these insurers provide this coverage.

While there is resistance to providing AI coverage by underwriters, when pushed, the coverage is available. The reason for such resistance is due to the eroding limit of Professional Liability policies as a result of defense costs. It is perceived by the industry that the cost of defending two parties to a lawsuit will quickly erode the policy limit, leaving little or no coverage to indemnify. While I would argue that the incremental cost to defend two entities in the same matter, with aligned interests, is small, the concern is prevalent in the industry.

In order to address this concern, I instruct clients (and in seminars, many others), to either strike the AI requirement from project contracts where possible, or obtain the necessary coverage. I constantly remind clients that the provision cannot be ignored, and must be addressed one way of the other. Where the higher tier

will not amend the contract, it is a business decision for the design professional whether or not it will intentionally breach the contract by failing to procure the proper coverage, pass on the project, or obtain the necessary AI protection for the higher tier. Coverage can be obtained via a fairly small increase in premium if the client's policy does not already have a blanket AI form. Most underwriters understand that some contracts require such coverage and will agree to add an AI when presented with the project contract.

In particular General Contractors (GC's) require AI protection from their design professionals due to the fact that most General Contractor's (GC's) do not carry professional liability coverage. GC's rarely have certified engineers or surveyors on staff, and do not perform professional service themselves. Instead they typically subcontract the design and survey responsibility to experts in the field. For this reason, General Contractors need to be protected from claims asserted against them for negligence arising out of engineering or other such professional services, which are typically excluded from General Liability policies.

Similarly, higher tiered professionals, even though they have their own Professional Liability coverage, require AI status from lower tiered professional subcontractor's PL policies, so that losses related to that lower tiered subcontractor's work falls under that subcontractor's policy, rather than eroding its own coverage. Defense costs typically erode PL policy limits, therefore the extra layer of protection provided by AI status, is very desirable. AI status not only protects the higher tiers own limits, but also protects its loss history, which directly impacts future premium cost. If a lower tiered design professional makes a mistake, the claim should fall under that design professional's insurance policy.

## VOLUNTARY PAYEE

In this case, Catlin has taken the position that it is entitled to recovery and is subrogated to SJB's rights against TBE. This is a

16

very odd position from an insurance perspective as Catlin has denied that it provides coverage to TBE in this matter. Catlin's position has been that TBE is not an additional insured on its policy.

If an insurer makes payment under a policy for the liability of a party that is not entitled to coverage under the policy, the insurance industry considers the payment to be a voluntary payment. As such, if Catlin paid any amounts on behalf of TBE, it did so on its own behalf, not as SJB's or as TBE's insurer. Additionally, it is my understanding that no release was obtained naming TBE or even SJB. I am therefore at a loss to understand why Catlin feels it has a right to recovery against TBE in this case.

According to industry standards, Catlin would therefore be considered a voluntary payor, and would not be entitled to recovery via subrogation.

In addition, the policy includes a waiver of subrogation provision and the project contracts require that SJB waive subrogation as to TBE. Therefore, to the extent that Catlin is subrogated to SJB's rights in this matter, such subrogation rights were waived by the insurance policy.

## CONCLUSION

SJB was required to name James as an additional insured on SJB's GL, Umbrella, and Professional Liability policies.

SJB was required to provide $1,000,000 PL and $1,000,000 Umbrella coverage to James as an additional insured under those policies.

SJB was to provide $500,000 GL coverage to James as an additional insured under its GL policy.

SJB was required to name TBE as an additional insured on SJB's GL, and Professional Liability policies.

SJB was required to provide $1,000,000 in GL and $1,000,000 in PL coverage to TBE as an additional insured under these policies.

The addition of higher tiers such as James and TBE as additional insureds to a lower tiered professionals PL policy is common practice in the construction / insurance / risk management industry.

Additional insured protection for a higher tier via a lower tier's Professional Liability policy is readily available in the market place.

TBE was not named as an additional insured on SJB's PL policy as required by the project contracts. Therefore SJB is in danger of being found by the court, to have breached the project contracts.

I can state with certainty, that had SJB come to me for insurance for this project, I could have provided AI coverage for TBE on SJB's Professional Liability policy in 2009.

If Catlin paid any amounts on behalf of TBE, it did so on its own behalf, not as TBE's insurer, and is therefore not entitled to recovery via subrogation. There was no release obtained by Catlin in exchange for the settlement releasing TBE from liability. Catlin would be considered to be a voluntary payor by the industry.

If Catlin made any payments on behalf of either TBE or SJB as an insured under the policy, it would not be entitled to subrogate against its own insured.

Catlin is not entitled to pursue subrogation against TBE as such rights were waived prior to the loss, by SJB by way of the written project contracts. Catlin's policy recognizes SJB's ability to waive subrogation prior to any loss in a written agreement.

**Prior testimony in the past 4 years as an expert:**

Georgia Casualty & Surety, Co. v Chambers Drum Company, Inc. - Superior Court of Fulton County- State of Georgia No: 2005-CV-104094. Defense expert - Business Income and Extra Expense insurance coverage and claim adjustment, equitable subrogation, Georgia's Fair Claims Practices Act, and bad faith - Deposition and trial testimony

Rigsby V State Farm – Mississippi Southern District Court, 1:2007cv00075. Plaintiff's expert – Claim handling, proper investigation, processes and procedure: insurance industry custom and practice - Deposition and trial testimony

Randall-Williams Investments, LLC, and Affordable Homes of Midtown Atlanta, LLC v HANOVER Indemnity Company d/b/a Landmark American Insurance Company – Superior Court of Fulton County, State of Georgia No: 2009CV175903. Plaintiff's expert - Georgia's Fair Claims Practices Act and bad faith as well as insurance company custom and practice with regard to the adjustment process in property insurance claims - Deposition and trial testimony

Richards Clearview, LLC v Sears, Roebuck and Company – 24th Judicial District Court for the Parish of Jefferson, State of Louisiana No: 678702 Div. P - Plaintiff's expert - The proper allocation of insurance premiums between the owner and a tenant of a shopping mall. - Deposition testimony

David V. Adler, Trustee v. Imperial A.I. Credit Companies, Inc. and A.I. Credit Corporation, Adversary No. 10-1030, United States Bankruptcy Court, Eastern District of Louisiana. Defense expert - The value received from insurance policies verses premium paid. New Orleans, Louisiana - Deposition testimony

19

Olivia A. Gibson, Individually and as Natural Tutrix of the Minors, Robert Gibson, Cecile Gibson, and Raven Lewis vs. Enterprise Leasing Company of New Orleans, ELCO Administrative Services, Inc., Business Couriers, Inc., D/B/A DHL, Mark David Freneaux, Scottsdale Insurance Company, and Lloyd's of London Insurance Company 19th Judicial District Court Parish of Baton Rouge State of Louisiana No. 560,197 Section 27 Baton Rouge Louisiana – Defense Expert on Fair Claim Practices, Claim handling and procedures, Spoliation of Evidence – (Deposition and trial testimony)

Argonaut Great Central Insurance Company v W. David Hammett and Davenport, Files Kelly, LLP. The Circuit Court of the First Judicial Circuit of Caddo Parish, Louisiana No: 449,814-B, Argonaut Great Central's expert on Agency E &O, Underwriting procedures, Binders, Legal Mal-practice, Shreveport, Louisiana – (Deposition and arbitration testimony)

Edward Brandon Noe, plaintiff, v. Metropolitan Property and Casualty Insurance Company, d/b/a Metlife Auto & Home, Defendant. In The United States District Court For The Northern District Of Georgia, Atlanta Division Case No: 1:11-CV-02026-SCJ Atlanta, Georgia – Plaintiff's expert on Georgia Fair Claims Practices Act / Bad Faith – improper rejection of a time limited policy limits demand - Deposition testimony

Amanda and Benjamin Cagle v The Hanover American Insurance Company, Number 1:11-CV-00031 United States District Court, Western District of Louisiana, Alexandria Division, Plaintiff's expert, on bad faith, insurance coverage, industry standards, custom, and usage of terms – Deposition testimony

Sitaram Inc., Plaintiff v. Bryan Insurance Agency, Inc. No. 40,869C State of Louisiana, Parish of Franklin, Fifth Judicial

District Court – proper methods of property appraisal - Deposition testimony

Ray Terese Versus 1500 Lorene, LLC, Et. Al. Civil Action No. 09-4342 Section: G Judge: Brown United States District Court, Eastern District Of Louisiana – Agency E&O - Deposition Testimony

Carriage Court Condominium Association, LLC versus State Farm Fire and Casualty Company, 24th Judicial District Court For the Parish of Jefferson, State Of Louisiana, New Orleans, Louisiana – Fair claim practices, bad faith, industry standards, industry usage of terms and conditions - Deposition testimony
James III and Sinclair Buquet v State Farm Insurance Company, Number United States District Court, District of Louisiana, Division - Louisiana Fair Claims Practices / Bad Faith – industry standards in claim handling, coverage, usage of terms - Deposition testimony

I do not believe I have testified in any other cases. If I discover any other cases I will provide the information. Likewise, the above information is the best information that I have concerning the cases in which I provided testimony. If I am better able to identify a case or court I will do so.

I have published the following articles in the last 10 years:

- IRMI Update: Risk Management & Insurance Commentary, Tips, and Tactics February 6, 2013 I Issue 287 I ISSN: 1530-7980 - "Don't Use ATIMA in Builders Risk Policies"

My compensation is based on an hourly rate. My hourly compensation is $300 per hour. I have worked on this case for

approximately 24.25 hours and have been paid $3,000.00 for my time to date.

    I reserve the right to supplement this opinion should I become aware of additional facts or information.

May 7, 2013
Date               Louis G. Fey Jr. CPCU, CIC, AIC