**Louis George Fey, Jr.**
**May 17, 2013**

---

**1**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

SJB GROUP, LLC AND      ) NO. 12-181-BAJ-DLD
CATLIN INSURANCE GROUP  )
                        )
VERSUS                  )
                        )
TBE GROUP, INC.         )
_____)

TRANSCRIPT OF THE DEPOSITION OF:
LOUIS GEORGE FEY, JR.,
TAKEN ON BEHALF OF PLAINTIFFS, REPORTED IN THE ABOVE
ENTITLED AND NUMBERED CAUSE BY CASSANDRA CHENEVERT,
CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

REPORTED AT THE OFFICES OF:
THE LONG LAW FIRM
4041 ESSEN LANE, SUITE 500
BATON ROUGE, LOUISIANA 70809

COMMENCING AT 10:02 A.M., ON MAY 17, 2013.

---

**3**

I N D E X
                                        PAGE
STIPULATION                              4
EXAMINATION BY:
    MR. NADEAU                           5
CERTIFICATE                             151
WITNESS CERTIFICATE                     152
WITNESS AMENDMENT(S)                    153

E X H I B I T S
    DESCRIPTION                         PAGE
Exhibit 1 - Mr. Fey's Report            13
Exhibit 2 - Travelers Stamped, Sealed and
            Delivered Fourth Quarter 2005 Issue  60

Exhibit 3 - Travelers Stamped, Sealed and
            Delivered 2009 Issue        60
Exhibit 4 - IRMI Article                67
Exhibit 5 - XL Guideline                90
Exhibit 6 - Catlin Professional Liability
            Coverage Form              120

---

**2**

A P P E A R A N C E S
FOR THE PLAINTIFFS:
    LONG LAW FIRM
    BY: ADRIAN G. NADEAU, ESQ.
    4041 ESSEN LANE, SUITE 500
    BATON ROUGE, LOUISIANA 70809

FOR THE DEFENDANT:

    LAW OFFICES OF MONTGOMERY BARNETT, L.L.P.
    BY: RYAN M. McCABE, ESQ.
    3300 ENERGY CENTRE
    1100 POYDRAS STREET
    NEW ORLEANS, LOUISIANA 70163

---

**4**

S T I P U L A T I O N

        IT IS STIPULATED AND AGREED by and among
the parties that this deposition is hereby being
taken for discovery purposes and for any and all
purposes pursuant to the Federal Rules of Civil
Procedure.
        All formalities, excluding reading and
signing of the transcript by the witness, are
hereby waived.
        Except as provided in Article 1455,
objections are considered reserved until trial
or other use of the deposition.

---

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

Louis George Fey, Jr.
May 17, 2013

---

**5**

```
1              LOUIS GEORGE FEY, JR.,
2   2136 North Woodchase Court, Baton Rouge, Louisiana,
3   70808, having been sworn, was examined and testified
4   as follows:
5              EXAMINATION
6   BY MR. NADEAU:
7       Q.  Mr. Fey, would you please state your name
8   for the record.
9       A.  Louis George Fey, Jr.
10      Q.  You understand that I represent SJB Group
11  and its professional liability carrier, Catlin
12  Specialty Insurance Company, in this lawsuit against
13  TBE Group, Inc.?
14      A.  Correct.
15      Q.  And you have been retained on behalf of TBE
16  to offer expert witness testimony on behalf of TBE; is
17  that correct?
18      A.  Correct.
19      Q.  I take it you've given several depositions.
20      A.  Several.
21      Q.  I'll skip the intro, except to say that if
22  you ever don't understand any of my questions, please
23  ask me to rephrase it, and I will certainly try to do
24  that.
25      A.  Sure.
```

---

**6**

```
1       Q.  Isn't it true that if TBE had been named as
2   an additional insured on SJB's professional liability
3   policy, that, in all likelihood, that status would not
4   have provided any coverage for TBE's own active or
5   independent negligence?
6       A.  It would depend on the form that they used
7   to do it.  Generally speaking, it would have been
8   vicarious types of liability.
9       Q.  Vicarious liability only; is that right?
10      A.  Correct.
11      Q.  And by "vicarious liability," you mean
12  liability where someone, such as, in this case, James,
13  who was TBE's client, or perhaps even the LaDOTD,
14  brought a claim against TBE for damages allegedly
15  arising out of TBE's sub-consultant, SJB's work; is
16  that right?
17      A.  Yes, and then general supervision of that
18  work probably would be included in the additional
19  insured coverage.
20      Q.  General supervision of what work by who?
21      A.  Oversight of SJB's work.  The allegation
22  could be that you improperly supervised SJB's work.
23  And due to your improper supervision, SJB made some
24  errors in whatever they were doing, and as a result of
25  that, we're seeking recovery from you.  In those type
```

---

**7**

```
1   of situations, those could be covered under the
2   additional insured coverage.
3       Q.  Supervision that you described?
4       A.  Oversight, yeah.
5       Q.  What is the basis for your understanding
6   that that type of oversight would be covered along
7   with the vicarious liability?
8       A.  Well, there's different forms of additional
9   insured coverage.  The general form that you see most
10  often is for liabilities arising out of work of the
11  named insured, which would be SJB on the SJB policy.
12  Then there's broader forms that would include, you
13  know, the -- even the sole negligence of the higher
14  tier, which in this case would have been TBE.  But it
15  just depends on the form they use and how they go
16  about it.  Generally speaking, it's going to be the
17  former version of it where if we cover you as an
18  insured to the extent that there's allegations that
19  arise out of the work of SJB.
20      Q.  The named insured?
21      A.  The named insured, right.
22      Q.  So it's fair to say that the general rule is
23  that additional insured coverage is only going to
24  cover the additional insured from the vicarious
25  liability of the named insured.  Is that a fair
```

---

**8**

```
1   statement?
2       A.  Yeah.  It's a little broader than just
3   vicarious.  It's related to their negligence, so, you
4   know, if -- it arises out of the work.  I think most
5   forms say, "Arising out of your work," and "your"
6   meaning SJB, the named insured.
7       Q.  Okay.  Let's talk about your qualifications
8   just a little bit.  Do you specialize at all in
9   professional liability lines of coverage for
10  architects and engineering?
11      A.  I have probably 27 clients in our office
12  that are professionals.
13      Q.  When you say "professional clients," are any
14  of them architects and engineers?
15      A.  Those are architects and engineers.
16      Q.  All 27 of them are?
17      A.  Yes.
18      Q.  Give me some examples that come to your
19  mind.  You don't have to name them all.
20      A.  Washer Hill Lipscomb.  I just looked at a
21  list of them, and I can't even think of the names.
22  I'm giving a seminar, so I wanted to send invites to
23  all of our clients.  I just looked at it, and that's
24  how I know it's 27, because there were 27 on the list.
25      Q.  Who are Mike and Russell currently insured
```

**Louis George Fey, Jr.**
**May 17, 2013**

---

9

1  with on the PL side? Mike Hill and Russell Washer?
2      A.   You mean who their carrier is?
3      Q.   Yeah.
4      A.   I'm not sure.
5      Q.   Is it Lexington?
6      A.   I'm not sure. I'd be guessing.
7      Q.   Just as we sit here right now, you don't
8  remember the names of any of the other architect and
9  engineer clients?
10     A.   I can remember a prospect. I can't remember
11 the names of the clients, though.
12     Q.   Of those 27 clients, are they active clients
13 or is that --
14     A.   Sure. When I say "clients," that's people
15 we are actually currently writing insurance for --
16 procuring insurance for. Prospects are people that we
17 are trying to get the business of.
18     Q.   You don't have your C.V. right in front of
19 me -- yes, I do. I know that you have currently your
20 own consulting company, Fey Consulting, LLC; is that
21 right?
22     A.   Correct, and that's what I'm here as today.
23     Q.   And then you also currently work for
24 Bancorpsouth Insurance Services; is that correct?
25     A.   Correct.

---

10

1      Q.   Okay. Now, when you mention those 27 A&E
2  clients, are those clients of Fey Consulting or
3  Bancorpsouth?
4      A.   Bancorpsouth.
5      Q.   All right. And in your role at
6  Bancorpsouth, you typically assist clients,
7  architecture and engineer clients, in reviewing
8  contracts, obtaining all of the requisite insurance,
9  including the PL?
10     A.   Correct.
11     Q.   And I know on a lot of topics you and I can
12 use some of the same lingo, but you understand that
13 when I use the term "PL," as you do in your report,
14 I'm referring to professional liability, correct?
15     A.   Correct.
16     Q.   And when I say "A&E," you understand that
17 I'm referring to architects and engineers, correct?
18     A.   Correct.
19     Q.   Do you have any other professional clients,
20 such as accountants, doctors, lawyers? Any other
21 professionals?
22     A.   Sure.
23     Q.   About how many of those?
24     A.   I have no idea. I know the Long Law Firm is
25 a client.

---

11

1      Q.   Are we talking tens? A hundred?
2      A.   I don't know. I'd have to go through and
3  have a run done. I know we're actually in the process
4  of writing Jack Whitehead as a professional.
5      Q.   The first line of questioning about the
6  vicarious liability, isn't that ultimately what
7  this -- what the additional insured issue boils down
8  to in this case, is whether had TBE been named on the
9  Catlin or some other PL policy, it would have provided
10 coverage for TBE's own active negligence?
11     A.   Yeah. It would have provided coverage for
12 allegations against TBE related to SJB's work.
13     Q.   But would it have -- but isn't ultimately
14 the issue whether, in all likelihood, if such coverage
15 had been obtained, it would have covered TBE's own
16 active negligence?
17     A.   Well, that remains to be seen. It depends
18 on the form that would have been provided.
19     Q.   All of the carriers are going to have
20 different forms and different policy terms, different
21 provisions; is that right?
22     A.   Correct.
23     Q.   But simply because there may have been a
24 technical breach of the failure to have obtained some
25 type of coverage or endorsement, that doesn't end the

---

12

1  inquiry, does it?
2      A.   No.
3      Q.   Okay. And the next step is, okay, had that
4  coverage been obtained, would it have provided
5  coverage to the additional insured for the claims in
6  this lawsuit?
7      A.   Correct. I mean, at a minimum, it would
8  have covered claims arising out of SJB's work.
9      Q.   Okay. I know that you list in the documents
10 that you've reviewed or relied upon the complaint and
11 the amended complaint on behalf of SJB and Catlin
12 against TBE; is that right?
13     A.   Correct.
14     Q.   And are you aware that the claims by SJB and
15 Catlin relate to an alleged TBE's own, independent
16 negligence?
17     A.   Yeah. As I recall, it was oversight of
18 SJB's work, which would be the types of things covered
19 by the minimal additional insured coverage. So I don't
20 think there's anything broader than that, as I recall
21 in the complaint, but you can correct me if I'm wrong.
22     Q.   Well, that oversight coverage that you say
23 would be included in the AI endorsement, are you
24 referring to an endorsement or endorsements on a
25 professional liability policy?

---

3 (Pages 9 to 12)

**Louis George Fey, Jr.**
**May 17, 2013**

---

### 13

1  A. Correct.
2  Q. And can you give me an example of a carrier
3  or a form for AI on the PL side that covers the
4  oversight work?
5  A. Can I see the attachments on my --
6  Q. Certainly.
7  A. Okay.
8  MR. NADEAU: Let's attach this as
9  Exhibit 1 to the deposition. This is a
10  copy of what I believe to be your report
11  along with the attachments.
12  (Exhibit 1 was marked for identification.)
13  BY MR. NADEAU:
14  Q. Can you just confirm that is what it is.
15  A. Yes, this is it. This is my report.
16  Q. Attached to the report is a draft copy of a
17  Catlin policy. I believe it is form EGEO 050 0610.
18  Is that the first attachment?
19  A. Correct.
20  Q. Then I believe behind that there are several
21  endorsement forms; is that right?
22  A. Correct.
23  Q. Just take a second and look through those.
24  If you come across an example where it covers that
25  oversight liability that you mentioned, point that out

---

### 14

1  to me, please.
2  A. Okay. This would be a broad form if this
3  endorsement was used because it basically makes them
4  an insured under the policy; so therefore, any
5  professional acts on their part would be covered,
6  whether it be their sole negligence or concurrent or
7  vicarious.
8  Q. Okay. Let me stop you so we can identify
9  that for the record, and I have a couple of questions
10  for you before we move on. In your report, you refer
11  to a Catlin AI endorsement on a professional liability
12  policy; is that correct?
13  A. Correct.
14  Q. Is this what we're looking at? It is form
15  EGMP 405 0910.
16  A. Correct.
17  Q. Is that the form that you were referring to
18  as the Catlin AI endorsement?
19  A. It's one of them, yes.
20  Q. Okay. The form we were just looking at, the
21  EGMP 405 0910 --
22  A. Yes.
23  Q. -- do you know what the "EGMP" stands for?
24  A. It's a Catlin form number. If I had to
25  guess, I would say "Engineering" -- I'm not sure what

---

### 15

1  the rest of it is, but it applies to professional
2  liability coverage forms.
3  Q. But you don't know what the "EG" in that
4  "EGMP" stands for, correct?
5  A. No. ISO uses "CG" or "PL" on their forms.
6  And if a carrier writes their own manuscript forms,
7  they have their own little codes that they use on
8  their forms.
9  Q. Take a look at -- I'm going to hand you a
10  copy of the 2010 -- this is a copy of the Catlin
11  2010-2011 policy that is the subject of this
12  litigation. I'll ask you first to confirm that that
13  is correct.
14  A. That's correct.
15  Q. If you turn to the policy itself, form
16  number DPAE 050 0908 -- again, it's page 1 of 11, and
17  tell me when you're there.
18  A. Yeah, I'm there.
19  Q. Do you know what the "DPAE" in that form
20  stands for?
21  A. "Design professional."
22  Q. Do you know what the "AE" stands for?
23  A. Probably "architects and engineers," if I
24  had to guess.
25  Q. Back to the endorsement, EGMP, have you ever

---

### 16

1  obtained from Catlin a copy of this -- not a copy.
2  Have you ever obtained this endorsement form for
3  additional insured coverage on behalf of any of your
4  clients?
5  A. I know it was in a proposal for an
6  engineering firm.
7  Q. And what engineering firm was that?
8  A. I don't recall the name.
9  Q. A proposal form from who?
10  A. From a broker that writes business for
11  Catlin. I can't remember the name of the broker. I
12  remember the engineer was doing work in plants,
13  refineries, that kind of thing. They were doing
14  engineering work.
15  Q. In your experience in the insurance
16  industry, are engineers who work in refineries treated
17  differently, from an underwriting standpoint, as to
18  your typical architects, engineers and surveyors who
19  are doing roadway and other commercial construction
20  work?
21  A. Well, obviously, the scope of the
22  professional services that they provide vary. So if
23  you're doing design work, you know, there are issues
24  involved with the design part of it. If you're doing
25  engineering and surveying, it's more of an engineering

---

4 (Pages 13 to 16)

**Louis George Fey, Jr.**
**May 17, 2013**

17

1  role. So, yes, there are differences.
2      Q. So those engineers who are working, for
3  example, on an oil and gas pipeline or for some
4  refinery are typically treated by most insurance
5  carriers differently than your typical architect and
6  engineer who are doing commercial or residential non
7  oil and gas, let's say, related work?
8      A. Sure. But the purpose of these endorsements
9  being attached are to show that there are ways to add
10 additional insureds to professional policies. I'm not
11 saying that this form would be compatible with the DP
12 form that Catlin used. I'm just saying the coverage
13 is available out there for the work that was being
14 done.
15     Q. I'm sorry. I was thinking about the next
16 question rather than listening to your answer. You
17 said that this coverage form, EGMP 405 0910, might not
18 necessarily be the form that Catlin would have used if
19 TBE had been named as an additional insured; is that
20 correct?
21     A. Yeah. I mean, Catlin has all kinds of
22 options on how they would do it if they were going to
23 add the coverage. They could do a manuscript form.
24 They have other endorsements like the one that's in
25 the policy where they added additional insureds.

18

1  These endorsements I attached in my report are
2  examples of how it can be done. In fact, let me find
3  the endorsement in the policy here.
4      Q. You're looking at the 2010-2011 policy,
5  correct?
6      A. Correct. It's DPAE 449 0210. It's an
7  endorsement where they can list additional insureds.
8  It says, "It is understood and agreed that the
9  following entities are included as additional insureds
10 but solely as respects to liability arising out of
11 professional services." So had they used this form
12 and added TBE on theirs in additional insureds, then
13 there would have been coverage for the allegations in
14 the complaint.
15     Q. And what is the basis of -- what is your
16 basis of that statement?
17     A. This is -- this adds -- anybody listed on
18 this form is added as an additional insured on the
19 policy; therefore, they're covered for their
20 professional services.
21     Q. Well, "professional services" is defined in
22 the policy, is it not?
23     A. Correct.
24     Q. And isn't it defined as professional
25 services by the named insured?

19

1      A. No. It says, "arising out of professional
2  services" on this endorsement.
3      Q. Correct. And we're looking at DPAE 449
4  0210.
5      A. Correct.
6      Q. But the term "professional services" in this
7  form is boldfaced, correct?
8      A. Correct.
9      Q. And those boldfaced terms are defined
10 specifically within the policy; is that right?
11     A. Correct.
12     Q. And do you know whether professional
13 services is defined as services by the insured?
14     A. Correct.
15     Q. Okay.
16     A. Additional insured becomes an insured once
17 they're added as an additional insured. It's not a
18 named insured. It's an insured.
19     Q. Okay. Back to the EGMP 405 0910 --
20     A. Okay.
21     Q. -- endorsement. You recall one time where
22 this was in a proposal but y'all did not end up going
23 with Catlin or using this form; is that correct?
24     A. That was in a proposal Catlin provided
25 through the broker to us. I can't remember if the

20

1  policy was actually issued or not. I just kept a copy
2  of it. I like to keep all of the endorsements that I
3  get my hands on because these issues come up all of
4  the time.
5      Q. Back to the policy at issue in this case,
6  the DPAE 050 0908. Have you ever obtained insurance
7  through Catlin for an architect or an engineer client
8  using this policy form?
9      A. I can't say for sure if we've placed it with
10 this particular form or not. I mean, I know we have a
11 lot of professional clients with Catlin.
12     Q. You do?
13     A. Sure.
14     Q. Have you ever used the DPAE 449 0210 form to
15 obtain additional insured status under a Catlin policy
16 for a client?
17     A. I can't say.
18     Q. Back to the EGMP 405 0910 endorsement.
19 Isn't it also fair to say that engineers working in
20 oil and gas refineries and pipelines are typically
21 subject to much more onerous contractual and
22 insurance requirements than typical architects and
23 engineers and surveyors working in the commercial and
24 residential non oil and gas world?
25     A. Well, it runs the gamut. Non refinery

5  (Pages 17 to 20)

**Louis George Fey, Jr.**
**May 17, 2013**

21

1  construction work, certain GCs and developers are very
2  stringent on their requirements, and others are not.
3  By and large, they're not as on top of it as
4  refineries are.  Refineries have a risk management
5  department, and they're very hardcore when it comes to
6  requiring certain coverages.
7      Q.  And in light of that, isn't it true that a
8  lot of carriers who write that kind of risk have
9  special policies and special endorsement forms
10  specifically for engineers working in the oil and gas
11  and other environmental contexts?
12      A.  Yeah, some do, and some don't.  Some use a
13  professional form for all lines, engineers, design
14  engineers, architects.  Other ones have specific forms
15  for each specialized type of operation.
16      Q.  Let's look at your report.  You've used the
17  term -- and I'm looking at page 1 of your May 7, 2013,
18  report.  You've used the term "manuscript" policy
19  already or "manuscripts" in your testimony.  Could you
20  define that term for the record?
21      A.  Yeah.  "Manuscript" can mean a couple of
22  different things.  By and large, a manuscript policy
23  is a policy written by an insurance carrier rather
24  than a policy written by the industry.  Like Insurance
25  Service Office puts out industry forms, and a lot of

22

1  carriers subscribe to that and use their forms.
2  Individual carriers might decide to write their own
3  forms, and so you refer to those as manuscript
4  policies.
5          There's also another use of the phrase,
6  "manuscript policies," where they -- an underwriter
7  will actually write a particular endorsement for a
8  particular policy.  So, for example, what we're
9  talking about here, they can manuscript an endorsement
10  other than the ones that the company already has to
11  provide certain coverages for their client that are
12  required and negotiated by the underwriter.  So in
13  this case, if for some reason they couldn't use the
14  forms that we've talked about, they can say, "TBE is
15  an additional insured on the policy in exchange -- in
16  consideration of additional premium or whatever," and
17  then draft it however they want to.  It's something
18  that can be done on a case-by-case basis.
19      Q.  Do you know whether Catlin or any other
20  professional liability carriers do those type of
21  special manuscripts for the additional insured
22  endorsement that you just described on a regular
23  basis?
24      A.  I mean, they have the standard forms that
25  they've manuscripted, and I think they tend to use

23

1  those, but I'm not saying it couldn't be done.
2      Q.  You say that you have experience in policy
3  drafting as to manuscript policies; is that right?
4      A.  Correct.
5      Q.  Any experience drafting manuscript policies
6  or endorsements relating to professional liability
7  policies?
8      A.  No.
9      Q.  Do you have any experience, PL or otherwise,
10  drafting standard, non manuscript policies?
11      A.  Well, if I'm involved in drafting an
12  endorsement for one of the carriers I worked for, that
13  would be a manuscript endorsement by the carrier in
14  the broader sense like I talked about.  So, yeah, I
15  was involved in writing Travelers' additional insured
16  endorsements that are used to this day in the
17  construction division.  In fact, the way those are set
18  up was my idea.
19      Q.  And that was for whom?
20      A.  For Travelers.
21      Q.  For Travelers.  But no experience drafting
22  manuscript policies or endorsements for PL coverage;
23  is that right?
24      A.  Not professional liability, no.  I did some
25  endorsements for -- I did probably the industry's

24

1  first synthetic stucco endorsement.  A few others.
2      Q.  The Travelers' AI endorsement that you
3  mentioned, is that one of the endorsements that you've
4  included in your report?
5      A.  No.  I don't think there's a Travelers'
6  endorsement in here.
7      Q.  I don't think there was either.  I just
8  wanted to make sure.
9      A.  Yeah, I mean, I didn't do a big search for
10  them.  I just grabbed the ones that I had handy and
11  attached them as examples.  I'm on Travelers' Agency
12  Services Advisory Council and AIG's Claims Advisory
13  Council, so I could get forms from them if I needed
14  them, but I felt that I had enough.
15      Q.  You say that's Travelers and AIG?
16      A.  Correct.
17      Q.  Do you know whether Travelers or AIG will
18  typically allow AI endorsements on their professional
19  liability policies?
20      A.  Yeah, you can get additional insureds added.
21      Q.  For both Travelers and AIG?
22      A.  Yes.
23      Q.  Are there any restrictions as to who can get
24  added or that -- can you get a blanket AI if it's
25  required by contract?

6  (Pages 21 to 24)

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

**Louis George Fey, Jr.**
**May 17, 2013**

25

1    A.   Well, a blanket is going to be tougher to
2  get on professional.  It's usually on a case-by-case
3  basis.  But if you show the contractor has the
4  requirement -- the way it works is the professional
5  gets a contract for a project, and there's a
6  requirement for additional insureds coverage.  My
7  advice to the client, first, would be to try to get it
8  taken out of the contract because it's kind of frowned
9  on to add additional insureds on a professional
10  policy.  But in the event that you can't get it
11  stricken from the contract, then we can get it done.
12  We can talk to the underwriter and say, there's got
13  this project and they're requiring additional insureds
14  coverage, and we need to add them.  They'll say, well,
15  show me the contract, and then they'll typically add
16  them.
17    Q.   And have you done that for a client?
18    A.   Yeah.  We've done it numerous times.
19    Q.   For professional liability clients?
20    A.   Yes.
21    Q.   Architects and engineers?
22    A.   Yes.  We've done it -- I know we've done it
23  on professionals doing road jobs.  I can recall at
24  least one instance.
25    Q.   What was that instance?

26

1    A.   I don't remember the details.  I want to say
2  it was a State project around Alexandria or something.
3    Q.   And do you recall who the engineer or the
4  architect was?
5    A.   No, I don't.
6    Q.   You said it was a State project.  Was DOTD
7  your client's client?
8    A.   No.  As I recall, the professional was
9  contracting with the GC in that situation.
10    Q.   Was it a design build?
11    A.   Well, the State usually designs their
12  projects, but for some reason there was some design
13  issues involved.  I can't remember exactly.  It may
14  have just been surveying-type work.  I don't really
15  remember the exact details of it.  I just kind of
16  remember, generally, having a discussion on a
17  conference call, on a speakerphone, talking about it.
18    Q.   Do you recall who the carrier was?
19    A.   No.
20    Q.   Do you recall what entity or entities were
21  ultimately named as AIs on your engineer client's
22  policy?
23    A.   Like I said, I don't remember the details of
24  it.
25    Q.   Do you remember whether it was the GC and/or

27

1  the GC's client?
2    A.   No.  Like I said, I don't recall.  I'm
3  pretty sure it wasn't the State requiring it.  I think
4  it was another entity involved in the project.
5    Q.   But it was ultimately a State project?
6    A.   Yeah.  That's about all I remember is that
7  it was a State project.
8    Q.   And do you remember approximately when that
9  was?
10    A.   A couple of years ago.  It's all kind of a
11  blur.  It could have been up to four or five years
12  ago, but I think it was in the last two or
13  three years.
14    Q.   Do you recall any other examples where you
15  obtained additional insured status for an architect or
16  engineer on a PL policy?
17    A.   Not specifics.  I know we do it.
18    Q.   Was this project --
19    A.   Like I said, the first attack on these
20  things is to see if we can get it stricken out of the
21  contract, explain why it's not normally done and that
22  kind of thing.  If you can get that accomplished, then
23  that kind of ends it.  But when push comes to shove,
24  the client either has the choice of walking away from
25  the project, taking the project and being in breach of

28

1  the contract, or getting the underwriter to provide
2  the coverage.  Another option is we could move the
3  account to another carrier.  So those are your four
4  options.
5    Q.   This State project you described for me, do
6  you think that was the last time that you've done
7  anything like this?
8    A.   I mean, this issue comes up fairly
9  regularly.  I'd say I probably run into it at least
10  quarterly.  I can't say how many of those have
11  resulted in the client being able to get it stricken
12  out of the contract.  I've had the discussion with
13  contractors that are hiring professionals, "Hey, you
14  don't have professional liability.  You could get
15  brought into an action because of hiring this
16  professional.  You don't have any professional
17  coverage, so if there's any allegations of design and
18  those kind of things against you, you're not going to
19  have any coverage.  So you have an option of getting
20  named as an additional insured on that professional's
21  policy or getting some professional coverage of your
22  own."  We have those discussions all of the time.
23    Q.   And in those instances where you were not
24  able to -- or the client was not able to negotiate the
25  requirement out of the contract and you had one of

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

Louis George Fey, Jr.
May 17, 2013

---

29

1    your A&E clients have another party named as an AI on
2    its professional liability policy, did you ever run
3    into any instances where their current carrier refused
4    to do it and you had to look to another carrier?
5       A.  I mean, I recall getting pushed back from
6    carriers on it, but I don't think we've ever run into
7    a situation where we ended up having to move the
8    account in order to get the coverage.  I think there's
9    usually been some accommodation.  The conversation is
10   typically, look, if it's a professional issue, it's
11   going to be the named insured's problem anyway.  I
12   mean, they are the ones doing the professional work,
13   so they're the ones that have the exposure, and it
14   should probably rightly go under their policy, because
15   generally, the higher tier is not going to be doing
16   any professional type work.  In this case, we have two
17   professional operations, so it's a little different
18   from that perspective.
19      Q.  I know you didn't remember the name of the
20   carrier who ultimately provided the AI endorsement on
21   that State project you mentioned.  But as we sit here
22   today, do you recall the names of any carriers that
23   you've been able to have an AI endorsement added to
24   one of your architect or engineer PL client's
25   policies?

---

30

1       A.  I'd be guessing.  A lot of professional
2    stuff is placed through brokers.  There's like a third
3    party involved there, so we would negotiate with the
4    broker who, in turn, will negotiate with the carrier.
5       Q.  So are some of those --
6       A.  We have Ironshore -- we do a lot of
7    professional placement with Ironshore through brokers.
8    Lexington is either through a broker or direct, but a
9    lot of times it's through brokers.  It just depends.
10      Q.  Who are some of the brokers y'all work with
11   on the PL side?
12      A.  I think -- I want to say it's CRC, Brian
13   Lawry.
14      Q.  Is Brian Lawry on his own, or is he with
15   CRC?
16      A.  I think he's with CRC.  I wouldn't swear to
17   that.  I'm horrible with names.
18      Q.  Any other names on the PL side that you can
19   remember?
20      A.  No, not off the top of my head.  I'm a
21   resource for the agency.  The producers start the
22   process, and then I get involved when there's an
23   issue, such as this, and that's when I get brought
24   into it.  I'm kind of bad about not identifying who
25   I'm talking to on the phone and that kind of thing.  I

---

31

1    just kind of get involved.  That's why I am a little
2    vague on who exactly we're dealing with.
3       Q.  I understand.  Are you a member of PLAN?
4       A.  The agency?
5       Q.  Do you know what PLAN is?
6       A.  I mean, is our agency a member?
7       Q.  Well, are you familiar with PLAN?  Do you
8    know what it is?
9       A.  I don't think so.
10      Q.  It's the Professional Liability Agents
11   Network.  Have you ever heard of it?
12      A.  I don't know if we're a member of it or not.
13   I mean, Bancorpsouth Insurance is one of 24 of the
14   largest brokerages in the United States, so it
15   wouldn't surprise me if we're a member, though, but
16   we're a member of a lot of stuff.
17      Q.  But you personally are not a member of PLAN?
18      A.  Not me, no.
19      Q.  The CPCU designation that you obtained, you
20   talk about, in your report, the core studies.  Did any
21   of that relate specifically to professional liability
22   lines?
23      A.  I don't think so.  It's more general stuff,
24   like claims, underwriting, operations, finance,
25   accounting.  That kind of thing.

---

32

1       Q.  If you look at page 4 of your report, you
2    state that you have over 30 years of practical
3    experience.  I'm not going to read the entire
4    paragraph, but the second sentence says, "I have also
5    spent those years instructing and training insurance
6    company, and insurance agency personnel, as well as
7    reviewing, auditing, and both conducting, and
8    supervising, multi-line claim investigations and
9    operations."  The multi-line claim investigations and
10   operations, have they involved any professional
11   liability claims?
12      A.  Sure.
13      Q.  Against architects and engineers?
14      A.  Correct.
15      Q.  Do you know about how many?
16      A.  I mean, it was always an issue.  I helped
17   set up Travelers' Construction Division, and I
18   basically went around and trained adjustors how to
19   handle construction claims, how to interpret the
20   contracts, how to make the proper tenders, various
21   defenses, like waiver subrogation, statutory employer,
22   all that kind of stuff.  Construction claims almost
23   invariably involve some kind of professional issue,
24   design --
25       (Telephonic interruption.)

---

Baton Rouge Court Reporters, LLC
225-292-8686

**Louis George Fey, Jr.**
**May 17, 2013**

33

1    MR. NADEAU:  Off the record.
2        (Break taken.)
3    MR. NADEAU:  Back on the record.
4    Off the record, Mr. McCabe and I
5    were having a discussion, and there will
6    be the standard stipulations for the
7    deposition.
8    BY MR. NADEAU:
9    Q.  Please continue.
10    A.  Almost invariably there's some kind of
11    design issue when you're dealing with construction
12    claims.
13    Q.  Is your role typically assessing that as
14    part of the overall claim, or do you work specifically
15    with the architects and engineers who are being sued?
16    A.  Typically, our insured was not the architect
17    and engineer.  Our insured was, by and large, the
18    general contractor, or the GC, or possibly the project
19    owners, so we would be looking at where the problem
20    came from, basically the approximate cause of the
21    situation.  If it was a design issue, then we would be
22    looking to the design professional to step up to the
23    plate and take care of the problem.  So there's
24    tenders through professionals all of the time.  And,
25    in turn, there's tenders from professionals to our

34

1    clients.  So we were dealing with professional
2    policies all of the time.
3    Q.  But typically your clients were general
4    contractors or --
5    A.  The Construction Division didn't write
6    professional; that's a different section of Travelers.
7    Travelers does write professional, but, in those
8    cases, we're typically the GC.  I mean, by and large
9    we're the GC, or subcontractor, or developer, or some
10    other entity involved.
11    Q.  Travelers had a professional liability
12    division; is that correct?  Is that what you said?
13    A.  Yeah, it's a different section.
14    Q.  Did they have a section related solely to
15    architects and engineers?
16    A.  It's such a big company.  I actually have a
17    contact there.  When I need to find someone at
18    Travelers, I actually call him, and he points me in
19    the right direction.
20    Q.  But when you were at Travelers, you were not
21    working in that professional liability section?
22    A.  No.
23    Q.  I think that answers my next question.  But
24    if you look at the first sentence on the second
25    paragraph of page 4 of your report.  You state, "As it

35

1    relates to this case, I helped establish, mentor, and
2    train the Travelers Construction Claim Division with
3    an emphasis on the analysis of construction
4    agreements."  Am I correct that that construction
5    claim division would have been the contractor and not
6    included design professionals?  Is that right?
7    A.  Correct.  But many times our contractors
8    would have contracts with design professionals, so we
9    would be making the tenders under the AI coverage and
10    contractual indemnity provisions.
11    Q.  But the design professionals were not your
12    clients?
13    A.  No, not at Travelers.
14    Q.  So again, when you refer to construction
15    agreements, I take it that that would typically
16    involve your contractor's contract with his client,
17    but then you'd also have to analyze the design
18    agreements because of the various issues in any
19    particular case?
20    A.  Yeah.  Construction projects are set up in
21    all kind of different fashions.  We could be the
22    owner, we could be the general contractor, we could be
23    a subcontractor.  Sometimes the owners will contract
24    directly with professionals.  Sometimes the
25    contractors will contract directly with the

36

1    professionals.  So there's different versions of the
2    setup and scenarios.
3    Q.  But that was typically dealing with
4    clients -- well, let me ask a better question.
5    Your clients, the owners and contractors
6    and others that you mentioned in the Travelers
7    Construction Claim Division, am I correct that your
8    client's policies and issues would typically be CGL
9    policies?
10    A.  Well, we would have the CGL policy, and then
11    the professionals would have their PL.  Most of the
12    time our general contractors weren't insured for
13    professional liability, so we would have to make sure
14    that the design professional is brought in on those
15    issues.  And then as often as possible, we tender
16    under both AI and contractual to get them covered and
17    try to get the professional liability carrier to come
18    in and defend the case or at least split costs on
19    defense.
20    Q.  A little further down, about halfway down in
21    that same paragraph, you state that you were a member
22    of the committee that drafted Travelers' additional
23    insured endorsements used in its construction related
24    insurance policy."  That is the AI endorsement that
25    you testified about earlier; is that correct?

**Louis George Fey, Jr.**
**May 17, 2013**

---

37

1  A.  Correct.
2  Q.  Am I correct that that endorsement was for
3  CGL policies at Travelers?
4  A.  Yeah.  There are a number of them, but, yes.
5  There's a whole series of them.
6  Q.  That AI endorsement that you assisted in
7  drafting, am I correct that Travelers did not use it
8  in its professional liability section, or do you know?
9  A.  I don't know.  They may be using it.
10  Q.  And you were at Travelers from 2000 to 2007,
11  right?
12  A.  Correct.
13  Q.  Right now I'll limit my questions to that
14  time frame.  At that time, 2000 to 2007, while you
15  were there in the construction claim division, do you
16  know whether the Travelers' professional liability
17  section had any additional insured endorsement that
18  they used on architect and engineer PL policies?
19  A.  That Travelers used?
20  Q.  Right.
21  A.  I don't know.  I mean, I know that it was
22  more common back then to find additional insureds on
23  PL policies than it is today; I can say that.
24  Q.  And why is that?
25  A.  When I was at Travelers, we were pretty much

---

38

1  the pioneers of tendering additional insured status to
2  carriers.  It hadn't been fully vetted in the
3  industry.  We were getting with our contractors and
4  insureds, and we were making sure they had the right
5  contractual risk transfer mechanisms in their
6  contract, which including AI.  And the industry just
7  hadn't encountered a big problem with additional
8  insured coverage and hadn't recognized the exposure
9  that potentially was there, so people were adding
10  additional insureds a lot freely -- a lot more freely
11  back then than they do today.  Now because of some
12  claims that have developed and -- there's tenders in
13  almost every single construction case.  A lot of
14  carriers have become more aware of it, so they have
15  restricted how they write AIs and how often they
16  provide that.  You can still get blanket additional
17  insureds on general liability policies.  And to some
18  extent you can get it on Professional policies, but
19  it's getting to be more uncommon; there's more premium
20  charged for it.
21  Q.  I want to make sure I understand you.
22  Travelers was kind of a pioneer in tendering claims
23  based on additional insured status; is that what you
24  said?
25  A.  Yeah.  Making sure we made tenders in every

---

39

1  single case, making sure our insureds had the proper
2  contractual risk transfer mechanism in their
3  contracts.  Back when I started at Travelers, it was
4  not uncommon to pick up a GCs contract with a
5  subcontractor and find no additional insured
6  requirement.  If it was, it wasn't -- I came up with
7  the verbiage of, you know, we require additional
8  insured status on a primary noncontributory basis
9  using form CG 2010 1185, that kind of thing.  We
10  started getting our clients to put those in our
11  contracts, which worked great for a number of years
12  until our clients would leave and go with other
13  carriers, and then we would get presented with our own
14  contractual language back at us.
15  Q.  That time frame when you were there, 2000 to
16  2007, do you know whether the Travelers' professional
17  liability section had any policy one way or another as
18  to whether additional insured status on architect and
19  engineer PL policies was typically allowed?
20  A.  Specifically with Travelers, no.  But I
21  saw -- I've seen AI coverage on professional policies
22  going back even before that.
23  Q.  Are you familiar with a risk management
24  publication that Travelers provides for its architect
25  and engineer clients?

---

40

1  A.  They put out all kinds of things.  I would
2  assume that they recommend not providing the AI
3  coverage.
4  Q.  Have you ever heard of "Signed, Sealed and
5  Delivered"?
6  A.  I don't think so.  I mean, I get buried with
7  industry writings from different carriers and
8  publications.  I subscribe to "IRMI," so I get
9  constant updates.  I'm forever reading.  I probably
10  spend the first two hours of every workday reading
11  articles in the profession.  That's why I attached
12  this Power Point on this seminar on adding additional
13  insureds to professional policies.  It was something
14  that I just attended and -- you know, just to kind of
15  add a little backdrop to the whole issue.
16  Q.  And I've got some questions about that, and
17  we'll get to it in a minute.  I'm going to hand you a
18  copy of a publication by St. Paul Travelers.  The
19  title is "Stamped, Sealed & Delivered, A Risk
20  Management Publication for Architects and Engineers."
21  MR. McCABE:  Do you have another
22  copy of that?
23  MR. NADEAU:  I don't.  We can take a
24  break and I can make a copy.
25  MR. McCABE:  Are you going to be

---

**Louis George Fey, Jr.**
**May 17, 2013**

---

41

1    using many other documents that I don't
2    have?
3         MR. NADEAU:  Not a lot.  We're not
4    going to spend a lot of time on this
5    document.  Let's go through this real
6    quick.  When we break, I'll make sure
7    that Nicole makes copies of everything
8    else.
9         MR. McCABE:  Okay.
10   BY MR. NADEAU:
11        Q.  In 2005, you were with Travelers at that
12   time; is that right?
13        A.  Correct.
14        Q.  Does this jog your memory at all as to
15   whether you've seen the "Stamped, Sealed & Delivered"
16   publication?
17        A.  No.  I mean, I have access to Travelers'
18   risk management website.  They've got a library in
19   there just chock-full of things.  You can spend your
20   whole life and never read everything that's in there.
21   No, I haven't seen this.
22        Q.  Okay.  If you look at page 4, towards the
23   bottom of the page there's a section that says,
24   "Nevada Reaffirms Insurable Indemnity Agreements."
25   Tell me when you get there.

---

42

1        A.  (No audible response.)
2        Q.  Did you find that section?
3        A.  Yes.  I'm just reading it.
4        Q.  It basically is giving a legislative update.
5    Apparently, Nevada had recently passed a bill
6    governing contracts between public entities and design
7    professionals.  Do you see that?
8        A.  Yes.
9        Q.  In the second paragraph, it states, "One of
10   the amendments clarified that a design professional
11   need not name the governmental agency as an additional
12   named insured where the applicable insurance policy
13   does not allow such an addition."  It goes on to
14   state, "This amendment reaffirms the insurance
15   industry's current position with respect to a design
16   firm's professional liability policy, wherein
17   additional insured endorsements are prohibited."  My
18   question is, whether or not you agree with that second
19   sentence, that at the time of this publication, the
20   fourth quarter of 2005, it was the insurance
21   industry's -- and not apparently just Travelers -- but
22   the insurance industry's position that additional
23   insured endorsements were prohibited on design firms'
24   PL policies?
25        A.  No, I don't agree with that.

---

43

1        Q.  Do you not agree with that?
2        A.  I think they might be talking about the
3    insurance industry in Nevada, but it's not
4    industry-wide.  That's clearly wrong.
5        Q.  Do you know whether that -- does this jog
6    your memory at all as to whether it was Travelers'
7    position at the time that AI endorsements were
8    prohibited on its design professional liability
9    policies?
10        A.  What was the question?  I'm sorry.
11        Q.  Does reading this jog your memory at all as
12   to my earlier question when I asked you whether at
13   this time, around 2005 or when you worked for
14   Travelers, that it was Travelers' position that
15   additional insured endorsements on professional design
16   firm professional liability policies were prohibited?
17        A.  No.  I mean, that's not true, because -- I
18   mean, there are any number of claims that we were
19   tendering to professionals that were doing design
20   work.  For example, the design of the maintenance of
21   traffic for highway projects, we were constantly
22   tendering AI as an AI to the professional carriers on
23   that.  That was a design activity, and it was covered
24   under professional liability.  I mean, almost every
25   highway accident where there was a construction zone,

---

44

1    maintenance of traffic, that's what we would get into,
2    so that's just not correct.
3        Q.  The tenders that you just described, were
4    those to Travelers' insureds under professional
5    liability policies?
6        A.  We didn't pick and choose.  Whoever the
7    carrier was for the professional that did the MOT, we
8    would make the tender.
9        Q.  I asked you earlier, and I can't recall, but
10   I thought you said that you didn't know or you didn't
11   remember, but do you know whether or not around this
12   time, 2005, and even 2000 to 2007, when you were with
13   Travelers, it was Travelers' position that additional
14   insured endorsements would be prohibited on design --
15   on its design firm PL policies?
16        A.  Like I said, I didn't have any involvement
17   with Travelers' professional liability, but I know for
18   a fact that professional liability carriers will name
19   other entities as additional insureds on their
20   policies.  In fact, when I talked to the bar
21   association a month ago when we had Jason -- I can't
22   remember his last name -- I guess he's with Alexander
23   Agency.  He confirmed that when we were sitting there
24   talking about naming people on professional policies.
25   He said -- first he said that they don't do it.  Then

---

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

**45**

1  when I brought up the issue, he said, "Well, yeah, we
2  can get it done." So he acknowledged that.
3  **Q. But my specific question was whether you**
4  **know at this time, 2000 to 2007, specific to**
5  **Travelers, was Travelers allowing AI endorsements on**
6  **its design firm PL policies?**
7  A. Yeah, I think I answered it. I didn't have
8  any involvement in the PL department at Travelers.
9  **Q. So you don't know?**
10  A. I don't know.
11  **Q. Okay.**
12  MR. NADEAU: Let's take a quick
13  break. I'll get some copies of these
14  things made.
15  (Break taken.)
16  MR. NADEAU: Back on the record.
17  BY MR. NADEAU:
18  **Q. Mr. Fey, before we broke, we were looking at**
19  **this Risk Management Publication, the fourth quarter**
20  **of 2005 by St. Paul Travelers, specifically the**
21  **statement on page 4 about the industry's then current**
22  **position prohibiting additional insured endorsements**
23  **on a design firm's professional liability policy. I**
24  **take it that you disagree with that statement, right?**
25  A. Yeah. I had a chance to think about it

**46**

1  during the break. A lot of jurisdictions have
2  implemented anti-indemnity statutes that prevent
3  insuring other parties under your policy, including
4  Louisiana, effective June of last year, 2012.
5  So what that might be referring to is in
6  Nevada, that you're not allowed to add somebody as an
7  additional insured. You can still add them for
8  vicarious liabilities, but you can't add them for
9  their act of negligence. For Louisiana, in contracts
10  prior to June of last year, you can still do that.
11  **Q. This particular statement perhaps relating**
12  **to some anti-indemnity statute in Nevada, I believe is**
13  **pretty correct, but that statement, "This amendment**
14  **reaffirms the industry's current position with respect**
15  **to a design firm's professional liability policy**
16  **wherein additional insured endorsements are**
17  **prohibited," that does not seem to be limited to --**
18  A. Well, I know for a fact that that comment is
19  wrong. Now, they might have meant that the insurance
20  industry in Nevada -- but, I mean, I know for a fact
21  that is wrong as far as the rest of the industry is
22  concerned. Like I was talking about, it was not
23  uncommon at all to tender to a design firm under
24  additional coverage that were doing MOTs on
25  construction zones.

**47**

1  **Q. On behalf of general contractors, owners, or**
2  **who?**
3  A. Sure. All -- all of the above. Developers,
4  owners, GCs. In a typical road project, you're going
5  to have a -- large road projects, you're going to
6  have a design professional come in and design the
7  maintenance of traffic, MOT. They'll come out and
8  they'll implement it, and they'll put the signs in
9  place. So you've got a GL exposure from the actual
10  implementation standpoint, and you've got a design
11  exposure from the way it was designed. A lot of the
12  major accidents -- and I got -- I was complex case
13  director, so I would get involved in cases in excess
14  of a million dollars. A lot of those cases, where you
15  have fiery crashes and pileups, that kind of thing,
16  there would be all kinds of allegations about design
17  defects in the MOT. We would make tenders on behalf
18  of our GC, owner, developer, on behalf of the state --
19  in certain states, not Louisiana, because they don't
20  require additional insureds in Louisiana. But we
21  would make tenders to these design professionals as
22  both AIs and under the contractual indemnity
23  provisions.
24  **Q. Were those tenders based on actual AI**
25  **endorsements that had named your clients, or were they**

**48**

1  **based on the contractual requirements regardless of**
2  **whether they were actually satisfied?**
3  A. Both. You'd run into situations where the
4  professional didn't comply with the contractual
5  requirements and were not named as an additional
6  insured. You would also run into a situation where
7  they were named as additional insureds and bring their
8  professional carrier in. So it was both.
9  **Q. In those situation that you've just**
10  **described, the general contractor and owner scenarios,**
11  **those are both true vicarious liability instances with**
12  **respect to the design professional's work; is that**
13  **right?**
14  A. Not necessarily because there would always
15  be allegations of improper oversight, and that kind of
16  thing. So vicarious is -- their actions are -- you
17  know, Mr. ABC Construction, we're suing you because
18  your design professional improperly designed the
19  thing; that's one allegation you might see. But then
20  also you'd see the allegations, Mr. ABC Contractor,
21  we're suing you because you didn't properly oversee
22  the work of your design professional. So that's not a
23  pure vicarious type of liability. The additional
24  insured coverage would provide coverage for that.
25  Now, for example, in Louisiana, with the

12 (Pages 45 to 48)

49

1  anti-indemnity statute, if you named somebody as an
2  additional insured, you're only getting vicarious
3  liability coverage. At the time of this loss, that
4  wasn't the way it was, but now that's the way it is.
5  In fact, I talked about it at the bar association
6  seminar. I'm recommending for operations that they
7  get OCP policies to take care of that oversight
8  responsibility and that type of exposure.
9      Q. Well, the crux of my last question was that
10 I'm assuming that, in those situations you described,
11 those general contractors and owners were not also
12 licensed professionals. Is that accurate, typically?
13     A. Typically, they're not, but they have the --
14 they still have the exposure. There's two ways of
15 addressing it. You either get a design policy on an
16 if-needed basis, or you get named as an additional
17 insured on your professional's policy.
18     Q. I'm jumping around here, and I jump around a
19 lot, and I apologize. I know that you have listed in
20 your report or your C.V. that you have access to West
21 Law or Lexus; is that right?
22     A. Correct.
23     Q. And you mentioned that at the time -- prior
24 to the implementation of Louisiana's anti-indemnity
25 statute, you said it's now under the statute, it's

50

1  only vicarious liability, but prior to that, it was
2  broader; is that right?
3      A. Correct.
4      Q. Have you ever seen a Louisiana reported case
5  dealing with an additional insured issue on a design
6  professional liability policy?
7      A. Can I name a case off the top of my head?
8  No.
9      Q. I'm not asking for the name of a case. Have
10 you ever seen one?
11     A. I don't know. I might have.
12     Q. There are countless cases dealing with
13 additional insured issues in the context of CGL
14 policies, correct?
15     A. Sure -- well, let me just say this: A good
16 risk manager is going to advise the professional not
17 to name somebody as an additional insured under the
18 policy because of the eroding limit, and there are
19 other issues. But, in general, they don't have access
20 coverage either, so they have only one million to work
21 with for defense and indemnification for the claim.
22 So the thought is not to allow that to happen. But
23 I'm not saying that's not the situation. That is the
24 situation. And that's exactly what I advise our
25 clients. However, if they have a contract that

51

1  requires a coverage and if they can't get it stricken
2  from the contract, then they can get that coverage
3  through the carriers, and that's all I'm saying.
4      Q. But am I correct, based on your earlier
5  testimony, that from the time you were at Travelers
6  from 2000 to 2007, you don't know whether the design
7  firms can get additional insured endorsements on their
8  PL policies from Travelers?
9      A. I don't know about Travelers, but they can
10 definitely get them.
11     Q. Sticking with that time frame, 2000 to 2007,
12 do you know through what professional liability
13 carriers that AI status could be obtained?
14     A. You mean particular names of particular
15 carriers?
16     Q. Yes.
17     A. No, I don't know.
18     Q. The earlier line of discussion about the
19 examples you were giving me where you did obtain AI
20 status -- an AI endorsement or coverage on the
21 professional liability policy of one of your architect
22 and engineer clients -- do you recall that?
23     A. Yeah.
24     Q. When you obtained that status with the
25 carrier, did you make any other modifications to the

52

1  policy, or did they just simply add the third party as
2  an AI?
3      A. They just added them as an AI. And I can't
4  say whether it was -- it was probably just the
5  standard, you know, arising out of their work or
6  professional services type deal.
7      The trick is only to comply with the
8  contractual requirements. So if it's requiring AI
9  coverage, you provide AI coverage. If it requires
10 broad form AI coverage, then you have to be able to
11 strike it or provide broad form AI coverage. If it
12 asks for primary noncontributory, then you have to
13 provide primary noncontributory. The trick is not to
14 give any more than what it asks for, but no less than
15 what it asks for either.
16     Q. I just want to make sure I understand your
17 last statements. You said several different
18 scenarios. I understood that it was the typical AI
19 coverage, which would be only vicarious; is that
20 right?
21     A. Well, it's a little broader. Arising out of
22 professional services.
23     Q. And then the second you said was the broad
24 form AI coverage; is that right?
25     A. Yeah. The examples we have here where it

13 (Pages 49 to 52)

**Louis George Fey, Jr.**
**May 17, 2013**

---

53

1  names them as an insured under the policy for the
2  insured's professional services, which -- once they're
3  an insured, then their professional services are
4  covered.  So anything that could be deemed a
5  professional service is covered, including the
6  vicarious liabilities of the named insured
7  professional.
8     Q.  So broad form coverage would be not only the
9  typical AI vicarious liability coverage but also
10 coverage for the additional insured's own negligence;
11 is that fair?
12    A.  Correct.  And this kind of goes back to
13 where the industry was when I started at Travelers and
14 we split off to the Construction Division.
15        And then under the CGL policies, the
16 standard state-of-the-art form that everybody used is
17 the CG 2010 1185.  And all that did, like some of
18 these endorsements we just looked at, was the
19 following person is the additional insured or, where
20 required by contract, the party is named -- is added
21 as an additional insured to the policy.  But it didn't
22 narrow the scope of that coverage at all.  So once
23 they were an insured, they were insured to the same
24 extent that really the named insured was with very few
25 exceptions.  So they would have broad form coverage

---

54

1  even for their own vicarious acts for that particular
2  project -- or not vicarious, but for their own acts
3  for that particular project.
4        So as the -- as time rolled on and the
5  carriers realized, hey, we're taking on a lot more
6  exposure than we might want to, they were trying to
7  narrow the scope of those additional insured
8  provisions, which is when we wrote the Travelers' AI
9  endorsements.  That's what our goal was.  We'll only
10 give as much as asked for in the contract, but no
11 more.  Depending on what the contract says will
12 trigger it a little broader, little broader, little
13 broader.  But if it doesn't ask for something
14 specifically, we're not going to give it.  Like, for
15 example, completed Ops coverage, if it doesn't ask for
16 it, we're not going to give it.
17        These professional AI forms that we're
18 looking at say, "The following entity is named as an
19 additional insured," and that's it.  So once they're
20 added as an additional insured or an insured under the
21 policy, they're covered for professional services,
22 period.
23    Q.  Okay.  I want to take you back to those
24 instances where you were able to obtain AI coverage
25 for one of your architect or engineer clients.  Was

---

55

1  that typically just the vicarious, or was it the broad
2  form AI coverage?
3     A.  We didn't want the broad form.  They're not
4  going to -- the AI provisions for professional
5  liability would not -- the way you ask for broad form
6  coverage in a contract is by using the phrase such as,
7  "As provided by CG 2010 1185," and that's a GL form;
8  it's a GL coverage.  There's no such similar
9  endorsement that you can name to explain that in a
10 contract.  For PL coverage, it usually just states
11 that you'll add them as an additional insured on a
12 primary noncontributory basis or something to that
13 effect, and then it goes to the form, what the form
14 says and what the scope of the coverage is.
15    Q.  My question is about those forms and the
16 scope of the coverage.  Was it typically just the
17 vicarious liability, or was it also the broader form
18 coverage?
19    A.  It's the broader form, but we didn't -- we
20 didn't care just as long as they were named as an
21 additional insured unless there was something strange
22 in the contract that broadened that.  But typically,
23 it's just going to say, "For professional liability,
24 you'll name us as an additional insured," and that's
25 all we wanted.  We didn't get involved in, well, this

---

56

1  is too broad, take it out or add these words, that
2  kind of thing.  We would just say that we need them
3  named as an additional insured, and then the carrier
4  would take whatever route they took to do that.  Like
5  I said, they could use manuscript form or any other
6  form they have to use at their disposal.
7     Q.  Do you recall whether the carriers who were
8  providing this coverage typically said, well, we'll
9  give you the AI status, but it's only going to be for
10 vicarious liability?
11    A.  No.  Usually they'll say one of two things.
12 Yeah, we'll do it; yeah, we'll do it, but there's
13 going to be an additional premium.
14    Q.  But that was for the broad form coverage?
15    A.  It's just adding them.  We didn't get into
16 discussions over broad or narrow.  It's just, add them
17 as an additional insured.  From my perspective, I
18 wouldn't think the underwriter would want to add them
19 for any more than they needed to.  But the general --
20 the general, basic additional insured coverage would
21 include vicarious acts and general supervision, things
22 arising from the work.
23    Q.  I want to show you a publication from
24 Travelers.  It says, "Stamped, Sealed & Delivered."
25 It says, "Travelers Offers Wide Array of Insurance

---

**Louis George Fey, Jr.**
**May 17, 2013**

57

1  Coverage For Design Professionals to Consider."  It
2  doesn't have a date on it.  If you look at the
3  copyright date on page 2, it appears to be published
4  in 2009 by the Travelers Company, Inc.  Do you see
5  that?
6      A.  Yes.
7      Q.  Take your time to read it, but my question
8  relates to the fourth paragraph.  About midway through
9  it says, "In addition, design firms are often required
10 to provide insurance for owners or contract clients as
11 additional insureds on the policy.  While Architects
12 and Engineers professional liability policies do not
13 provide this type of coverage, Travelers' General
14 Liability coverage provides Blanket Additional Insured
15 coverage to clients of the A&E firm when required by
16 contract or agreement (not limited to a written
17 contract)."  Have you ever seen this particular
18 publication before?
19     A.  No, but that's true.  I don't have any
20 problem with that.  General aggregates is a general
21 liability issue.  Professional policies used to have
22 one limit.
23     Q.  Well, the first part of those two sentences
24 states, "Design firms are often required to provide
25 insurance for owners or contract clients as additional

58

1  insureds on the policy."  The next sentence begins,
2  "While Architect and Engineers professional liability
3  policies do not provide this type of coverage."  My
4  question is, do you agree with the statement in this
5  Travelers publication that architects and engineers
6  professional liability policies do not provide
7  coverage for owners or contract clients as additional
8  insureds on the design firm's PL policy?
9      A.  Yeah, it's true.  You'd have to add them as
10 an additional insured.  General liability policies
11 have the blanket AI provisions on them.
12     Q.  Maybe we're interpreting this differently.
13 I'm interpreting those two sentences to mean that
14 architects and engineers professional liability
15 policies do not provide additional insured status for
16 owners or contractors on the design firm's policy; is
17 that not your interpretation?
18     A.  Right, not automatically.  Like I said, the
19 industry frowns on adding additional insureds to
20 professional liability policies, but it can be done.
21 What it says here is that our policy doesn't add
22 coverage for additional insureds where required by
23 contract; our GL policy does, "blanket additional
24 insured where required by contract," which is pretty
25 standard for GL policies covering contractors in any

59

1  kind of construction operations, owners, developers --
2  well, not so much owners, but developers and
3  contractors, project managers, all that kind of stuff.
4  So, yeah, I mean, there's nothing wrong with the way
5  this is written.
6      Q.  Back to the last one we were looking at, the
7  fourth quarter of 2005, is it fair to say that while
8  you disagree with that blanket statement that this
9  type of coverage is prohibited, is it fair to say that
10 the general rule is that it's prohibited but there are
11 some exceptions?
12         MR. McCABE:  Object to the form.
13         THE WITNESS:  No.  I mean, the
14     industry -- there's no edict out in the
15     industry that says that you're prohibited
16     from adding somebody as an additional
17     insured on your professional liability
18     coverage.  The way that was worded was
19     poor.  Travelers might have an
20     underwriting guideline telling them that
21     they won't do it, or it might be just
22     Nevada, or they might be referring to the
23     Nevada anti-indemnity statute that
24     prohibits that.  But the way they phrased
25     that in that article is wrong.

60

1          MR. McCABE:  Adrian, I don't believe
2      you've attached these as exhibits.
3          MR. NADEAU:  No.
4          MR. McCABE:  Are you going to?
5          MR. NADEAU:  Yes.  Let's go ahead
6      and do that.  We'll make the --
7          MR. McCABE:  2005.
8          MR. NADEAU:  We'll make the Fourth
9      Quarter 2005, "Stamped, Sealed and
10     Delivered" document as Exhibit No. 2.
11     And then we'll make the 2009 St. Paul
12     Travelers "Stamped, Sealed and Delivered"
13     document as Exhibit No. 3.
14 (Exhibits 2 and 3 were marked for identification.)
15 BY MR. NADEAU:
16     Q.  Let's look back at your report.  In the
17 second paragraph towards the bottom, the last sentence
18 says, "I assist clients with contract language related
19 to additional insured, various other contractual
20 issues, and in regard to coverage compliance resulting
21 from project contracts on a daily basis."  Am I
22 correct that that's in your role with Bancorpsouth
23 Insurance Services?
24     A.  Right.
25     Q.  And based on your earlier testimony, some of

15  (Pages 57 to 60)

**Louis George Fey, Jr.**
**May 17, 2013**

---

61

1    those clients include design firms; is that right?
2        A.   Correct.
3        Q.   The last paragraph of this page, it's the
4    second sentence, it says, "I have been involved in the
5    development and drafting of various other coverage
6    endorsements over the last 30 years for various
7    insurers."  I think I may have asked you this already,
8    but I just want to make sure.  That did not include
9    the drafting of any coverage endorsements for PL
10   policies; is that right?
11       A.   Yeah.  You did ask that.  Correct.
12       Q.   Sorry.
13       A.   That's all right.
14       Q.   In the next paragraph, you mention several
15   industry resources such as Sage, Silver Plume, FC&S,
16   West Law, and IRMI.  I have heard of the term "Sage,"
17   but I don't know what it is.  What is that?
18       A.   It's a -- I guess the best way to phrase it
19   is a gateway to different research databases.
20       Q.   Is it specific to the insurance industry, or
21   is it legal resources, or --
22       A.   I think it's insurance.
23       Q.   Insurance?
24       A.   Yeah.
25       Q.   What is Silver Plume?

---

62

1        A.   Same kind of deal.  You can access IRMI and
2    ISO and all of these other ones through there.
3    They're kind of gateways for research.
4        Q.   FC&S?
5        A.   Yeah.  It's a company -- an industry group
6    out of Cincinnati, Ohio.  And they do dissertations on
7    different -- well, they do a lot of things.  They do
8    rates and regulations and that kind of stuff, but they
9    also do dissertations on various coverage issues and
10   things like that.
11       Q.   West Law, I know what that one is.
12       A.   Yes.
13       Q.   You mentioned "IRMI" a couple of times, and
14   you list it here again.  What does that stand for?
15       A.   International Risk Management --
16   International Risk Management Institute, I believe.
17       Q.   And it's commonly referred to as "IRMI"?
18       A.   Correct.
19       Q.   Is it kind of the same thing?
20       A.   Yeah.  I mean, it's got a lot of -- there's
21   a lot of commentary, a lot of analysis of case law
22   across the country.  They'll take the forms and break
23   them down and do some analysis and discussion on them.
24   It's pretty good data.
25       Q.   When you say "It's pretty good data," that's

---

63

1    specifically for the insurance industry, correct?
2        A.   Correct.
3        Q.   I take it you would consider IRMI a reliable
4    authority?
5        A.   Sure.  I mean, it's filled with opinion,
6    so --
7        Q.   You may not agree with all of them, but --
8        A.   Correct.
9        Q.   -- typically IRMI isn't going to put stuff
10   out there that's --
11       A.   And there will be multiple pieces on the
12   same issue so you can get different sides of the
13   issue.
14       Q.   Does IRMI have an additional insured
15   handbook, like an entire book related to --
16       A.   Yes.
17       Q.   Have you ever read that?
18       A.   Yeah.  I've got it on my desk.
19       Q.   Does it say anything about professional --
20   like additional insured in connection with
21   professional liability policies?
22       A.   I'd have to go back and look at it.
23       Q.   All right.  Let me show you another article
24   that I found on IRMI.  This is dated May 2000.  It
25   says, "Project-Specific professional liability:  Who

---

64

1    Really Pays for Design Errors," and it's by David H.
2    Collings, and then Ames & Gough.
3        A.   Yeah, I've read this before.
4        Q.   You have read this one?
5        A.   Uh-huh.
6        Q.   Do you know who Mr. Collings is?
7        A.   No, not specifically.
8        Q.   Do you know who or what Ames & Gough is?
9        A.   I suspect that David Collings is a producer
10   at Ames & Gough, which is probably an insurance
11   agency, but I'm just guessing, or it could be a law
12   firm.
13       Q.   Generally, this article is talking about
14   design professional liability insurance on
15   construction projects; is that right?
16       A.   Correct.
17       Q.   The first section has the heading, "Owner's
18   Professional Risk Graphic."  The crux of this article,
19   as I read it, is who is going to bear the risk of some
20   or all of a design professional's negligence on a
21   project; is that right?
22       A.   Correct.
23       Q.   Okay.  The third bullet down in this article
24   states, "Owner cannot be added as an additional
25   insured.  Most professional liability underwriters for

---

16  (Pages 61 to 64)

Louis George Fey, Jr.
May 17, 2013

---

65

1  design firms will not name the owner as an additional
2  insured.  If the owner is sued for a professional loss
3  caused by the design firm, the indemnification clause
4  in the owner/design firm contract may provide
5  protection but the professional policy will not defend
6  the owner."  I take it, based on your earlier
7  testimony, that you would disagree with that first
8  statement, "Owner cannot be added as an additional
9  insured on the design firm's PL policy"; is that
10 right?
11     A.  Yeah, I think he's speaking generally there,
12 because the next sentence starts out with "Most
13 professional liability underwriters."  He's not saying
14 all of them, he's just saying most.  And it goes with
15 what I've been saying all along.  They don't like to
16 do it, but you can get it done.
17     Q.  Okay.  So you would agree with that second
18 statement, "Most professional liability underwriters
19 for design firms will not name the owner as an
20 additional insured"?
21     A.  Except for the "will not."  I think proper
22 phrasing of that would be, "Most professional
23 liability underwriters do not like to name owners as
24 additional insureds," but he's being more, you know,
25 concrete about his feelings.

---

66

1     Q.  All right.  And am I correct that the basis
2  of your disagreement with the first, second one, and
3  kind of clarification with the second sentence is that
4  in the past you have actually had additional insured
5  coverage placed on some of your architect and engineer
6  clients?
7     A.  Yeah, I've actually done it, and I've
8  actually been involved in a lot of claims where it
9  existed.  So I know it exists.
10    Q.  A lot of claims where the AI status existed
11 pursuant to an endorsement or actual coverage, or
12 whether it was just required by the contract?
13    A.  Well, a lot of professional forms include
14 clients as additional insureds in "Who is an insured?"
15 provision, and we've got a couple of those policies
16 here in front of us.  Others add them by endorsement
17 as additional insureds, and then yet others have
18 blanket who are required by contract language.  You
19 don't see that anymore, but you used to see it a lot.
20 But in the last five or six years or so, or maybe even
21 a little longer than that, they stopped doing that.
22    Q.  But you don't remember the names of any of
23 the carriers where you were able to obtain the
24 additional insured status for one of your A&E clients;
25 is that right?

---

67

1     A.  No.  I think there was a -- I know there was
2  one through Travelers because it got to be an issue at
3  one point on a claim with a firm that did design of
4  MOT and placement of barricades, that kind of thing.
5  We tendered to them.  They got all upset and said, you
6  know, it was Travelers versus Travelers, that kind of
7  thing, but we got it all worked out.
8     Q.  So you do recall one instance where --
9     A.  Yeah.  And I can almost come up with the
10 name of the company, but --
11    Q.  But that was on a Travelers' policy; is that
12 right?
13    A.  Right.
14    Q.  A Travelers' PL policy?
15    A.  Yeah.  It kind of put the two departments
16 against each other, and they kind of frowned on that.
17        MR. NADEAU:  Off the record for a
18    moment.
19    (Discussion held off the record.)
20        MR. NADEAU:  Back on the record.
21        MR. McCABE:  Are we attaching this?
22        MR. NADEAU:  Sure.  We can attach
23    that.  That will be Exhibit 4.
24    (Exhibit 4 was marked for identification.)
25 BY MR. NADEAU:

---

68

1     Q.  Okay.  The analysis on page 7 is basically
2  breaking down the scope of work that you did in this
3  case, correct?
4     A.  Correct.
5     Q.  The first thing that you state is that you
6  were asked to assess whether James and TBE should have
7  been named as an additional insured on SJB's
8  professional liability policy with Catlin; is that
9  right?
10    A.  Correct.
11    Q.  Then the second thing you state is whether
12 that contractual obligation of naming parties such as
13 James and TBE as an additional insured on design firms
14 PL policies is common practice and customary in the
15 industry; is that right?
16    A.  Correct.
17    Q.  The third thing you state is whether
18 coverage for James and TBE as an additional coverage
19 on Catlin's PL policy was available in the insurance
20 market at the time the contracts were signed; is that
21 correct?
22    A.  Correct.
23    Q.  And the time the contracts were signed was
24 approximately April of 2009; is that right?
25    A.  I think that's right, yeah.

---

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

**Louis George Fey, Jr.**
**May 17, 2013**

---

69

1    Q.   Then you state that you also examined
2  Catlin's subrogation potential.  Do you see that?
3    A.   Yes.
4    Q.   Was that something you were asked to do, or
5  was that something you did on your own?
6    A.   No, that was something I was asked to do.
7    Q.   Other than those four items that we just
8  laid out, were you asked to do anything else?
9    A.   I mean, that's kind of my synopsis of what I
10  thought they were asking me to do.  That was kind of
11  my general understanding of what they wanted me to do.
12    Q.   Do you have a retainer agreement with
13  anybody in this matter?
14    A.   Yeah.  It's on the disk or thumb drive.  It
15  doesn't specify anything detailed about my scope of
16  what I'm doing.
17    Q.   Other than those four things that you've
18  listed generally as your scope, did you do any other
19  assessment, reach any other opinions that are not
20  contained in your report?
21    A.   No, nothing other than what's in the report.
22    Q.   On page 7 of your report in the Analysis of
23  the Contracts, the first contract you discuss is the
24  agreement between SJB and TBE; is that right?
25    A.   Correct.

---

70

1    Q.   I handed you a copy of the subcontract for
2  professional services between TBE and SJB dated
3  April 29, 2009.  I would just like you to take a
4  moment to review that.  Let me know whether or not
5  that is the same subcontract that you referred to in
6  your report.
7    A.   Yes.
8    Q.   Is it your understanding now -- the first
9  page has an e-mail attached to it that is referenced
10  on the second page of the report, where it says,
11  "Surveying Services/Attached SJB E-mail dated 15 April
12  2009."  Do you see that?
13    A.   Where are you looking?
14    Q.   If you look at the first page of the
15  contract itself, paragraph 2, it states, "Description
16  of Services to be provided by the Professional
17  Subcontractor," and then it references that e-mail.
18    A.   Correct.
19    Q.   Okay.  Excluding that e-mail and limited to
20  the subcontract for professional services itself,
21  which are pages 1 and 2 of this exhibit, is it your
22  understanding that this is a standard form subcontract
23  that was prepared by TBE?
24    A.   Standard form?  I can't say if it's a
25  standard form.  It's a subcontract prepared by TBE.

---

71

1    Q.   Okay.  And while all of the copies that I
2  have seen are produced like this in two pages, I
3  believe if you look about three-quarters of the way
4  down right on the first page right before the
5  signatures, the second page, with the form TBE014, is
6  actually the reverse side of the first page.  So I
7  think the subcontract, the original is actually one
8  page, front and back; is that your understanding, as
9  well?
10    A.   Yes.
11    Q.   In your report, you refer to Section 3 on
12  the second page of the subcontract; is that right?
13  Those are the insurance provisions?
14    A.   Correct.
15    Q.   Have you been provided with a copy of the
16  Certificate of Insurance that SJB provided to TBE in
17  connection with this project?
18    A.   Yes.
19    Q.   You do have a copy of that?
20    A.   Yes.
21    Q.   Okay.  You didn't list it as one of the
22  documents that you reviewed or relied upon, which is
23  fine, but would that be contained on the disk that you
24  provided me earlier?
25    A.   Yeah, it will all be in there.

---

72

1    MR. NADEAU:  This is another
2  document that's been attached to several
3  depositions, so I'm not going to attach
4  this.
5    MR. McCABE:  All right.
6  BY MR. NADEAU:
7    Q.   Mr. Fey, I'm going to hand you what is a
8  copy of the May 5, 2009, Certificate of Liability
9  Insurance, indicating the insured is SJB Group, LLC,
10  and showing TBE Group as a certificate holder.  My
11  first question is, is this the SJB certificate that
12  you testified a moment ago that you did receive?
13    A.   Yes.
14    Q.   The insurers affording coverage is in the
15  top right, and then if you look at the coverages at
16  the bottom, it appears that Hartford was providing
17  general liability for SJB; is that correct?
18    A.   Correct.
19    Q.   It indicates that there was on that Hartford
20  CGL policy a blanket waiver of subrogation; do you see
21  that?
22    A.   On the GL?
23    Q.   Yes.
24    A.   Correct.
25    Q.   Then it also shows that there was a blanket

---

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

**Louis George Fey, Jr.**
**May 17, 2013**

73

1  additional insured endorsement; is that correct?
2      A.  Correct.
3      Q.  If you look at Auto, that appears to be
4  Hartford, as well; is that right?
5      A.  Correct.
6      Q.  And again, under the policy number column
7  for the Auto, it also lists the Blanket AI and the
8  waiver of subrogation; is that right?
9      A.  Correct.
10     Q.  The Excess or Umbrella coverage was by
11 Hartford, as well; is that right?
12     A.  Correct.
13     Q.  All right.  And then there is apparently an
14 asterisk to a note, in the Description of
15 Operations/Locations/Vehicles/Exclusions added by
16 Endorsement/Special Provisions that indicates, "Excess
17 is not over professional liability; is that right?
18     A.  Correct.
19     Q.  And then if you look down at the Workers'
20 Comp, that apparently has a blanket waiver of
21 subrogation, but no additional insured status; is that
22 right?
23     A.  Correct.  You wouldn't name somebody as an
24 additional insured on work comp.
25     Q.  And why is that?

74

1      A.  It's just not done.  It covers the employer
2  named as the named insured in the policy.  There's no
3  such thing as AI coverage on work comp.
4      Q.  Okay.  So there's no such thing, and you
5  can't get it?
6      A.  Correct.  You can get alternate employer
7  coverage, which is similar, but it's -- you can't add
8  AIs to work comp policies.
9      Q.  Do you have any idea as to why both the
10 James TBE prime contract and the TBE/SJB subcontract
11 would both purport to require the additional insured
12 status on the workers' comp?
13     A.  You see that a lot in contracts, and I
14 recommend our clients strike that when it's in there.
15 A lot of times what you'll see is, they'll say you'll
16 name us as an additional insured with the exception of
17 work comp, but that's not what the contract says.
18 There wouldn't be any coverage for somebody added as
19 an additional insured on a work comp policy because
20 the employees are not their employees.  And
21 statutorily, they aren't liable for work comp benefits
22 unless it's a statutory employer situation, in which
23 case they'd have their own work comp policy.  But they
24 don't have coverage unless the underlying work comp
25 coverage is not in place.  There's no -- in other

75

1  words, the underlying subcontractor has work comp
2  coverage in place.  There's no way for the injured
3  employee to make a claim against the higher tier for
4  the work comp because the benefits come from his
5  direct employer.  The only way that that can happen is
6  if the policy wasn't in place.  There's no need for
7  additional coverage in this situation.  Because those
8  work comp benefits -- you can't sue a higher tier for
9  work comp benefits that you're already collecting from
10 your direct employer.  Do you see what I'm saying?
11     Q.  Right.
12     A.  Okay.
13     Q.  So, in short, you can't get AI status on a
14 workers' comp policy, and it's not necessary?
15     A.  Correct.
16     Q.  And there is no indication on this
17 Certificate of Liability policy that there was either
18 additional insured status or waiver of subrogation on
19 the professional liability policy; is that right?
20     A.  I'm sorry.  Say that again.
21     Q.  Looking back at the SJB's May 5, 2009,
22 Certificate that shows TBE as a certificate holder,
23 the bottom row under "Coverages," where it lists the
24 professional liability, there is no indication that
25 there was any additional insured endorsement or a

76

1  waiver of subrogation; is that right?
2      A.  Correct.  There was no -- there was a waiver
3  subrogation in the contract -- in the policy, Catlin
4  policy, but there was no additional insured coverage
5  for TBE.
6      Q.  And my question is limited just to this
7  certificate.  It doesn't indicate, just based on
8  looking at this certificate that TBE provided -- or
9  SJB provided to TBE, that TBE had been named as an
10 additional insured on the PL policy or that there was
11 a waiver of subrogation; is that right?
12     A.  Correct.
13     Q.  Do you know whether anyone at TBE ever
14 complained, went back to SJB and said, "Hey, we got
15 this certificate.  It doesn't show that we're AI or
16 anything else on the PL policy.  Can you get us the
17 policy, the endorsements or anything else to confirm
18 the status was achieved?"
19     A.  Yeah.  I mean, it's pretty common for
20 construction projects for all of the contractors to
21 submit their certificates, anybody working on the
22 project, and then somebody will collect them and put
23 them in a file.  Some operations are very good at
24 going through and making sure everybody has complied.
25 They even have computer systems out there now, like

19  (Pages 73 to 76)

**Louis George Fey, Jr.**
**May 17, 2013**

---

77

1    ISNetworld, where you have to enter all of the
2    insurance information, and it has to be in compliance,
3    and the computer checks it. A lot of entities do not
4    check them. They'll just take them, kind of give them
5    a quick glance over and throw them in a file. It's
6    not uncommon to see a certificate that's not in
7    compliance with the contract.
8        Q. And some firms have inhouse risk managers
9    who will gather all of the certificates from all of
10   the various projects the company is working on, and
11   that's one of their tasks is to go through and make
12   sure all of the coverage is there, right?
13       A. Correct.
14       Q. I understood your last answer, but my
15   question was, do you know whether on this project,
16   after receiving this SJB certificate, anyone at TBE
17   that went back to SJB, you know, made any complaints,
18   comments or anything about the scope of coverage?
19       A. Yeah, I don't know what they did with it.
20       Q. Okay. Have you read any of the deposition
21   testimony in this matter?
22       A. No.
23       Q. The next thing I want to ask you about is on
24   the next page of your report, which is page 8. The
25   first full paragraph, you state, "Likewise, by virtue

---

78

1    of the flow down provision, Item 5 of form TBE 014 in
2    the SJB to TBE subcontract, SJB assumed the same
3    obligations towards James (James was defined in the
4    SJB-TBE contract as the 'prime client') and TBE, as
5    TBE assumed towards James in the James-TBE contract."
6    Do you see that?
7        A. Yes.
8        Q. If I'm following that correctly, if you look
9    back at the TBE-SJB subcontract, page 2, which is the
10   Form TBE014 with the terms and conditions of the
11   agreement, paragraph 5 states, "Additional
12   Obligations: The professional subcontractor shall
13   undertake as to TBE the same duties and obligations
14   which TBE has undertaken as to the prime client
15   pursuant to the Prime agreement between TBE and the
16   Prime Client, the terms of which are incorporated
17   herein by reference." And that is the, quote-unquote,
18   flow down provision that you were referring to in your
19   report?
20       A. Correct.
21       Q. Do you know whether anyone at TBE ever
22   provided a copy of that contract, the prime contract
23   between James and TBE to SJB?
24       A. I don't know.
25       Q. And other than identifying James as the

---

79

1    prime client on the first page of the contract and
2    stating in Article 5 that there is a prime agreement,
3    does this Section 5 attempt in any other way to
4    identify the agreement between James and TBE?
5        A. No. As a risk manager, when I'm reviewing
6    contracts for clients, I tell them, "Look, there's a
7    flow down provision. We really need to see the other
8    contract in order to determine what all of your
9    obligations are going to be. If you can provide us
10   with a copy of that, we can look at that too. But if
11   we don't have it, then I won't be able to let you know
12   if you're truly insured for everything that you need
13   to be insured for." It's something that needs to be
14   looked at when you get a contract in, and I advise our
15   clients to look carefully at those kind of issues.
16       Q. So it's your interpretation that pursuant to
17   Section 5 on TBE014, which is the second page of the
18   subcontract, that the terms of the prime agreement
19   between James and TBE were incorporated by reference
20   into the TBE-SJB subcontract?
21       A. Yeah. From an insurance perspective, when
22   you're looking at coverage on claims like this with
23   multiple contracts, you have to keep an eye out for
24   flow down provisions because they can impact the
25   coverage. So you have to consider both contracts.

---

80

1        Q. I know you stated at the outset of your
2    report that you're not offering any legal conclusions.
3    I can't remember exactly how you put it -- but isn't
4    that statement that -- your opinion that one contract
5    was incorporated into another one, isn't that a legal
6    interpretation of the contract?
7        A. To some degree it would be. But from an
8    insurance perspective, when you're looking at
9    coverage, you have to be able to look at, you know, if
10   you have provisions, what are required by the
11   contract, that type of thing. Or if you're looking
12   for compliance, did the person comply with the terms
13   of the contract. You have to be able to look at those
14   types of provisions and determine what the obligations
15   are when you're handling the claim.
16       Q. So if you came across a client who sent you
17   a contract with that language, it would be typical for
18   you to advise the client, hey, this references another
19   contract in here, we need to get our hands on that and
20   see what, if anything, in addition it says. Is that
21   fair?
22       A. Correct.
23       Q. Looking at the next paragraph in your
24   report, still on page 8, second full paragraph, you
25   say, "As outlined in the General Services Agreement

---

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

Louis George Fey, Jr.
May 17, 2013

---

81

between James and TBE, (the 'James-TBE Contract') in Item 9, TBE, and therefore, SJB (as a result of Item 5 mentioned above), were both required to name James as an additional insured on its GL, Umbrella, and PL (since the contract included surveying or engineering services - according to Item 1, Description of Services)." Do you see that?

A. Yes.

Q. I'm going to show you another document. I won't be attaching this. What I've handed you is the April 29, 2009, General Services Agreement between James and TBE. This is a copy -- this is the document you're referring to in your report, right?

A. Yes.

Q. The insurance requirements are on the third page in Section 9 entitled, "Insurance," correct?

A. Correct.

Q. The statement in your report that both TBE and SJB were required to name James as an additional insured on their GL, Umbrella, and PL policies comes from Section 9 here; is that correct?

A. Correct.

Q. The second paragraph of the insurance requirements states, "In addition, Subcontractor agrees to name Company and Client as additional

---

82

insured and to include a waiver of subrogation against Company for the following liability insurance policies." Then it lists, CGL, Auto, Umbrella, and then professional liability, correct?

A. Correct.

Q. Do you know who James' client was?

A. I don't see it anywhere. I believe it was DOT, but I'm not positive.

Q. Have you seen a copy of TBE's Certificate of Insurance that was provided to James in connection with this contract?

A. I don't think so.

Q. I am going to hand you an April 24, 2009, Certificate of Liability Insurance listing Cardno TBE as the insured and James Construction Group, LLC, as the certificate holder. You have not seen this before; is that right?

A. I don't think so.

Q. My first question is, and it just came to me, is this the same Acord form as the one we just looked at for the SJB certificate?

A. Yes.

Q. It is?

A. Yes.

Q. I meant to ask you when we were looking at

---

83

that other one in the context of the additional insured not being provided for on the workers' comp coverage -- in fact, if you look at this standard form, under the Coverages, the first column is Insurer Letter; is that what that stands for?

A. Yes.

Q. Then those letters, A, E, B, C, D, identify the insurer's affording those types of coverages; is that right?

A. Correct.

Q. You look up at the top right under the Insurer's Affording Coverage and it identifies insurer's A through E?

A. Right.

Q. That second column on the standard Acord form, shows -- has a column where I presume you can check the box, if you want, for whether additional insured status was provided on that type of insurance; is that correct?

A. Correct.

Q. And consistent with your testimony it's just not done on workers' comp policies, there's not even the option with that Additional Insured column to check it for workers' comp. It stops before that at the Excess/Umbrella Liability; is that correct?

---

84

A. Correct.

Q. Is it your understanding that -- I mean, that's the very reason that that column stops there is because it's not typical and it's not done to add an AI on a workers' comp policy?

A. Yeah, I mean, that could be one reason they did it. It would make sense.

Q. If you look in the -- do you see this box down here (indicating)?

A. Sure.

Q. Is there a shorthand word for that area? "Notes"?

A. It's just "Special Provisions Section."

Q. In that Special Provisions Section, do you see it states, "James Construction Group, LLC, is listed as an additional insured with respect to the General and Auto Liability policies. Waiver of subrogation in favor of the additional insured applies to the General, Auto and Workers' Compensation policies." Do you see that?

A. Correct.

Q. It does not indicate, though, that James was listed as an additional insured on TBE's professional liability policy, right?

A. Correct.

---

21 (Pages 81 to 84)

Louis George Fey, Jr.
May 17, 2013

---

85

Q.   My interpretation of this Special Provisions
Section is that the waiver of subrogation in favor of
the additional insured is limited to the General, Auto
and the Workers' Comp and that it doesn't imply the
professional liability.  Is that your interpretation,
as well?
A.   Well, certificates of insurance are supposed
to be a reflection of policy information.  It doesn't
change coverage, it doesn't broaden coverage, it
doesn't narrow coverage, and it may not reflect all
coverage; it's just a general summary.  All this is
talking about is waiver of subrogation on the General
Liability, Auto and Work Comp policies.  It doesn't
mention professional liability.  It doesn't mean it
doesn't exist, it just doesn't say.
Q.   If you're in James' shoes and this is all
TBE provides to you, just based on the four corners of
this document, it wouldn't appear that the AI status
was provided on the PL policy?
A.   Correct.  If I'm James, I'm asking
questions.  If I'm TBE, I'm either amending the
contract or asking my agent to provide additional
coverages.
Q.   Have you seen the actual Lexington -- I'm
sorry -- the actual XL?  It lists for Insurer D, the

---

86

professional liability carrier as XL Specialty
Insurance Company; is that right?
A.   Yeah.  We write for XL.  Obviously, I've
seen their Professional policies.  I can't tell you
what they say, though.  I'd have to look at it.
Q.   Have you seen TBE's policy that was written
by XL that this certificate refers to, the
November 26, 2008, through November 26, 2009, policy
period?  Have you seen that policy?
A.   No.
Q.   So you don't know whether it names James as
an additional insured or not?
A.   No.  I wasn't asked to look at TBE's
insurance coverage.
Q.   Well, just out of curiosity or research, did
you ask TBE or anybody else whether it attempted to
get additional insured coverage from XL at this time
back in April of 2009?
A.   No.
Q.   I know you testified that you don't know
XL's -- that you know that they have a PL policy, I
think you said, that you've used it before, but
familiar with specific details, specific provisions --
you haven't memorized it; is that right?
A.   Right.  And especially with Professional

---

87

coverages, you almost have to look at every single
policy.  You can't generally say this and that.
There's certainly things you can generalize about, but
pretty much you have to look at every policy.
Q.   And is that because all of the professional
liability writers, while there may be some standard
provisions, they all have their own specific quirks,
for lack of a better word?
A.   Pretty much, yes.
Q.   And am I correct that the additional insured
coverage, if it's provided, and the endorsement is
going to be one of those peculiar things that you
would have to go look at and see what this particular
PL carrier provides in terms of the terms of the AI
coverage?
A.   Sure.  I think I was told one time that
there are over 500 additional insured endorsements in
the industry floating around out there.  You have to
look at every coverage form and every additional
insured form for every claim.
MR. NADEAU:  Let's go off the record
for a moment.
(Break taken.)
MR. NADEAU:  Back on the record.
BY MR. NADEAU:

---

88

Q.   So you don't know whether TBE in fact had
James listed as an additional insured on its PL policy
with XL?
A.   No, I don't know.
Q.   And I know you said you weren't familiar
with XL's PL policy for A&Es in detail, but do you
know whether XL has any policy or procedure relating
to adding additional insureds to its A&E PL policies?
A.   I'm sure they frown on it.  What you have to
understand is, if you have a client that's large
enough or if you have an agent that's got enough
clout, you can pretty much get anything you want done
when it comes to insurance.  There are very few things
you can't have accomplished.
It really doesn't matter what the policies
are because they're all generalizations.  If you look
at any underwriting manual or guide or claims manual,
the first thing they start out with is, "This is a
guide, a general guide to our philosophy."  So for
every rule, there's exceptions made.
Q.   Well, let me ask you more specifically.
Have you ever had a client obtain AI coverage for
either an owner, a client, or someone else that they
had a contract with on one of XL's professional
liability policies for A&Es?

---

22  (Pages 85 to 88)

Louis George Fey, Jr.
May 17, 2013

---

89

1    A.  Like I said, I can't -- names and
2    carriers -- I know we've done it for various clients,
3    but which clients and which insurers, I don't know.
4        Q.  Are you familiar with XL's practice
5    management tool or risk management tool for its
6    architects and engineers?
7        A.  They all have them.
8        Q.  Do you have access to XL's guidelines for
9    its architects and engineers?
10       A.  I'm sure I have access to it.  I've never
11   accessed it.
12       Q.  Okay.  Do you know where XL's guide came
13   from?
14       A.  No.
15       Q.  Are you familiar with DPIC?
16       A.  Vaguely, yeah.  I'm trying to place it.
17       Q.  Design Professional Insurance Company.
18       A.  Yeah.  Okay.
19       Q.  They got real cleaver with naming their
20   company.  They specialize in PL for design firms.
21       A.  Okay.
22       Q.  Any dealings with DPIC in the past?
23       A.  If we did, it was through a broker, I'm
24   sure.
25       Q.  It's my understanding that DPIC prepared a

---

90

1    practice management guideline for its architects and
2    engineers that has somewhat become, quote-unquote, the
3    Bible in the professional liability industry.  Are you
4    familiar with that at all?
5        A.  No, but it wouldn't surprise me.
6        Q.  I'm going to show you a document.  This is
7    from the XL guideline.  It's Chapter 9 on Insurance.
8    The copyright on this one is 2009.  In the bottom
9    right, the title of this chapter is "The Design
10   Professional Group of the XL Insurance Companies."
11   Actually, I don't think that's the title.  I think
12   that's who published it.  The name of the chapter in
13   the top right corner is "Insurance."
14           MR. NADEAU:  We'll go ahead and
15           attach this as Exhibit 5.
16   (Exhibit 5 was marked for identification.)
17   BY MR. NADEAU:
18       Q.  I don't want to take anything out of
19   context, it's eight or nine pages, but it is typically
20   talking about some of the idiosyncrasies of
21   professional liability, specifically for architects
22   and engineers.  Take as much time as you need to
23   review as much of it as you want, but my question is
24   about a statement on page 3.  This section begins on
25   page 2 with the heading, "professional liability."

---

91

1        The first statement in that section is, "professional
2    liability insurance, sometimes called errors and
3    omissions insurance, protects you and your firm from
4    claims arising out of negligent acts, errors or
5    omissions in the performance of your professional
6    services.  Because this coverage is specific to
7    licensed professionals in their practice, few clients
8    fully understand its function and limitations."  Has
9    that been your experience in your practice that a lot
10   of non architect and engineers, owners, and
11   contractors don't fully understand the function and
12   limitations of professional liability insurance?
13       A.  Sure, and you can even extend that to
14   professionals themselves.
15       Q.  If you look on page 3 -- well, let's back up
16   and go through it.  The next section is going through
17   some of the unique features that narrowly define
18   coverage.  The first one is the claim is made or
19   claims made and reported, an aspect of professional
20   liability -- which you pointed out in your report and
21   is different from a typical CGL -- and then there are
22   several other unique features that they go through.
23   But if you look at page 3, the second to the last full
24   paragraph, it states, "What's more, clients often
25   confuse professional liability with Commercial general

---

92

1    liability (CGL) insurance and try to specify the same
2    conditions of coverage they require of contractors.
3    For these reasons, it is important to review and to
4    delete any unattainable, uncustomary or unreasonable
5    requirements placed on your professional liability
6    policy.  Despite a client's demands, there are often
7    provisions to which you simply cannot or should not
8    agree.  (Some of these requirements, such as being
9    listed as an Additional Insured on your PL policy, are
10   listed in Exhibit 9 at the end of this chapter."  Then
11   if you look at Exhibit 9, which is attached to it,
12   it's page 11, Exhibit 9 states -- the title of this
13   attachment or exhibit is professional liability
14   Insurance Restrictions.  It states, "Despite a
15   client's demands, there are professional liability
16   insurance provisions to which you simply cannot agree
17   because of the nature of the PL policy."  Then it
18   says, "Your professional liability insurance policy,"
19   and one of the things listed is, "Cannot name the
20   client as an Additional Insured."  And the last one
21   is, "Cannot cover the client for his or her own
22   negligence."  I take it from your previous testimony,
23   you would disagree with that statement that you cannot
24   name the additional insured on a PL policy; is that
25   right?

---

Baton Rouge Court Reporters, LLC
225-292-8686

**Louis George Fey, Jr.**
**May 17, 2013**

93

1    A.  Well, I think probably what they're talking
2  about is the standard policy; it won't pick anybody up
3  as an additional insured.  I disagree from the
4  perspective of you can't do it.  You can do it.  Is it
5  done frequently?  No.  Is it frowned on?  Yeah.  And
6  that's why all this stuff that's put out by the
7  industry discourages it as much as they can because
8  it's a practice they don't want to encourage.  They
9  are trying to tell professionals, "Don't do this,
10  strike it from your contracts," which is exactly what
11  I said here.
12    If you get a contract and it requires AI
13  coverage, you either strike it from the contract or
14  you have to get it.  And if you can't get it, then you
15  need to have that conversation or walk away from the
16  job.  I recommend our clients strike it, and most of
17  the time we can get that done.  We can go to them and
18  say, "Look, we're going to provide AI coverage under
19  the GL.  We're not going to provide it under the PL
20  because it's a different coverage.  It's a different
21  situation, and it's not really customary.  If there's
22  some kind of design claim, you know, they're going to
23  step in -- the PL carrier will step in and settle that
24  claim under that coverage, so it should protect you to
25  that extent, but you don't need PL coverage as an

94

1  additional insured."  I kind of disagree with that.  I
2  think you do need it because of the stuff that gets
3  outside of the vicarious realms, especially with
4  regard to defense, direct oversight, that kind of
5  thing.  So my recommendation is always to strike it.
6  But if you can't strike it and you don't want to walk
7  away from the job, we don't want them to be in breach
8  of contract, we'll help them get it.  That's pretty
9  much the bottom line on it.
10    Q.  Looking back at your report on page 8.  This
11  is the third full paragraph, and I'm looking about
12  halfway down, "SJB was required to provide 1 million
13  in GL and PL coverage to TBE."  When I stop there, I
14  want to make sure I'm following you.  That comes from
15  the TBE-SJB subcontract, correct?
16    A.  Well, sort of it.  It flows through that
17  contract, but it comes from the James contract.  The
18  million dollars professional liability?
19    Q.  Yes.  "SJB was required to provide 1 million
20  GL and PL."  So you're saying 1 million for each --
21  both, right?
22    A.  Well, there's a million for GL under the TBE
23  to SJB contract.
24    Q.  Right.
25    A.  There's only $500,000 in the James contract.

95

1    Q.  But if you look in the TBE-SJB subcontract
2  and the insurance provision in Section 3 of the second
3  page, 3B requires, as I read it, 1 million in CGL, and
4  also 1 million for Errors and Omissions liability.  Do
5  you see that?
6    A.  Correct.
7    Q.  So that's why I thought that statement was
8  coming from the subcontract and not the prime
9  agreement.
10    A.  Well, I think it's kind of a summary of all
11  of it.
12    Q.  All right.  And the subcontract between TBE
13  and SJB doesn't require any Umbrella, but you're
14  saying that SJB was required to provide that in favor
15  of James because of the insurance requirements in the
16  prime agreement and the flow down provision; is that
17  right?
18    A.  Correct.
19    Q.  Okay.
20    A.  Once again, this is from an insurance
21  perspective.  It would be up to the Court to rule
22  whether the flow down provision is valid or not.  But
23  from the insurance perspective, we have to look at
24  that and see.
25    Q.  As I take your testimony, you're telling me

96

1  how you would advise a client who came and sat down in
2  your office if you were looking at these agreements;
3  is that fair?
4    A.  And/or if I was adjusting the claim and
5  happened to interpret the coverage for the claim,
6  correct.
7    Q.  In the same paragraph, paragraph 3, the last
8  sentence, "In addition, TBE was to provide $500,000 GL
9  coverage to James."  Are you saying that based on your
10  interpretation of the James-TBE contract, that
11  $500,000 in GL coverage is all of the insurance TBE
12  had to procure?
13    A.  No.  That's GL coverage.
14    Q.  Just GL coverage?
15    A.  Right.
16    Q.  TBE would still be required to obtain the
17  CGL, the Auto, the Umbrella, and the PL listed in the
18  Prime agreement; is that right?
19    A.  Sure.
20    Q.  I was just making sure I understood that.
21    A.  Okay.
22    Q.  Now, looking at the prime agreement, the
23  insurance requirements in Section 9, the insurance
24  required by the prime agreement was only required to
25  be maintained during the performance of TBE's work; is

24  (Pages 93 to 96)

Louis George Fey, Jr.
May 17, 2013

97

1  that correct?
2      A.  Correct.
3      Q.  That first sentence, it says, "Subcontractor
4  agrees to maintain at all times during the performance
5  of services described in this agreement," and it goes
6  on to list the insurance that is required.  I have
7  looked through the contract -- feel free to do it
8  yourself -- but I have not found any other provision
9  in this agreement that would suggest that TBE was
10  required to maintain any of those coverages in
11  Section 9 past the performance of its services.  Are
12  you familiar with anything else in the contract that
13  would require that?
14      A.  No.  But if they're added to a particular
15  policy, it's going to last for that policy period.  If
16  they're doing work during a particular policy period,
17  they would be an insured through that policy period,
18  unless it's added to the extent required by contract,
19  which some AI endorsements do, which is what we did
20  with Travelers GL and AI endorsements.  But in
21  general, if you add them to the policy, it's going to
22  be added to the policy period.
23      Q.  Hypothetically, TBE could have acquired all
24  of the insurance required by the prime agreement had
25  all of the additional insured waivers obtained fully

98

1  complied with the provisions, but then when TBE
2  completed its services under this agreement, TBE could
3  have canceled all of those policies, canceled the AI
4  or waiver of subrogation, endorsements, and would not
5  have been in breach of this Section 9, would it have?
6      A.  No.  They would have had to maintain the
7  insurance because the other contract requires for a
8  period of two years beyond the term of this
9  agreement --
10      Q.  No, no, no.  I'm talking -- I didn't mean to
11  interrupt you.  I'm talking about TBE right now.
12      A.  Oh, TBE?
13      Q.  Yes.
14      A.  Correct.
15      Q.  And just so the record is clear, you were
16  answering my probably long-winded question earlier
17  that I think I'll try to shorten by saying, TBE could
18  have obtained all of the coverage listed in Section 9
19  of the prime agreement, obtained all of the
20  endorsements that were required but then have canceled
21  all of that when TBE finished its work and would not
22  have been in breach of this insurance provision; is
23  that right?
24      A.  Correct.
25      Q.  Okay.  You pointed out that -- let me back

99

1  up.
2      That suggests to me a misunderstanding, at
3  least with respect to the professional liability
4  insurance, on the part of James or whoever drafted
5  this agreement in terms of how PL insurance works.
6  Would you agree with that?
7      A.  Yeah, PL and GL.  If you're drafting an
8  insurance provision for a project, you want -- I
9  recommend Completed Operations coverage on the GL for
10  a period of any statute of repose, and professional
11  liability, you would want it for a period of any
12  statute of repose.
13      Q.  And that's because, in all likelihood, a
14  design error is not going to manifest until some time
15  after the services are performed and the work is
16  completed; is that right?
17      A.  Yeah.  That goes to patent defects and
18  latent defects.  If it's a latent defect, it's not
19  going to be discovered for some time.
20      Q.  And the fact that the PL coverage is claims
21  made as opposed to occurrence based, you can't
22  retroactively go back and make a claim on that PL
23  policy that may have been enforced during the
24  services; is that right?
25      A.  Correct.  Well, there's the tail, the

100

1  reporting tail.  You've got the policy period plus the
2  reporting tail.
3      Q.  But the claim has to be made during the
4  policy period, and if the services have already been
5  completed -- strike that.
6      MR. NADEAU:  Let's go off the
7  record.
8      (Lunch break taken.)
9      MR. NADEAU:  Back on the record.
10  BY MR. NADEAU:
11      Q.  Mr. Fey, before we broke for lunch, we were
12  talking about the insurance requirements of the prime
13  agreement only being required to be maintained during
14  the performance of the services.  My follow-up
15  question is, likewise, based on the theory of the flow
16  down provision in the subcontract, SJB could have done
17  the same thing, that is, cancel all of the coverages
18  required by the prime agreement and any endorsements,
19  such as the AI or the waiver of subrogation and not
20  have been in violation of the prime agreement to the
21  extent that it applies to the subcontract; is that
22  right?
23      A.  Yeah, if the work was completed.
24      Q.  On the waiver of subrogation issue --
25      A.  Let me just clarify that.  The performance

Louis George Fey, Jr.
May 17, 2013

---

101

1  of the services described in the agreement, so it
2  would be through the work of both TBE and SJB.
3      Q.  Correct.  Until all of TBE's services that
4  it was contracting to perform, whether directly or
5  through its sub-consultant, SJB, pursuant to the prime
6  agreement were completed?
7      A.  Correct.
8      Q.  On the waiver of subrogation issue, the
9  subcontract between TBE and SJB, specifically Section
10 3 on Insurance, does not require any waiver of
11 subrogation; is that correct?
12     A.  The TBE to SJB contract?
13     Q.  Yes.  That's the James-TBE Prime agreement.
14     A.  Correct.
15     Q.  I'm referring to the TBE-SJB subcontract,
16 and specifically, Section 3 on Insurance.
17     A.  Correct.
18     Q.  That provision does not require a provision
19 of subrogation, correct?
20     A.  Correct.
21     Q.  The only way you get to the waiver of
22 subrogation issue is through the flow down provision
23 in the subcontract?
24     A.  Correct.
25     Q.  And that is because based on the policy

---

102

1  language on the 2010-2011 Catlin policy that's the
2  subject of this issue, there must be a contract, a
3  written contract that requires waiver of subrogation;
4  is that right?
5      A.  I believe that's right.  The Catlin policy?
6      Q.  Yes.  It's the second to last page at the
7  very back -- well, you point this out in your report,
8  that is, the last endorsement to the policy are the
9  Louisiana Changes.  And the waiver of subrogation
10 provision there -- which, frankly, I think is not
11 substantively any different than the one that's in the
12 policy -- but that is the one that trumps.  It's DPAE
13 119 1108.  It's the last four pages attached, the
14 Louisiana Changes.
15     A.  Oh, sorry.  I was drawing a blank.  Correct.
16     Q.  Okay.  When you say "correct," there must be
17 a written agreement to waive subrogation rights in
18 order for the waiver of subrogation to be effective,
19 correct?
20     A.  In effect prior to the claim, right.
21     Q.  And that language, "prior to the claim," the
22 written agreement being in effect prior to the claim
23 of occurrence, is so that the insured cannot after the
24 claim arises go out and waive subrogation; otherwise,
25 they would be in violation of the previous sentence

---

103

1  about being insured not doing anything after the claim
2  is made to jeopardize the company's rights?
3      A.  Correct.
4      Q.  If you look at page 8 of your report,
5  paragraph 5, you state, "Both contracts required SJB
6  to defend and indemnify TBE for losses arising from
7  SJB's work."  And similar to the question that I just
8  asked you about the waiver of subrogation, Section 4
9  regarding indemnification in the TBE-SJB subcontract
10 does not state that SJB is to defend TBE, does it?
11     A.  Well, it says, "Will indemnify for costs,
12 expenses, and attorney's fees."
13     Q.  Correct, but indemnification for costs,
14 expenses, and attorney's fees, does not mean that the
15 person agreeing to provide the indemnity must defend.
16     A.  You're asking me if there's a trigger for a
17 duty to defend?
18     Q.  No, no, no.  In your statement -- in your
19 paragraph, it says, "Both contracts require SJB to
20 defend and indemnify TBE for losses arising from SBJ's
21 work."
22     A.  I've got you.
23     Q.  I'm just trying to break it down.  There's
24 no question that the James-TBE Prime contract says
25 defense.  But I don't see either in the insurance

---

104

1  section or for the indemnification section of the
2  subcontract where SJB was required to provide a
3  defense.
4      A.  You're right.  The James' contract requires
5  the defense.  The other contract requires
6  reimbursement of defense costs, so there's a slight
7  difference there.
8      Q.  Okay.  So there is no defense requirement in
9  the subcontract without the flow down provision that
10 gets you to the prime agreement; is that fair?
11     A.  Just the responsibility to indemnify for
12 those expenses.
13     Q.  And the scope of the indemnity was -- we can
14 break it down or take it in both contracts, limited to
15 the negligent acts, errors or omissions of the
16 professional subcontractor, looking at the subcontract
17 between TBE and SJB; is that right?
18     A.  Hang on.  Let me back up on that last one.
19 I think what I'm referring to in the -- both contracts
20 would require that because the James' contract
21 requires it, and the flow down provision makes this
22 contract require it.  So, in effect, they both require
23 defense.  But if you're just looking at each
24 particular contract, the James' contract requires the
25 defense, the SJB contract requires reimbursement for

---

26 (Pages 101 to 104)

**Louis George Fey, Jr.**
**May 17, 2013**

---

105

1  the defense.
2     Q.  Okay, and that was -- I'll reask the
3  question, but I don't think your answer would be any
4  different.  Absent the flow down provision in the
5  subcontract, the subcontract between TBE and SJB does
6  not require any defense obligations?
7     A.  Correct, without the -- just reimbursement,
8  yeah.
9     Q.  Okay.  Onto the next sentence, and let's
10  just stick with the subcontract.  Just to kind of
11  speed it up a little bit, if I refer to the
12  "subcontract," I'm talking about the TBE-SJB
13  agreement.  And if I refer to the "contract" or the
14  "Prime contract," I'm referring to the James-TBE
15  agreement.
16     A.  Okay.
17     Q.  The subcontract, the scope of the
18  indemnification is limited to SJB's negligent acts,
19  errors or omissions, or anyone acting on SJB's behalf
20  in connection with an incident to the subcontract; is
21  that right?
22     A.  Yes.
23     Q.  It doesn't require SJB to indemnify TBE for
24  TBE's negligent acts or errors or omissions; is that
25  right?

---

106

1     A.  Correct.
2     Q.  Would you agree with me that,
3  hypothetically, if the subcontract had required SJB to
4  provide indemnity for TBE's active independent
5  negligence, that would have been precluded from
6  coverage under the Catlin policy pursuant to the
7  contractual liability exclusion?
8     A.  For the contractual indemnity piece, had
9  there been additional insured coverage, that would
10  have been different.  But, yes.
11     Q.  If you look at the indemnity requirements in
12  the prime agreement, those are, likewise, limited to
13  any negligent act, error or omission of, or the
14  willful misconduct of subcontractor, in which this
15  case would be TBE; is that correct?
16     A.  (No audible response.)
17     Q.  If you look at page 3, 10A.
18     A.  That's correct.
19     Q.  So TBE was not agreeing to indemnify James
20  for James' negligent act, error or omission, correct?
21     A.  Correct.
22     Q.  Likewise, to the extent that these
23  provisions would apply to SJB pursuant to the flow
24  down provision, SJB would not have agreed to indemnify
25  either TBE or James from one of those respective

---

107

1  parties, active or independent negligence?
2     A.  Correct.
3     Q.  You say this in the report, but I just want
4  to confirm it.  It's on page 9.  Because of the
5  "claims made" and the nature of PL policies, the only
6  relevant policy to this case is the Catlin 2010-2011
7  policy, correct?
8     A.  Correct.
9     Q.  You mention that the waiver of subrogation
10  provision is statutorily required.  And based on the
11  Louisiana Changes, endorsement to the Catlin policy, I
12  don't have any reason to doubt that, but do you know
13  what statute that is?
14     A.  Not the statute number, but those
15  endorsements are generated from those statutes.  Each
16  state has similar endorsements.
17     Q.  Is this -- so this would not be what you
18  referred to as a manuscript endorsement earlier?  This
19  is kind of a standard one that was likely prepared by
20  ISO?
21     A.  Those are amended -- mandatory endorsements
22  put out by ISO for each particular state.  And as the
23  statutes change, they will update those for subsequent
24  policy periods.  They are mandatory forms, so anybody
25  that issues a policy in the state of Louisiana has to

---

108

1  have those on there.
2     Q.  Let's look at the 2011 policy, page 2 of 11
3  on DPAE 050 0908, Section 3, Definitions "A."  It
4  states, "Claim means a demand for money or services,
5  naming the Insured, and alleging a wrongful act or
6  pollution condition."  Do you see that?
7     A.  What page are you on?
8     Q.  Page 2 of 11 of the policy form itself.
9     A.  Okay.
10     Q.  Within the definition of "claim," there are
11  several other terms that are defined by the policy,
12  one being "insured," another being "wrongful act," and
13  then "pollution condition," correct?
14     A.  Correct.
15     Q.  This policy, it's a PL and a Pollution
16  Liability policy, but the pollution condition is not
17  relevant to this case, is it?
18     A.  Correct.
19     Q.  Look at the definition of "wrongful act."
20     A.  Okay.
21     Q.  "Wrongful act means an alleged or actual
22  act, error, or omission in the performance of
23  professional services for others by the Insured or by
24  any entity or person for whom the Insured is legally
25  liable."  Do you see that?

---

27 (Pages 105 to 108)

**Louis George Fey, Jr.**
**May 17, 2013**

---

109

1   A.  Yes.
2   Q.  And again, the definition of "wrongful act"
3   incorporates another defined term -- well, a couple --
4   another one in addition to "insured," that one being
5   "professional services."  Do you see that?
6   A.  Yes.
7   Q.  "Professional services" is defined in this
8   section -- it's actually the preceding definition.
9   "Professional services means those services that the
10  Insured is legally qualified to perform for others in
11  the Insured's capacity as an architect, engineer, and
12  land surveyor, landscape architect, construction
13  manager, planner, interior designer, scientist,
14  technical consultant, expert witness, or as defined by
15  endorsement to the policy."  My question is, do you
16  know whether SJB is qualified to perform subsurface
17  utility engineering services?
18  A.  Whether they're qualified?
19  Q.  Yes.
20  A.  No.
21  Q.  No, you don't know?
22  A.  I don't know.  It's kind of out of my realm.
23  Q.  Take a look at page 11 about midway down in
24  your report.
25  A.  Okay.

---

110

1   Q.  The paragraph that begins, "The policy
2   provides coverage for liability assumed in a contract
3   or agreement that SJB would have in the absence of the
4   contract or agreement.  This provision is a standard
5   policy provision and is intended to provide coverage
6   for the vicarious liabilities of TBE, imputed upon
7   TBE, as a result of the negligent acts of its
8   sub-consultant, SJB."  Am I correct that the first
9   "TBE" should be "SJB"?  Shouldn't it read, "This
10  provision is a standard policy provision and is
11  intended to provide coverage for the vicarious
12  liabilities of" -- should that be "SJB"?
13  A.  "Vicarious liabilities of" -- yeah, "SJB,
14  imputed upon TBE."  That's right.
15  Q.  All right.  I was just making sure?
16  A.  Yeah, that's my mistake.
17  Q.  That's fine.  The next paragraph talking
18  about the waivers of subrogation, the last sentence
19  says, "Such waivers of subrogation are very common in
20  construction related claim scenarios and contracts."
21  Obviously in Louisiana, they're statutorily required,
22  so I presume they're going to be pretty common here;
23  is that right?
24  A.  Yeah, sure.
25  Q.  What about other industries?  Are waivers of

---

111

1   subrogation in professional liability policies for
2   design firms -- is that common?
3   A.  Yeah.  I mean, a waiver of subrogation is a
4   pretty common theme in all contracts.  You'll even see
5   it in police agreements.  It's kind of a means to
6   prevent litigation or conflict between the parties to
7   the extent that there's insurance coverage.  So as a
8   risk manager, I always recommend waiver of subrogation
9   going both directions.
10  Q.  Look at page 12.
11  A.  Okay.
12  Q.  The first paragraph begins, "The policy does
13  not list TBE as an additional insured."  In that last
14  sentence, you just state that you're basing your
15  opinion from the insurance perspective, and the Catlin
16  policy did not provide the required coverage; is that
17  right?
18  A.  Correct.
19  Q.  Can you say with any degree of certainty
20  that if TBE had been named on either Catlin's AI
21  endorsement or some other professional liability
22  carrier's policy that that would have provided
23  coverage for TBE's independent wrongful act?
24  A.  Well, I can say that it -- had Catlin added
25  TBE to the additional insured provision on the policy

---

112

1   that's already on there, it would have provided that
2   broad form protection.
3   Q.  If you look at DPAE 449 0210 attached to the
4   2010-2011 policy, page 1 of 1, this is the Additional
5   Insured endorsement that was actually obtained in
6   connection with the policy.  Explain to me why you
7   believe that this policy would cover the act of
8   negligence of the additional insured.
9   A.  If Catlin had named TBE on this additional
10  insured endorsement as one of these listed additional
11  insureds, the coverage would have been -- "It is
12  understood and agreed that the following entities are
13  included as additional insureds, but solely as
14  respects to liability arising out of professional
15  services."  So to the extent that there are any
16  allegations against TBE for professional services,
17  errors and omissions, they would be covered under this
18  policy.
19  Q.  And that's based upon your interpretation of
20  the endorsement language?
21  A.  That's the way it's interpreted in the
22  industry.
23  Q.  Are you familiar with the definition of
24  "named insured" in the --
25  A.  Sure.

28  (Pages 109 to 112)

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

**Louis George Fey, Jr.**
**May 17, 2013**

---

113

1    Q.  If you look at page 3 of 11 of the policy
2  form, Section E, "Insured means the Named Insured
3  and," then it lists several others.  I want to draw
4  your attention to Subsection 5, "Any Named Insured
5  with regard to its participation in a legal entity,
6  including a joint venture, but solely for the Named
7  Insured's legal liability for the performance of
8  professional services by the respective legal entity
9  or joint venture.  Insured does not include the legal
10 entity itself, the joint venture itself or any other
11 entity that is part of either the legal entity or
12 joint venture."  Are you familiar with that type of
13 language?
14    A.  Sure.
15    Q.  My interpretation of that -- and tell me if
16 you agree or disagree -- is that if there is a joint
17 venture, that there will be coverage for the named
18 insured's professional services but not for the other
19 joint venture entity or the joint venture as a whole.
20    A.  Correct.  That's for joint ventures.
21    Q.  So is it typical to afford for additional
22 insureds broader coverage than insureds?
23    A.  Well, not broader coverage.
24    Q.  The policy doesn't use this, but I've seen
25 the term "additional named insured."

---

114

1    A.  That's a different situation where you would
2  have parties that are -- different entities owned by
3  the same parent, but they have substantially the same
4  principals as owners.  Then you list all of those as
5  additional named insureds on the policy.  It's to
6  prevent confusion at claim time.  For instance, the
7  claim is against XYZ, which is a subsidiary of ABC,
8  the named insured.  Well, if they put XYZ on theirs as
9  an additional named insured, it takes the confusion
10 out of it come claim time.
11    Q.  Okay.  On page 12, paragraph 2, in the first
12 sentence, it says, "However, SJB was not one of them."
13 I take it that should be "TBE was not one of them"?
14    A.  Yeah.
15    Q.  It says, "Therefore, for Catlin to argue
16 that it does not add parties as additional insureds on
17 its professional liability policies, is not quite
18 accurate."  What is the basis of your statement that
19 it's Catlin's position that it does not add parties --
20 any parties as additional insureds on its PL policies?
21    A.  That's what I was told.
22    Q.  By counsel?
23    A.  Yes.
24    Q.  Okay.  I will let you know that Catlin's
25 position in this matter is that it does not add

---

115

1  unaffiliated or non-related parties to the named
2  insured as additional insureds on its professional
3  liability policies, hence, the SJB Group, Inc., the
4  partnership and I believe the joint venture that are
5  identified on the actual AI endorsement.  Based on
6  your experience in the industry, is that common that
7  professional liability carriers typically won't allow
8  AI for unaffiliated or unrelated entities?
9    A.  Well, I'm a little surprised that they're
10 adding joint ventures on there.  Because typically if
11 there is a joint venture, they would set up a separate
12 policy for the joint venture.  I don't know if these
13 are joint ventures; it doesn't really say that.  It
14 lists -- you know, it has a slash between SJB and Owen
15 & White, SJB and Holden & Associates.  It doesn't say
16 what the relationship is between those parties, but I
17 know Owen & White is a separate entity and Holden &
18 Associates is a separate entity, so -- I mean, they're
19 not affiliated with SJB.
20    Q.  Well, SJB Group, Inc., is the predecessor of
21 SJB Group, LLC.  It's the prior entity.  They just
22 changed from an Inc. to an LLC.
23    A.  Correct.
24    Q.  The LLC was the survivor, and the Inc. did
25 not survive.  It's my understanding that the next two,

---

116

1  one is a partnership and one is a joint venture.  On
2  page 12, paragraph 4, "I can also state from firsthand
3  experience that Catlin does in fact add unaffiliated
4  entities as AIs when pressed to do so."  What
5  firsthand experience have you had with Catlin adding
6  unaffiliated AIs?
7    A.  Well, I gave that form that was given to us
8  in a proposal by Catlin.
9    Q.  Okay.  We looked at that.
10    A.  Right.
11    Q.  The EGEO form?
12    A.  Right.
13    Q.  Any others?
14    A.  Well, there was the AI form, DPAE 449 0210
15 contained in the policy, so they do have additional
16 insureds there, then the Catlin form that we talked
17 about earlier, then the alternative coverage form,
18 which is an actual policy, PL policy, that lists under
19 Insureds on the policy clients of the named insured.
20    Q.  Okay.  I just want to make sure I'm
21 following you.  We're talking about the EGEO 050 0610
22 form, correct?
23    A.  Correct.
24    Q.  Then we're talking about the Catlin AI
25 endorsement, EGMP 405 0910?

---

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

**Louis George Fey, Jr.**
**May 17, 2013**

---

117

1    A.  Correct.
2        Q.  And am I correct that this AI endorsement, I
3    believe you say in your report, was for an engineer
4    working in the oil refinery industry; is that right?
5        A.  Correct.
6        Q.  And then you listed obviously, the AI
7    endorsement actually attached to the 2010-2011 policy
8    that's at issue, right?
9        A.  Correct.
10        Q.  Other than those three documents, any other
11    documents?
12        A.  No.
13        Q.  Absent your activity as an expert in this
14    case, the only firsthand experience you've had with
15    Catlin regarding AI status was the proposal that was
16    provided to you, we looked at the EG forms, but you
17    don't recall whether --
18        A.  Well, that's not the only dealings I've had
19    with Catlin.  That's the only one that I can talk
20    about as far as forms and stuff like that.
21        Q.  Well, my question is, is that the only
22    instance you recall dealing with Catlin and adding an
23    AI to a professional liability policy?
24        A.  Well, specifically -- you know, there's just
25    a blur of thousands and thousands of transactions over

---

118

1    years.  I can't talk about individual instances.
2        Q.  I noticed that the form EGEO 050 0610 that
3    you produced, the other Catlin PL coverage form, it's
4    stamped with "Draft."
5        A.  Correct.
6        Q.  Is this a policy that was provided to you in
7    connection with a proposal?
8        A.  A proposal, right.
9        Q.  But they gave you a draft policy?
10        A.  Right.
11        Q.  Okay.  Do you know when this policy became
12    effective, when Catlin first began using it?
13        A.  No.
14        Q.  Do you know whether this policy was
15    available in April of 2009?
16        A.  I'm trying to remember when that deal would
17    have been.  Well, I can't say whether they had it in
18    '09 or not, I mean, from my end.
19        Q.  And am I correct that the reason that you
20    attached this policy is because of Section II, "Who is
21    an Insured," Subsection 3, "The client for whom the
22    named insured performs 'professional services' solely
23    with respect to 'claims' arising from your
24    'professional services' and only when required per the
25    written contract"; is that right?

---

119

1    A.  Correct.  And to clarify, I was given these
2    as examples of what can be done.  Generally speaking,
3    it's harder today to add someone as an additional
4    insured than it was back in '09.  So could they have
5    used these specific forms?  You'd have to ask Catlin
6    if they were using them at that point in time.  We
7    know the one on the policy was being used at that
8    point in time.  The other one had an addition date of
9    September 2010, so they would have been using it at
10    that point.
11        Q.  Which one are you referring to?
12        A.  The EGMP 405 0910.
13        Q.  You said it was dated September 2010?
14        A.  Yeah.  The EGEO 050 0610 is the June of 2010
15    addition.  The last four digits on the numbers are the
16    addition date.
17        Q.  So for example, the one you were just
18    looking at would be June of 2010?
19        A.  Correct.
20        Q.  Okay.
21        A.  They probably had other versions of this at
22    that point in time.
23        Q.  Just because that one is labeled "Draft,"
24    I'm going to show you the final Catlin professional
25    liability form, EGEO 050 0610.

---

120

1        MR. NADEAU:  We will attach this as
2        the next exhibit, whatever the next one
3        is.
4        (Exhibit 6 was marked for identification.)
5    BY MR. NADEAU:
6        Q.  Your understanding that the last four digits
7    of that form number indicate the date, which is
8    consistent with my understanding that this would be
9    June of 2010.  It is somewhat different -- I haven't
10    studied it word for word.  I don't think it is
11    material for our purposes here today.  If you look at
12    page 5 of 12 of the form, Section 2, "Who is an
13    Insured," it has the same definition that we just
14    read, "The client for whom the named insured performs
15    'professional services' solely with respect to
16    'claims' arising from your 'professional services' and
17    only when required per written contract."  It's just
18    now Subsection 2E instead of Section 3 in the Draft
19    form that you looked at.  Do you see that?
20        A.  Correct.
21        Q.  Have you reviewed -- and I know you haven't
22    reviewed the final one I just gave you, but the Draft
23    form, EGEO 050 0610, have you analyzed that to
24    determine whether there would have been any other
25    exclusions that would have applied in this instance if

---

30 (Pages 117 to 120)

Louis George Fey, Jr.
May 17, 2013

---

121

1  TBE had been named as an additional insured under the
2  terms of that policy?
3       A. Can you be more specific?
4       Q. Have you done that --
5       A. I generally went through it. I didn't study
6  it like I was going to evaluate a claim under it.
7       Q. Well, that was my question, whether you did
8  that analysis or not.
9       A. These were illustrative in nature. Here is
10 how they can do it. This is one way, here is another
11 way, that kind of thing. I'm not saying that these
12 are the exact forms they would have used back in '09.
13 I'm just saying that it's done in the industry, and
14 this is an example of how it's done. It was easier to
15 do in '09 than it is today. So I can say, yes, they
16 could have been added as an additional insured if SJB
17 had so desired and the agent, and they could have
18 convinced the underwriter to do it, but that policy.
19      Q. Do you know whether, from an underwriting
20 standpoint, in June of 2010 when that form was issued,
21 or even today if it's still in use, whether from an
22 underwriting perspective a land surveyor such as SJB
23 would have qualified for that policy?
24      A. No, I don't know for sure. Land surveying
25 is one of the lower exposures of professional work.

---

122

1  Design is probably the most hazardous or most likely
2  to result in a claim. So I wouldn't see why an
3  engineer who does land surveying work wouldn't qualify
4  under this form, but I don't know what Catlin's
5  policies and procedures are internally.
6       MR. NADEAU: Let's take a quick
7       break.
8       (Break taken.)
9       MR. NADEAU: Back on the record.
10 BY MR. NADEAU:
11      Q. Before we look at those endorsements, I do
12 have a couple of quick questions about your report.
13 Look at page 13.
14      A. (Witness complies.)
15      Q. In the first couple of paragraphs, you are
16 referring to the EGEO 050 0610 Catlin policy; is that
17 correct?
18      A. Correct.
19      Q. And in the second paragraph on page 13,
20 where you say, "I have seen this in Catlin
21 professional liability policies for engineers that
22 worked regularly in refineries"; is that right?
23      A. Right.
24      Q. The instance that you gave earlier where you
25 received the proposal with the draft Catlin policy and

---

123

1  then endorsement, was your client an engineer working
2  in a refinery?
3       A. Correct.
4       Q. Any other examples that you can think of
5  where you saw that policy in use?
6       A. No. That's where I got my hands on it.
7       Q. The third full paragraph down where you're
8  talking about Catlin writing its own manuscript forms,
9  you pose a couple of questions. The second one that
10 you pose is, "Why would [Catlin] have multiple AI
11 endorsements?" Would you agree that insurers have
12 different AI endorsements for different lines of
13 insurance?
14      A. Correct. But what I was told was they don't
15 add AIs to their policies. So if he don't do that,
16 then why would they have an AI endorsement at all, was
17 my point.
18      Q. Well, I believe Catlin's position is that it
19 does not add additional insureds to its professional
20 liability policies for architects and engineers -- or
21 at least it doesn't add unaffiliated or unrelated
22 entities. You've seen the endorsement. There were
23 additional insureds added to this policy.
24      A. Yeah, but the engineer that I was talking
25 about was an engineer and had the additional insured

---

124

1  language in the policy.
2       Q. Then the engineer was working in a refinery;
3  is that right?
4       A. Yeah, but as an engineer.
5       Q. Sure. When we look at the form
6  identifiers -- it's a number, but I know it's actually
7  an alphanumeric code -- but is that typical for there
8  to be a few letters followed by some numbers?
9       A. Sure.
10      Q. Okay. Do you know why the Catlin draft
11 policy and the endorsement that you provided say,
12 "EGEO" while the policy at issue in this matter -- and
13 I'm sure you've seen all of the other Catlin policies
14 that were issued to SJB -- all have that "DPAE"
15 letter?
16      A. Yeah, we talked about that earlier. One is
17 for engineers, and the other one is for design
18 professionals. In this case we have engineering
19 issues. Land surveying is considered engineering. My
20 point is that exposure could have been written under
21 the engineer's form rather than the design
22 professionals. And like I said, the reason they have
23 different forms is because design professionals have a
24 much higher exposure than land surveyors, which is a
25 very low exposure, actuarially, so I'm sure they would

---

31 (Pages 121 to 124)

**Louis George Fey, Jr.**
**May 17, 2013**

125

```
1   want to use a different form.  I didn't compare the
2   two next to each other to see what the main
3   differences are, but the AI provision is one of them.
4   You might be more hesitant to add someone as an AI for
5   design issues, because if you've got somebody that's
6   doing additional design work, I mean, that's a pretty
7   high risk.  That's where you get into the gray areas
8   of, we don't put AIs on our policies for design
9   engineers.  Well, they do for other professional
10  services a lot easier than they do for design
11  professionals.  It all gets kind of intermingled in
12  the issues here.  But for this particular situation
13  with a low level surveying engineering project, it
14  shouldn't have been a problem.
15       Q.  Okay.  Looking back at your report, page 13,
16  the fourth full paragraph, "Another option for SJB
17  would have been to obtain a Project professional
18  liability policy, which would have covered both SJB
19  and TBE."  Do you agree with me that neither the
20  subcontract or the prime agreement require any type of
21  project PL policy?
22       A.  Yeah, sure.  I'm just saying that was an
23  option.
24       Q.  The next paragraph, you say, "I can state
25  with certainty, that had SJB come to me for insurance
```

126

```
1   for this project, I could have provided AI coverage on
2   SJB's PL policy."  And that would have been around
3   April of 2009; is that correct?
4        A.  Correct.
5        Q.  Can you name for me the carriers that
6   provided the PL with which you could have provided PL
7   coverage for SJB?
8        A.  I probably could have gotten it through
9   Catlin.  I know they're saying they don't do it, but
10  it's not been my experience.  We've got Ironshore,
11  we've got XL, we've got Lexington, we've got
12  Travelers.  We've got all of the professional markets,
13  and I could have gotten it done.
14       Q.  Okay.  And do you believe all of the ones
15  you listed, Ironshore, XL, Lexington, do you think you
16  could have gotten AI status for TBE from all of those
17  carriers?
18       A.  For this particular project, I feel fairly
19  confident that -- I mean, I'm certain I could have
20  gotten coverage put in place.
21       Q.  I understand you think you could have gotten
22  it; you're confident you could have gotten it put in
23  place.  I want to know what carriers you think you
24  could have placed it with.  Other than Catlin,
25  Ironshore, XL, Lexington, any other carriers you think
```

127

```
1   you could have gotten the coverage placed with?
2        A.  I don't know.  First thing you do is you
3   approach the carrier that's on the risk at the time
4   and see if you can't negotiate it.  It might involve
5   an additional premium, but you can get it done.
6   That's what I've been saying the whole time.  You can
7   get it done when you need to get it done.
8        Q.  Are you familiar at all with Catlin's
9   discovery responses in this case?
10       A.  Just what I've been told.
11       Q.  Since you haven't read any of the
12  depositions, and I don't even think the corporate
13  deposition of Catlin has been transcribed yet, but in
14  its written responses, Catlin stated that it has never
15  issued additional insured status to an unaffiliated
16  entity.  I believe that statement was confirmed in the
17  corporate deposition of Catlin.
18       A.  Yeah, I don't buy that.  I think I saw that
19  or it was told to me, and I just don't -- I just don't
20  think that's accurate.
21       Q.  You don't think that's accurate, and you
22  think you could have gotten it done?
23       A.  Yes.
24       Q.  Ironshore, have you ever had an additional
25  insured endorsement for an unaffiliated entity from
```

128

```
1   one of your A&E clients?
2        A.  Like I said, I can't remember specifically
3   which carriers and which clients, but we've done it.
4        Q.  So if I went through the list, the answers
5   would be the same, you don't recall the specifics, but
6   you guys have done it?
7        A.  Correct.
8        Q.  Can you state with certainty that had you
9   obtained that AI coverage for TBE on SJB's
10  professional liability policy, that that would have
11  provided coverage to TBE for its active or independent
12  negligence?
13           MR. McCABE:  Object to the form.
14      Asked and answered.
15           THE WITNESS:  Well, like I said,
16      it's very form specific.  At a minimum,
17      it would have covered the direct
18      supervision of the work, SJB's work, and
19      it could be a broad form.  It's just
20      depending on the form that's used.  If it
21      says, "You're an additional insured for
22      professional services," then you've got
23      everything.  If it says, "You're an
24      additional insured only to the extent
25      that the claims arise out of professional
```

32 (Pages 125 to 128)

**Louis George Fey, Jr.**
**May 17, 2013**

---

129

1        service performed by SJB," then it would
2  be more vicarious, and it would cover
3  supervisory type stuff, things that arise
4  out of it.
5  BY MR. NADEAU:
6     Q.  Okay.  But the answer to that question,
7  whether it would have only covered vicarious liability
8  or not, would be driven by which carrier you were able
9  to obtain the coverage for, correct?
10    A.  And the form that they were willing to put
11  on there, correct.
12    Q.  They are all different, and sometimes even
13  the same carriers use different forms in certain
14  situations?
15    A.  Correct, and sometimes they just make them
16  up.
17    Q.  Let's look at the presentation that you
18  provided.  This is one of the attachments to your
19  report.  It's from the Academy of Insurance.
20  Additional Insureds in professional liability, A Dicey
21  Proposition, presentation by Chris Christian, CIC,
22  RPLU.  Let me ask you, other than this presentation,
23  are you familiar with Ms. Christian?
24    A.  No.
25    Q.  When was this?

---

130

1    A.  It was within the last year.  I'd say
2  probably within the last six months.
3    Q.  Did you attend this in person, or was it an
4  online presentation?
5    A.  It was an online webinar.
6    Q.  And was it live, or was it being --
7  sometimes they're recorded and they replay them.
8    A.  It was live.  You get to ask questions.
9    Q.  If you look at the first page of the
10  presentation, the slide says, "When you ask for an AI
11  on professional liability policy, you're likely to
12  get, 'No,' 'Yes, but,' 'Questions about the
13  relationship,' 'Clear language regarding vicarious
14  liability only,' 'No agreement to provide 30 days
15  notification.'"  Do you recall what Ms. Christian said
16  when y'all were looking at this slide relating to the
17  bullet point that says, "Clear language regarding
18  vicarious liability only"?
19    A.  Yeah.  Like I've been saying, carriers are
20  hesitant to provide that coverage, and she said, "Your
21  first response might be 'No.'"  Depending on the
22  underwriter you talk to, you might get "Yes, but we're
23  going to have to do it this way or there might be more
24  premium or whatever," or "Yes, we'll give it but for
25  only vicarious only."  I mean, it just depends.

---

131

1  They're all over the place on this.
2    Q.  Was the crux of Ms. Christian's presentation
3  on this point that, if you were able to obtain AI on a
4  PL policy, that the carrier in all likelihood was
5  going to limit it to vicarious liability?
6    A.  No.  The crux of her whole presentation was,
7  "Don't do it."  She was strongly recommending against
8  allowing that for your clients.
9    Q.  Well, my question was not the crux of the
10  entire presentation, but the crux of her bullet point
11  where she says, "Clear language regarding vicarious
12  liability only."  Was that --
13    A.  That was just one of the things that you
14  might hear back from the underwriter.
15    Q.  Take a look at -- including the cover page,
16  it's four pages in.  The title is "We Don't Cover Cat
17  Fights."  And "Insured Versus Insured Exclusion."  I
18  take it you're familiar with that exclusion?
19    A.  Sure.
20    Q.  And you're aware that there is such an
21  insured versus insured exclusion of the Catlin policy
22  at issue here?
23    A.  Correct.
24    Q.  And under your theory of SJB being required
25  to name both James and TBE as an additional insured on

---

132

1  its PL policy, isn't it true that that insured versus
2  insured exclusion would prohibit either James or TBE
3  because of that AI status from making a claim against
4  SJB on the Catlin policy?
5    A.  Correct, but the claim that was presented
6  was against TBE and SJB.  So if TBE qualified as an
7  insured under the policy, they would have been
8  defended.
9    Q.  But TBE would not have been able to bring a
10  claim against SJB?
11    A.  No.  It wouldn't need to because they both
12  would be covered under the same policy.  There would
13  be no need to sue each other.
14    Q.  If you look at the next slide, that's
15  Contractual Liability.  "Liability assumed under
16  contract excluded" is the first bullet point.  The
17  second is "Liability of others assumed under contract
18  excluded."  Am I correct that that's similar to the
19  situation where a contract will require one party to
20  indemnify another for that party's own negligence?
21  Kind of the broad form indemnity scenario?
22    A.  Correct.
23    Q.  The handwriting there, is that yours?
24    A.  No.
25    Q.  Whose handwriting is that?

---

33 (Pages 129 to 132)

**Louis George Fey, Jr.**
**May 17, 2013**

---

133

1      A.  Someone I work with.  I didn't keep a copy
2  of the presentation, and I got it from him.
3      Q.  Did y'all discuss the question -- did he
4  attend this with you?
5      A.  Yes.
6      Q.  Who was it?
7      A.  Dick Spire.
8      Q.  That's somebody that works with you over at
9  Bancorpsouth?
10     A.  Right.
11     Q.  So his question was, "So why put an
12  additional insured on the policy when there's no
13  assumption of liability for the additional insured?"
14  Was that his question?
15     A.  Yeah.  And I explained to him it's two
16  separate issues and got him straightened out on that.
17     Q.  But isn't the answer to that question really
18  that the fundamental purpose of additional insured
19  coverage is to protect the AI from the vicarious
20  liability of the named insured?
21     A.  Well, it can be broader than that, plus it
22  provides a defense obligation.
23     Q.  It can be broader than that, but it's not
24  always, is it?
25     A.  It's usually a little broader than that.

---

134

1  It's usually not just vicarious.  It's -- it includes
2  supervision and oversight type issues.
3      Q.  And that's based on the wording of the
4  endorsements?
5      A.  Uh-huh -- yes.
6      Q.  We're a couple of more slides in.  The title
7  of the slide is "Vicarious Liability."  The first
8  bullet point says, "GL wording is very broad and its
9  interpretation has been expanded over time."  The
10  second one is, "PL wording almost always restricts
11  coverage to the AI's vicarious liability arising from
12  the insured's acts."  Was that a point that
13  Ms. Christian emphasized in this presentation?
14     A.  She talked about it.  What you've got to
15  understand is when you're talking about vicarious
16  liability in insurance circles, there's always a
17  debate about the scope of the coverage, whether or not
18  direct supervision and that kind of thing is
19  considered vicarious types of liability.  But if you
20  get the "arising out of" verbiage, then that gets the
21  general supervision.  If it's very specific and it
22  says, "Only to the extent of wrongful acts by the
23  named insured," that kind of language, then it's
24  vicarious only.  So they kind of use both of them kind
25  of loosely.

---

135

1      Q.  Did she, in this presentation, explain which
2  of the -- how she was defining vicarious liability?
3      A.  No.  I mean, we didn't get that detailed
4  into how the AI coverage responds in claimed scenarios
5  and that kind of thing.
6      Q.  If you look at the next bullet point on the
7  slide, it says that the AI coverage "May also require
8  that the insured be solely liable (no contribution to
9  harm by the AI)."  Is that -- have you run into that
10  in your dealings with AI coverage in the PL context?
11     A.  Yeah, I haven't seen that one, but I'm sure
12  it's out there.
13     Q.  If you look at the next slide, she has
14  "Company-Specific Wording," then "Typical Clause."
15  And a typical clause would be something like,
16  "Definition of insured is amended to include XYZ for
17  coverage under Insuring Agreements 1 and 2, but only
18  as respects the vicarious liability of such person or
19  entity for negligent acts, errors or omissions of the
20  Insured Organization otherwise covered by the
21  insurance."  My first question is, do you agree with
22  her that that's the typical type clause you may see in
23  an AI PL policy?
24     A.  No.  I mean, really there's no typical
25  clause.  Like I said, it's all over the board.

---

136

1      Q.  "Other Company-Specific Wording" is the next
2  slide.  The second bullet point is, "Note, use of the
3  term 'Additional Insured' by these markets does not
4  mean they are willing to provide that status to
5  unaffiliated entities."  Do you recall what, if
6  anything, Ms. Christian said about that bullet point
7  in that statement?
8      A.  I think she was saying some carriers will
9  not add AIs unless they're affiliated, which is what
10  you're saying Catlin's position is here.
11     Q.  Okay.  And have you run into that in your
12  experience?
13     A.  My experience has been, we can get it done
14  when we need to get it done.  I mean, I've never had
15  anybody come back say, "We won't add them because
16  they're not affiliated."
17     Q.  Can you, ballpark, tell me how many times
18  you've been able to add an additional insured to a PL
19  policy for an architect or engineer?
20     A.  It's hard for me to put a number on it.  My
21  role is that when there's a problem, they get me
22  involved.  We'll talk to the broker or the
23  underwriter, or whoever it is.  We'll talk about the
24  exposures and say, look, in this particular -- for
25  example, in this contract, what I would say to the

---

34  (Pages 133 to 136)

---

137

1  underwriter is, "They're doing land surveying work
2  underground. The exposure here is fairly slight.
3  They're doing the work. TBE wants to be protected
4  just in case your guys do something wrong. So what's
5  the harm in putting them on there?" And typically the
6  underwriter will say, "Yeah, okay, we'll do it," or
7  "We'll do it, but there's an additional premium," that
8  kind of thing. If for some reason they won't do it,
9  then you go back to the client and you say, "Okay.
10 They're refusing to do it, so you need to strike it
11 out of the contract."
12      **Q. Well, I understand that you have been listed**
13 **as an insurance expert, not necessarily a technical**
14 **expert in terms of the subsurface utility engineering**
15 **that TBE was doing and the surveying that SJB was**
16 **doing, but I think your last response oversimplifies**
17 **the relationship and the division of labor between TBE**
18 **and SJB on this project. You do understand that they**
19 **both had separate tasks and were both providing**
20 **professional services on this project, right?**
21      A. Correct.
22      **Q. To the extent that -- scratch that.**
23      **Because they were each providing separate**
24 **professional services, in the event of a dispute, that**
25 **certainly leaves the door open for a conflict between**

---

138

1  **TBE and SJB to the extent that SJB says, "It's not my**
2  **fault, TBE, it's your fault," and TBE replies, "No,**
3  **it's not my fault, it's your fault," which is**
4  **basically exactly what we have in this lawsuit, right?**
5      A. Sure. If they're both covered under the
6  same policy, though, you really have a joint defense,
7  and it really wouldn't matter who was at fault.
8      **Q. Unless the specific wording of the AI**
9  **endorsement or coverage excludes liability -- is**
10 **limited only to vicarious liability?**
11     A. Correct.
12     **Q. Now, if you look into the slides a little**
13 **bit, there's one that says, "To Every Rule, an**
14 **Exception."**
15     A. That's what I've been saying the whole time.
16     **Q. My interpretation of this is that she's**
17 **saying that the general rule is that you're not going**
18 **to be able to get the AI coverage on the PL, but there**
19 **are some exceptions. The only one she refers to here**
20 **relates to media and technology. Do you see that on**
21 **the first bullet point?**
22     A. Sure. I don't think she ever said that you
23 couldn't get it. I think she said that you're going
24 to have trouble getting it.
25     **Q. Look at the statement a few slides in, the**

---

139

1  **title is "Practical Matters." It states, "You are**
2  **most going to be successful in obtaining an**
3  **Additional Insured endorsement when," and the first**
4  **bullet point is "The AI has a truly vicarious**
5  **exposure." Do you see that?**
6      A. Right.
7      **Q. I interpret that to mean true vicarious**
8  **liability rather than the broader form vicarious**
9  **liability that you spoke about earlier. Do you agree**
10 **with that?**
11     A. No. And I think -- you know, professional
12 carriers tend to understand that there's a GC out
13 there that's not doing any design function, and they
14 don't have professional policies because they have no
15 professionals working for them and they're relying
16 upon the professional to do the design work. They
17 understand that exposure, so they're more willing to
18 go ahead and put that on there. I think that's what
19 she's referring to.
20     And, once again, people use that term
21 "vicarious" a little loosely in the industry. The
22 exposure to the GC is not so much the vicarious
23 exposure because the professional policy would
24 eventually pay that anyway. It's the slop-over type
25 allegations of improper supervision, and that kind of

---

140

1  thing, negligent hiring or whatever.
2      **Q. If you look at the last page, "Summary," the**
3  **first bullet point is, "By their nature, Additional**
4  **Insureds violate several basic principles of**
5  **professional liability." My first question is, do you**
6  **agree or disagree with that statement?**
7      A. Oh, I agree with it.
8      **Q. Let's look quickly at the -- do you need to**
9  **take a break?**
10     A. No, I'm good. Let's get it done.
11     **Q. The additional insured endorsements that you**
12 **attached to your policy, the first one that I have is**
13 **the Catlin EGMP 405 0910. We've already talked about**
14 **that one.**
15     A. Right.
16     **Q. V1875 (1/2007). Do you see that one?**
17     A. Correct.
18     **Q. What carrier or carriers is this?**
19     A. I don't recall.
20     **Q. Is this applicable to a professional**
21 **liability policy?**
22     A. Yes.
23     **Q. Does it indicate that on here anywhere? How**
24 **do you know that?**
25     A. "Professional services." (Indicating.)

Louis George Fey, Jr.
May 17, 2013

---

141

Q.   That would explain that.  If you look at the -- let me ask you this:  Do you know if this is a standard form prepared by ISO or somebody or if this is specific to a certain carrier?

A.   It is specific to a certain carrier.

Q.   Is this something that you have used for a client before, or is this something you had in your file and you found through research?

A.   Yes.  It's something we used for a client. That's how I get these.  I collect them.  Any time I find a form that's new, I grab it, copy it, and stick it in the file.

Q.   Do you know what client that was?

A.   I have no idea.

Q.   Do you recall when that was?

A.   No.

Q.   If you look at the scope of the coverage --

A.   That's where all of these come from.

Q.   If you look at the scope of the coverage, it says, "In consideration of the premium charged, it is hereby agreed that coverage under this Policy shall be extended to include Claims against the following persons or entities" -- and you list the additional insureds -- "hereinafter referred to as 'Additional Insureds', provided, however, that any such claim,

---

142

one, is made and continuously maintained against at least one Insured, other than an Additional Insureds, and two, arises out of Professional Services performed on behalf of the Named Insured or any Subsidiary, and, otherwise covered under this Policy."  The first limitation is that the claim must be asserted against both the insured or an insured and the additional insured?

A.   Correct.

Q.   It can't be against only the additional insured; is that right?

A.   Correct.

Q.   Then the second limitation is that it has to arise out of professional services performed by or on behalf of the named insured?

A.   Correct.

Q.   So that would not provide coverage for professional services performed on behalf of the additional insured?

A.   Well, it would provide coverage for the professional's services rendered by the named insured and any subsidiaries or subcontractors performing professional services for the named insured.

Q.   But the status as an additional insured makes the additional insured an insured under the

---

143

policy but not the named insured; is that right?

A.   Say that again.

Q.   Additional insured status makes the additional insured an insured under the policy but not a named insured?

A.   Correct.

Q.   And this AI coverage is Excess coverage if you look at the second paragraph; is that right?

A.   Yeah.  If there's other professional insurance coverage, this would be in excess of it, right.

Q.   It says, "The coverage provided by this endorsement is excess of, and shall not contribute with, any other applicable insurance plan, policy or program of self-insurance carried by or applicable to a person or entity listed above."  So if the additional insured had its own professional liability policy that would otherwise respond to the claim, then the additional insured's PL coverage would be primary and the additional insured's coverage under this policy would be excess?

A.   Correct.

Q.   The next one I have is AEL-10201-END-POL, apparently April 2011.  Do you have that one?

A.   Yes.

---

144

Q.   And apparently this is Ironshore?

A.   Correct.

Q.   Have you ever named -- this says, "Specimen."  Have you ever used this endorsement form to have an AI added to an A&E policy for Ironshore?

A.   Yes.

Q.   "Additional Insured Endorsement - Limited." Then it says, "It is agreed that Section 2, Definition 1, is changed to add the following Additional Insured, but only for Damages or Claim Expenses arising out of actual or alleged Wrongful Acts committed by the Named Insured."  And so am I correct that that is a true vicarious liability endorsement?

A.   It's a little broader than vicarious liability.  That's the one I was talking about with the -- vicarious plus general supervision type issues.

Q.   Well, this says --

A.   "Arising out of the actual or alleged wrongful acts."

Q.   So you're focusing on the "arising out of" --

A.   Correct.

Q.   -- "actual or alleged Wrongful Acts committed by the Named Insured"?

A.   Sure.  In insurance parlance, there's all

---

**Louis George Fey, Jr.**
**May 17, 2013**

---

145

1  kinds of cases of "arising out of," but the general
2  supervision allegations arise out of the wrongful acts
3  of the professional.  So had it not been for the
4  wrongful acts, they wouldn't have been sued for the
5  negligent supervision or whatever.
6      Q.  Okay.
7      A.  That's what I've been talking about as
8  being -- sometimes they'll refer to that in the
9  industry as "vicarious," but it's really not; it's a
10  little broader than that.
11      Q.  And that's because of juris prudence
12  interpreting this form language; is that right?
13      A.  Well, you know, that too.  But in the
14  industry, "arising out of" is a broad term.  You use
15  it broadly.  You use it in the way most favorable to
16  the person seeking coverage.
17      Q.  The next one that I have, actually I think
18  it's a policy "Specimen," "RA&MCO 3240 10/04."  Do you
19  see that one?
20      A.  Right.
21      Q.  If I'm correct, the significance of this is
22  on page 2 of 17, the definition of Insured.
23  Subsection 2 says, "Any other person or organization
24  specifically added as an Insured by endorsement or
25  schedule, however, only while acting in the scope of

---

146

1  its duties for the Policyholder."  Am I correct?
2      A.  Correct.
3      Q.  Despite having this -- have you ever
4  actually used this RA&MCO policy for an architect or
5  engineer client?
6      A.  Yes.
7      Q.  Were you able to add an additional insured
8  to it?
9      A.  I don't recall.
10      Q.  Do you know what RA&MCO's position is,
11  generally, with respect to adding AIs to architect and
12  engineer professional liability policies?
13      A.  I'm sure if you talk to any professional
14  liability underwriter, their first response or most of
15  them are going to say, "No, we don't do that."
16      Q.  Do you know if you've ever gotten an AI
17  coverage on any RA&MCO policy?
18      A.  Yeah, after I was first told, "We don't do
19  that," and then I get it.
20      Q.  Was it an affiliated company, or was it a
21  GC?
22      A.  Oh, RA&MCO in particular?
23      Q.  Yes.
24      A.  Oh, I don't know about RA&MCO in particular.
25      Q.  Okay.  Let's look at the next endorsement

---

147

1  that you have.  It's a CNA form, SB-146968-A17; is
2  that right?
3      A.  Correct.
4      Q.  All right.  And this says, "Blanket
5  Additional Insured Endorsement with Products-Completed
6  Operations Coverage & Blanket Waiver of Subrogation,
7  Architects, Engineers and Surveyors."  In this one,
8  the coverage provided to the AI expressly excludes the
9  act of negligence of the additional insured; is that
10  right?
11      A.  Correct.
12      Q.  We were talking off the record about the
13  doddered motions that apparently State Farm was
14  lobbing at you that were recently denied in a case
15  where you're providing expert services; is that
16  correct?
17      A.  Yes.
18      Q.  Has your testimony as an expert ever been
19  limited or excluded by a court?
20      A.  No.  I just can't testify on legal issues,
21  which I don't testify on anyway.
22      Q.  "Voluntary payee," are you familiar with
23  that, in your report?
24      A.  Sure.
25      Q.  Explain to me that principle.  That's a new

---

148

1  one to me.
2      A.  It's an insurance industry kind of rule.  If
3  an insurance carrier pays for an exposure that it
4  doesn't have any coverage for, it's considered to be a
5  voluntary payer, and it can't pursue subrogation.
6  Because it had no coverage, you can't assume the
7  subrogation rights of another party, but they should
8  have paid the money to begin with.
9      Q.  Are you aware that in this case SJB and
10  Catlin made a demand on TBE to contribute, pay some or
11  all of the relocation costs before SJB and Catlin paid
12  to have that work performed?
13      A.  Yeah, I'm not familiar with that.
14      Q.  Are you aware that SJB, Catlin, and TBE even
15  mediated this dispute to try to reach some kind of
16  cost sharing agreement for the relocation work before
17  Catlin and SJB paid for the relocation work?
18      A.  No.
19      Q.  You weren't aware of that?
20      A.  No.
21      Q.  Would that change your voluntary payee
22  analysis at all?
23      A.  No.  The way it would work would be if -- if
24  Catlin wanted to pursue subrogation on the thing,
25  assuming they could, and get around the way of

---

37 (Pages 145 to 148)

Louis George Fey, Jr.
May 17, 2013

|  | 149 |
|---|---|

1   subrogation that's in the policy, they would have to
2   obtain a release and name TBE on it to release TBE's
3   liability exposures, and then pursue them.  But in
4   this case, they didn't even take a release is what
5   I've been told.  So they're purely a voluntary payer
6   if their position is that they paid for exposures that
7   weren't covered under their policy.
8       **Q.  And you said that's just common in the**
9   **industry.  Is that -- is there case law out there to**
10  **support that?**
11      A.  Well, I'm sure there is, but I can't cite to
12  any.
13          MR. NADEAU:  All right.  Mr. Fey, I
14  believe that is all of the questions that
15  I have.
16          THE WITNESS:  Thank you.
17          MR. McCABE:  Do you want to read and
18  sign?
19          THE WITNESS:  Do you want me to read
20  and sign?
21          MR. McCABE:  I have the most
22  confidence in our lovely court reporter,
23  but if you would like to read and sign,
24  that's your right.  Why don't you just do
25  it anyway.

|  | 150 |
|---|---|

1          THE WITNESS:  Okay.  I'll read and
2   sign it.
3          (DEPOSITION CONCLUDED AT 2:57 P.M.)

|  | 151 |
|---|---|

C E R T I F I C A T E
1
2       I, Cassandra S. Chenevert, Certified Court
    Reporter in and for the State of Louisiana, as the
3   officer before whom this testimony was taken, do
    hereby certify that LOUIS GEORGE FEY, JR., after
4   having been duly sworn by me upon authority of R.S.
    37:2554, did testify as hereinbefore set forth in the
5   foregoing 150 pages.
6       I further certify that said testimony was
    reported by me in the Stenotype reporting method, was
7   prepared and transcribed by me or under my personal
    direction and supervision, and is a true and correct
8   transcript to the best of my ability and
    understanding.
9
        I further certify that the transcript has
10  been prepared in compliance with transcript format
    guidelines required by statute or by rules of the
11  board, that I have acted in compliance with the
    prohibition on contractual relationships, as defined
12  by Louisiana Code of Civil Procedure Article 1434 and
    in rules and advisory opinions of the board.
13
        I further certify that I am not an attorney
14  or counsel for any of the parties, that I am neither
    related to nor employed by any attorney or counsel
15  connected with this action, and that I have no
    financial interest in the outcome of this matter.
16
        This certificate is valid only for this
17  transcript accompanied by my original signature and
    original required seal on this page.
18
        Baton Rouge, Louisiana, this 31st day of
19  May, 2013.
20
21
22      _____
        CASSANDRA S. CHENEVERT, CCR, RPR
23
24
25

|  | 152 |
|---|---|

1           WITNESS CERTIFICATE
2
3       I, LOUIS GEORGE FEY, JR., the witness named
4   to give testimony on behalf of Livingston Parish in
5   the foregoing deposition, have read or have had the
6   foregoing testimony read to me pursuant to Rule 30(e)
7   of the Federal Rules of civil Procedure or Article
8   1445 of the Louisiana Code of Civil Procedure.
9       I hereby certify that the preceding
10  transcript is a true and correct transcription of the
11  sworn testimony given by me in this matter on the 17th
12  of May, 2013, with the exception of any corrections or
13  changes noted on the Witness Amendment(s) page
14  attached hereto.
15
16
17
18
19  _____
    LOUIS GEORGE FEY, JR.
20
21  _____
22  DATE
23
24
25

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

**Louis George Fey, Jr.**
**May 17, 2013**

153

1    SJB GROUP, LLC AND        ) NO. 12-181-BAJ-DLD
     CATLIN INSURANCE GROUP    )
2                              )
     VERSUS                    )
3                              )
     TBE GROUP, INC.           )
4    _____)
5
6
7              WITNESS AMENDMENT(S)
8    Page  Line  Amendment
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ROUTING:   MR. NADEAU, ESQ.
                MR. McCABE, ESQ.
25

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

Louis George Fey, Jr.
May 17, 2013

154

**A**

**abc** 48:17,20 114:7
**ability** 151:8
**able** 28:11,24,24 29:23 52:10
    54:24 66:23 79:11 80:9,13
    129:8 131:3 132:9 136:18
    138:18 146:7
**absence** 110:3
**absent** 105:4 117:13
**academy** 129:19
**access** 41:17 49:20 50:19
    62:1 89:8,10
**accessed** 89:11
**accident** 43:25
**accidents** 47:12
**accommodation** 29:9
**accompanied** 151:17
**accomplished** 27:22 88:14
**account** 28:3 29:8
**accountants** 10:20
**accounting** 31:25
**accurate** 49:12 114:18
    127:20,21
**achieved** 76:18
**acknowledged** 45:2
**acord** 82:20 83:15
**acquired** 97:23
**act** 46:9 106:13,20 108:5,12
    108:19,21,22 109:2 111:23
    112:7 147:9
**acted** 151:11
**acting** 105:19 145:25
**action** 28:15 151:15
**actions** 48:16
**active** 6:4 9:12 11:10,16
    106:4 107:1 128:11
**activity** 43:23 117:13
**acts** 14:5 54:1,2 56:21 91:4
    104:15 105:18,24 110:7
    134:12,22 135:19 144:11
    144:19,23 145:2,4
**actual** 47:9,24 66:11 85:24
    85:25 108:21 115:5 116:18
    144:11,18,23
**actuarially** 124:25
**add** 17:9,23 25:9,14,15 40:15
    46:6,7,8 52:1 55:11 56:1
    56:16,18 58:9,21 66:16
    74:7 84:4 97:21 114:16,19
    114:25 116:3 119:3 123:15
    123:19,21 125:4 136:9,15
    136:18 144:9 146:7
**added** 17:25 18:12,18 19:17
    24:20,24 29:23 52:3 53:20

54:20 64:24 65:8 73:15
    74:18 97:14,18,22 111:24
    121:16 123:23 144:5
    145:24
**adding** 38:9 40:12 56:15
    58:19 59:16 88:8 115:10
    116:5 117:22 146:11
**addition** 42:13 57:9 80:20
    81:24 96:8 109:4 119:8,15
    119:16
**additional** 6:2,18 7:2,8,23,24
    11:7 12:5,19 16:3 17:10,19
    17:25 18:7,9,12,18 19:16
    19:17 20:15 22:15,16,21
    23:15 24:20 25:6,9,13
    27:15 28:20 36:22 37:17
    37:22 38:1,7,10,16,23 39:5
    39:7,18 40:12 42:11,17,22
    43:15 44:13,19 45:22 46:7
    46:16,24 47:20 48:5,7,23
    49:2,16 50:5,13,17 51:7
    53:10,19,21 54:7,19,20
    55:11,21,24 56:3,13,17,20
    57:11,14,25 58:7,10,15,19
    58:22,23 59:16 60:19
    63:14,20 64:24 65:1,8,20
    65:24 66:4,14,17,24 68:7
    68:13,18 73:1,21,24 74:11
    74:16,19 75:7,18,25 76:4
    76:10 78:11 81:4,19,25
    83:1,17,23 84:16,18,23
    85:3,22 86:12,17 87:10,17
    87:19 88:2,8 92:9,20,24
    93:3 94:1 97:25 106:9
    111:13,25 112:4,8,9,10,13
    113:21,25 114:5,9,16,20
    115:2 116:15 119:3 121:1
    121:16 123:19,23,25 125:6
    127:5,15,24 128:21,24
    129:20 131:25 133:12,13
    133:18 136:3,18 137:7
    139:3 140:3,11 141:23,24
    142:2,7,10,19,24,25 143:3
    143:4,17,19,20 144:7,9
    146:7 147:5,9
**addressing** 49:15
**adds** 18:17
**adjusting** 96:4
**adjustors** 32:18
**adrian** 2:3 60:1
**advice** 25:7
**advise** 50:16,24 79:14 80:18
    96:1
**advisory** 24:12,12 151:12

**ae** 15:22
**ael10201endpol** 143:23
**affiliated** 115:19 136:9,16
    146:20
**afford** 113:21
**affording** 72:14 83:8,12
**agency** 24:11 30:21 31:4,6
    32:6 42:11 44:23 64:11
**agent** 85:22 88:11 121:17
**agents** 31:10
**aggregates** 57:20
**ago** 27:10,12 44:21 72:12
**agree** 42:18,25 43:1 58:4
    63:7 65:17 92:8,16 99:6
    106:2 113:16 123:11
    125:19 135:21 139:9 140:6
    140:7
**agreed** 4:3 18:8 106:24
    112:12 141:21 144:8
**agreeing** 103:15 106:19
**agreement** 57:16 69:12,24
    78:11,15 79:2,4,18 80:25
    81:11 95:9,16 96:18,22,24
    97:5,9,24 98:2,9,19 99:5
    100:13,18,20 101:1,6,13
    102:17,22 104:10 105:13
    105:15 106:12 110:3,4
    125:20 130:14 148:16
**agreements** 35:4,15,18 41:24
    96:2 111:5 135:17
**agrees** 81:25 97:4
**ahead** 60:5 90:14 139:18
**ai** 12:23 13:3 14:11,18 24:2
    24:18,24 29:1,20,23 35:9
    36:16,24 37:6 38:6 39:21
    40:2 43:7,22,22 45:5 47:24
    51:13,19,20 52:2,3,8,9,10
    52:11,18,24 53:9 54:8,17
    54:24 55:2,4 56:9 58:11
    66:10 73:7 74:3 75:13
    76:15 84:5 85:18 87:14
    88:22 93:12,18 97:19,20
    98:3 100:19 111:20 115:5
    115:8 116:14,24 117:2,6
    117:15,23 123:10,12,16
    125:3,4 126:1,16 128:9
    130:10 131:3 132:3 133:19
    135:4,7,9,10,23 138:8,18
    139:4 143:7 144:5 146:16
    147:8
**aig** 24:15,17,21
**aigs** 24:12
**ais** 26:21 38:15 47:22 74:8
    116:4,6 123:15 125:8

134:11 136:9 146:11
**alexander** 44:22
**alexandria** 26:2
**allegation** 6:21 48:19
**allegations** 7:18 11:12 18:13
    28:17 47:16 48:15,20
    112:16 139:25 145:2
**alleged** 12:15 108:21 144:11
    144:18,23
**allegedly** 6:14
**alleging** 108:5
**allow** 24:18 42:13 50:22
    115:7
**allowed** 39:19 46:6
**allowing** 45:5 131:8
**alphanumeric** 124:7
**alternate** 74:6
**alternative** 116:17
**amended** 12:11 107:21
    135:16
**amending** 85:21
**amendment** 3:8 42:14 46:13
    152:13 153:7,8
**amendments** 42:10
**ames** 64:2,8,10
**analysis** 35:3 62:21,23 68:1
    69:22 121:8 148:22
**analyze** 35:17
**analyzed** 120:23
**answer** 17:16 77:14 105:3
    129:6 133:17
**answered** 45:7 128:14
**answering** 98:16
**answers** 34:23 128:4
**antiindemnity** 46:2,12 49:1
    49:24 59:23
**anybody** 18:17 69:13 76:21
    86:16 93:2 107:24 136:15
**anymore** 66:19
**anyway** 29:11 139:24 147:21
    149:25
**apologize** 49:19
**apparently** 42:5,21 73:13,20
    143:24 144:1 147:13
**appear** 85:18
**appears** 57:3 72:16 73:3
**applicable** 42:12 140:20
    143:14,15
**applied** 120:25
**applies** 15:1 84:18 100:21
**apply** 106:23
**approach** 127:3
**approximate** 33:20
**approximately** 27:8 68:24

**Louis George Fey, Jr.**
**May 17, 2013**

155

april 68:24 70:3,11 81:11
  82:13 86:18 118:15 126:3
  143:24
architect 9:8 17:5 20:7 26:4
  27:15 29:24 33:16 37:18
  39:18,24 51:21 54:25 58:2
  66:5 91:10 109:11,12
  136:19 146:4,11
architects 8:10,14,15 10:17
  15:23 16:18 20:22 21:14
  25:21 32:13 33:15 34:15
  40:20 57:11 58:5,14 89:6,9
  90:1,21 123:20 147:7
architecture 10:7
area 84:11
areas 125:7
arent 74:21
argue 114:15
arises 8:4 102:24 142:3
arising 6:15 7:10 8:5 12:8
  18:10 19:1 52:5,21 56:22
  91:4 103:6,20 112:14
  118:23 120:16 134:11,20
  144:10,18,20 145:1,14
array 56:25
article 3:16 4:11 59:25 63:23
  64:13,18,23 79:2 151:12
  152:7
articles 40:11
asked 43:12 44:9 54:10 61:7
  68:6 69:4,6,8 86:13 103:8
  128:14
asking 50:9 69:10 85:20,22
  103:16
asks 52:12,14,15
aspect 91:19
asserted 142:6
assess 68:6
assessing 33:13
assessment 69:19
assist 10:6 60:18
assisted 37:6
associates 115:15,18
association 44:21 49:5
assume 40:2 148:6
assumed 78:2,5 110:2 132:15
  132:17
assuming 49:10 148:25
assumption 133:13
asterisk 73:14
attach 13:8 67:22 72:3 90:15
  120:1
attached 13:16 17:9 18:1
  24:11 40:11 60:2 70:9,11

72:2 92:11 102:13 112:3
  117:7 118:20 140:12
  152:14
attaching 67:21 81:10
attachment 13:18 92:13
attachments 13:5,11 129:18
attack 27:19
attempt 79:3
attempted 86:16
attend 130:3 133:4
attended 40:14
attention 113:4
attorney 151:13,14
attorneys 103:12,14
audible 42:1 106:16
auditing 32:7
authority 63:4 151:4
auto 73:3,7 82:3 84:17,19
  85:3,13 96:17
automatically 58:18
available 17:13 68:19 118:15
aware 12:14 38:14 131:20
  148:9,14,19

**B**

b 3:10 83:7
back 15:25 19:19 20:5,18
  29:5 33:3 37:22 38:11 39:3
  39:14,22 45:16 53:12
  54:23 59:6 60:16 63:22
  67:20 71:8 75:21 76:14
  77:17 78:9 86:18 87:24
  91:15 94:10 98:25 99:22
  100:9 102:7 104:18 119:4
  121:12 122:9 125:15
  131:14 136:15 137:9
backdrop 40:15
bad 30:24
ballpark 136:17
bancorpsouth 9:24 10:3,4,6
  31:13 60:22 133:9
bar 44:20 49:5
barnett 2:6
barricades 67:4
based 38:23 47:24 48:1 51:4
  60:25 65:6 76:7 85:17 96:9
  99:21 100:15 101:25
  107:10 112:19 115:5 134:3
basic 56:20 140:4
basically 14:3 32:18 33:20
  42:4 68:1 138:4
basing 111:14
basis 7:5 18:15,16 22:18,23
  25:3 39:8 49:16 55:12

60:21 66:1 114:18
baton 1:17 2:4 5:2 151:18
bear 64:19
began 118:12
begins 58:1 90:24 110:1
  111:12
behalf 1:11 5:15,16 12:11
  16:3 47:1,17,18 105:19
  142:4,15,18 152:4
believe 13:10,17,20 46:12
  60:1 62:16 71:3 82:7 102:5
  112:7 115:4 117:3 123:18
  126:14 127:16 149:14
benefits 74:21 75:4,8,9
best 61:18 151:8
better 36:4 87:8
beyond 98:8
bible 90:3
big 24:9 34:16 38:7
bill 42:5
bit 8:8 105:11 138:13
blank 102:15
blanket 24:24 25:1 38:16
  57:14 58:11,23 59:8 66:18
  72:20,25 73:7,20 147:4,6
blur 27:11 117:25
board 135:25 151:11,12
boils 11:7
boldfaced 19:7,9
book 63:15
bottom 41:23 60:17 72:16
  75:23 90:8 94:9
box 83:17 84:8
breach 11:24 27:25 94:7
  98:5,22
break 33:2 40:24 41:6 45:13
  45:15 46:1 62:22 87:23
  100:8 103:23 104:14 122:7
  122:8 140:9
breaking 68:2
brian 30:12,14
bring 48:7 132:9
broad 14:2 52:10,11,23 53:8
  53:25 55:1,3,5 56:1,14,16
  112:2 128:19 132:21 134:8
  145:14
broaden 85:9
broadened 55:22
broader 7:12 8:2 12:20
  23:14 50:2 52:21 54:12,12
  54:13 55:17,19 113:22,23
  133:21,23,25 139:8 144:14
  145:10
broadly 145:15

broke 45:18 100:11
broker 16:10,11 19:25 30:4
  30:8 89:23 136:22
brokerages 31:14
brokers 30:2,7,9,10
brought 6:14 28:15 30:23
  36:14 45:1
build 26:10
bullet 64:23 130:17 131:10
  132:16 134:8 135:6 136:2
  136:6 138:21 139:4 140:3
buried 40:6
business 9:17 16:10
buy 127:18

**C**

c 2:1 9:18 49:20 83:7 151:1,1
call 26:17 34:18
called 91:2
cancel 100:17
canceled 98:3,3,20
cant 8:21 9:10 16:11 19:25
  20:9,17 25:10 26:13 28:10
  44:9,21 46:8 51:1 52:3
  70:24 74:5,7 75:8,13 80:3
  86:4 87:2 88:14 89:1 93:4
  93:14 94:6 99:21 118:1,17
  127:4 128:2 142:10 147:20
  148:5,6 149:11
capacity 109:11
cardno 82:14
care 33:23 49:7 55:20
carefully 79:15
carried 143:15
carrier 5:11 9:2 13:2 15:6
  21:23 23:13 26:18 28:3
  29:3,4,20 30:4 36:17 44:7
  48:8 51:25 56:3 86:1 87:14
  93:23 127:3 129:8 131:4
  140:18 141:4,5 148:3
carriers 11:19 17:5 21:8 22:1
  22:2,20 23:12 29:6,22 38:2
  38:14 39:13 40:7 43:22
  44:18 51:3,13,15 54:5 56:7
  66:23 89:2 111:22 115:7
  126:5,17,23,25 128:3
  129:13 130:19 136:8
  139:12 140:18
case 6:12 7:14 11:8 20:5
  22:13 29:16 35:1,19 36:18
  38:13 39:1 47:12 50:4,7,9
  62:21 68:3 74:23 106:15
  107:6 108:17 117:14
  124:18 127:9 137:4 147:14

Louis George Fey, Jr.
May 17, 2013

148:9 149:4,9
casebycase 22:18 25:2
cases 34:8 47:13,14 50:12
  145:1
cassandra 1:12 151:2,22
cat 131:16
catlin 1:4 3:18 5:11 11:9
  12:11,15 13:17 14:11,18
  14:24 15:10 16:1,11 17:12
  17:18,21 19:23,24 20:7,11
  20:15 22:19 68:8 76:3
  102:1,5 106:6 107:6,11
  111:15,24 112:9 114:15
  116:3,5,8,16,24 117:15,19
  117:22 118:3,12 119:5,24
  122:16,20,25 123:8,10
  124:10,13 126:9,24 127:13
  127:14,17 131:21 132:4
  140:13 148:10,11,14,17,24
  153:1
catlins 68:19 69:2 111:20
  114:19,24 122:4 123:18
  127:8 136:10
cause 1:12 33:20
caused 65:3
ccr 151:22
centre 2:7
certain 21:1,6 22:11 47:19
  126:19 129:13 141:4,5
certainly 5:23 13:6 87:3
  137:25
certainty 111:19 125:25
  128:8
certificate 3:6,7 71:16 72:8
  72:10,11 75:17,22,22 76:7
  76:8,15 77:6,16 82:9,14,16
  82:21 86:7 151:16 152:1
certificates 76:21 77:9 85:7
certified 1:13 151:2
certify 151:3,6,9,13 152:9
cg 15:5 39:9 53:17 55:7
cgl 36:8,10 37:3 50:13 53:15
  72:20 82:3 91:21 92:1 95:3
  96:17
chance 45:25
change 85:9 107:23 148:21
changed 115:22 144:9
changes 102:9,14 107:11
  152:13
chapter 90:7,9,12 92:10
charged 38:20 141:20
check 77:4 83:17,24
checks 77:3
chenevert 1:12 151:2,22

chockfull 41:19
choice 27:24
choose 44:6
chris 129:21
christian 129:21,23 130:15
  134:13 136:6
christians 131:2
cic 129:21
cincinnati 62:6
circles 134:16
cite 149:11
civil 4:6 151:12 152:7,8
claim 6:14 32:8,9 33:14 35:2
  35:5 36:7 37:15 50:21 67:3
  75:3 80:15 87:20 91:18
  93:22,24 96:4,5 99:22
  100:3 102:20,21,22,24
  103:1 108:4,10 110:20
  114:6,7,10 121:6 122:2
  132:3,5,10 141:25 142:6
  143:18 144:10
claimed 135:4
claims 12:5,8,14 24:12 31:24
  32:11,19,22 33:12 38:12
  38:22 43:18 66:8,10 79:22
  88:17 91:4,19 99:20 107:5
  118:23 120:16 128:25
  141:22
clarification 66:3
clarified 42:10
clarify 100:25 119:1
clause 65:3 135:14,15,22,25
clear 98:15 130:13,17 131:11
clearly 43:4
cleaver 89:19
client 6:13 10:25 20:7,16
  22:11 25:7,17 26:7 27:1,24
  28:11,24 35:16 78:4,14,16
  79:1 80:16,18 81:25 82:6
  88:10,22,23 92:20,21 96:1
  118:21 120:14 123:1 137:9
  141:7,9,13 146:5
clients 8:11,13,23 9:9,11,12
  9:12,14 10:2,2,6,7,19 16:4
  20:11 25:19 26:7,21 29:1
  29:24 34:1,3 35:12 36:4,5
  36:8 39:10,12,25 47:25
  50:25 51:22 54:25 57:10
  57:15,25 58:7 60:18 61:1
  66:6,14,24 74:14 79:6,15
  89:2,3 91:7,24 92:6,15
  93:16 116:19 128:1,3
  131:8
clout 88:12

cna 147:1
code 147 151:12 152:8
codes 15:7
collect 76:22 141:10
collecting 75:9
collings 64:2,6,9
column 73:6 83:4,15,16,23
  84:3
come 8:18 13:24 20:3 36:17
  47:6,7 67:9 75:4 114:10
  125:25 136:15 141:18
comes 21:5 27:23 28:8 81:20
  88:13 94:14,17
coming 95:8
commencing 1:19
comment 46:18
commentary 62:21
comments 77:18
commercial 16:19 17:6
  20:23 91:25
committed 144:11,24
committee 36:22
common 37:22 68:14 76:19
  110:19,22 111:2,4 115:6
  149:8
commonly 62:17
comp 73:20,24 74:3,8,12,17
  74:19,21,23,24 75:1,4,8,9
  75:14 83:2,22,24 84:5 85:4
  85:13
companies 90:10
company 5:12 9:20 22:10
  32:6 34:16 57:4 62:5 67:10
  77:10 81:25 82:2 86:2
  89:17,20 146:20
companys 103:2
companyspecific 135:14
  136:1
compare 125:1
compatible 17:11
compensation 84:19
complained 76:14
complaint 12:10,11,21 18:14
complaints 77:17
completed 54:15 98:2 99:9
  99:16 100:5,23 101:6
complex 47:2
compliance 60:20 77:2,7
  80:12 151:10,11
complied 76:24 98:1
complies 122:14
comply 48:4 52:7 80:12
computer 76:25 77:3
concerned 46:22

concluded 150:3
conclusions 80:2
concrete 65:25
concurrent 14:6
condition 108:6,13,16
conditions 78:10 92:2
conducting 32:7
conference 26:17
confidence 149:22
confident 126:19,22
confirm 13:14 15:12 76:17
  107:4
confirmed 44:23 127:16
conflict 111:6 137:25
confuse 91:25
confusion 114:6,9
connected 151:15
connection 63:20 71:17
  82:10 105:20 112:6 118:7
consider 57:1 63:3 79:25
consideration 22:16 141:20
considered 4:12 124:19
  134:19 148:4
consistent 83:21 120:8
constant 40:9
constantly 43:21
construction 16:19 21:1
  23:17 32:17,19,22 33:11
  34:5 35:2,3,4,14,20 36:7
  36:23 37:15 38:13 43:25
  46:25 48:17 53:14 59:1
  64:15 76:20 82:15 84:15
  109:12 110:20
consultant 109:14
consulting 9:20,20 10:2
contact 34:17
contained 69:20 71:23
  116:15
context 50:13 83:1 90:19
  135:10
contexts 21:11
continue 33:9
continuously 142:1
contract 24:25 25:5,8,11,15
  27:21 28:1,12,25 35:16,23
  35:25 38:6 39:4 50:25 51:2
  53:20 54:10,11 55:6,10,22
  57:10,16,17,25 58:7,23,24
  60:18 65:4 66:12,18 69:23
  70:15 74:10,17 76:3 77:7
  78:4,5,22,22 79:1,8,14
  80:4,6,11,13,17,19 81:1,5
  82:11 85:22 88:24 93:12
  93:13 94:8,17,17,23,25

Louis George Fey, Jr.
May 17, 2013

96:10 97:7,12,18 98:7
101:12 102:2,3 103:24
104:4,5,20,22,24,24,25
105:13,14 110:2,4 118:25
120:17 132:16,17,19
136:25 137:11
**contracting** 26:9 101:4
**contractor** 25:3 33:18 35:5
35:22 48:10,20
**contractors** 28:13 34:4 35:7
35:16,25 36:5,12 38:3 47:1
49:11 58:16,25 59:3 76:20
91:11 92:2
**contracts** 10:8 32:20 35:8
39:3,11 42:6 46:9 60:21
68:20,23 69:23 74:13 79:6
79:23,25 93:10 103:5,19
104:14,19 110:20 111:4
**contractual** 35:10 36:16
39:14 52:8 60:19 68:12
106:7,8 132:15
**contractural** 20:21 38:5 39:2
47:22 48:1,4 151:11
**contribute** 143:13 148:10
**contribution** 135:8
**conversation** 29:9 93:15
**convinced** 121:18
**copies** 41:7 45:13 71:1
**copy** 13:10,16 15:10,10 16:1
16:1 20:1 40:18,22,24 70:1
71:15,19 72:8 78:22 79:10
81:12 82:9 133:1 141:11
**copyright** 57:3 90:8
**core** 31:20
**corner** 90:13
**corners** 85:17
**corporate** 127:12,17
**correct** 5:14,17,18 6:10 9:22
9:24,25 10:10,14,15,17,18
11:22 12:7,13,21 13:1,19
13:22 14:12,13,16 15:4,13
15:14 17:20 18:5,6,23 19:3
19:5,7,8,11,14,23 23:4
24:16 32:14 34:12 35:4,7
36:7,25 37:1,2,7,12 41:13
44:2 46:13 49:22 50:3,14
51:4 53:12 60:22 61:2,11
62:18 63:1,2,8 64:16,22
66:1 68:3,4,10,16,21,22
69:25 70:18 71:14 72:17
72:18,24 73:1,2,5,9,12,18
73:23 74:6 75:15 76:2,12
77:13 78:20 80:22 81:16
81:17,21,22 82:4,5 83:10

83:19,20,25 84:1,21,25
85:20 87:10 94:15 95:6,18
96:6 97:1,2 98:14,24 99:25
101:3,7,11,14,17,19,20,24
102:15,16,19 103:3,13
105:7 106:1,15,18,20,21
107:2,7,8 108:13,14,18
110:8 111:18 113:20
115:23 116:22,23 117:1,2
117:5,9 118:5,19 119:1,19
120:20 122:17,18 123:3,14
126:3,4 128:7 129:9,11,15
131:23 132:5,18,22 137:21
138:11 140:17 142:9,12,16
143:6,22 144:2,12,22
145:21 146:1,2 147:3,11
147:16 151:7 152:10
**corrections** 152:12
**correctly** 78:8
**cost** 148:16
**costs** 36:18 103:11,13 104:6
148:11
**couldn't** 22:13 23:1 138:23
**council** 24:12,13
**counsel** 114:22 151:14,14
**countless** 50:12
**country** 62:22
**couple** 14:9 21:21 27:10
62:13 66:15 109:3 122:12
122:15 123:9 134:6
**court** 1:1,13 5:2 95:21
147:19 149:22 151:2
**cover** 7:17,24 92:21 112:7
129:2 131:15,16
**coverage** 3:18 6:4,19 7:2,9
7:23 8:9 11:10,11,14,25
12:4,5,19,22 15:2 16:3
17:12,17,23 18:13 23:22
25:6,14 28:2,17,19,21 29:8
35:9 38:8 39:21 40:3 46:24
48:24,24 49:3 50:20 51:1,2
51:20 52:9,9,10,11,19,24
53:8,9,10,22,25 54:15,24
55:2,6,8,10,14,16,18 56:8
56:14,20 57:1,13,14,15
58:3,7,22 59:9,18 60:20
61:5,9 62:19 66:5,11 68:18
68:18 72:14 73:10 74:3,7
74:18,24,25 75:2,7 76:4
77:12,18 79:22,25 80:9
83:3,12 85:9,9,10,11 86:14
86:17 87:11,15,19 88:22
91:6,18 92:2 93:13,18,20
93:24,25 94:13 96:5,9,11

96:13,14 98:18 99:9,20
106:6,9 110:2,5,11 111:7
111:16,23 112:11 113:17
113:22,23 116:17 118:3
126:1,7,20 127:1 128:9,11
129:9 130:20 133:19
134:11,17 135:4,7,10,17
138:9,18 141:17,19,21
142:17,20 143:7,7,10,12,19
143:20 145:16 146:17
147:6,8 148:4,6
**coverages** 21:6 22:11 72:15
75:23 83:4,8 85:23 87:1
97:10 100:17
**covered** 7:1,6 11:15 12:8,18
14:5 18:19 36:16 43:23
53:4,5 54:21 112:17
125:18 128:17 129:7
132:12 135:20 138:5 142:5
149:7
**covering** 58:25
**covers** 13:3,24 74:1
**cpcu** 31:19
**crashes** 47:15
**crc** 30:12,15,16
**crux** 49:9 64:18 131:2,6,9,10
**curiosity** 86:15
**current** 29:3 42:15 45:21
46:14
**currently** 8:25 9:15,19,23
**customary** 68:14 93:21

---

**D**

**d** 3:1 83:7 85:25
**daily** 60:21
**damages** 6:14 144:10
**data** 62:24,25
**databases** 61:19
**date** 57:2,3 119:8,16 120:7
152:21
**dated** 63:24 70:2,11 119:13
**david** 64:1,9
**day** 23:16 151:18
**days** 130:14
**deal** 52:6 62:1 118:16
**dealing** 31:2 33:11 34:1 36:3
50:5,12 117:22
**dealings** 89:22 117:18
135:10
**debate** 134:17
**decide** 22:2
**deemed** 53:4
**defect** 99:18
**defects** 47:17 99:17,18

**defend** 36:18 65:5 103:6,10
103:15,17,20
**defendant** 2:5
**defended** 132:8
**defense** 36:19 50:21 94:4
103:25 104:3,5,6,8,23,25
105:1,6 133:22 138:6
**defenses** 32:21
**define** 21:20 91:17
**defined** 18:21,24 19:9,13
78:3 108:11 109:3,7,14
151:11
**defining** 135:2
**definitely** 51:10
**definition** 108:10,19 109:2,8
112:23 120:13 135:16
144:8 145:22
**definitions** 108:3
**degree** 80:7 111:19
**delete** 92:4
**delivered** 3:13,15 40:5,19
41:15 56:24 60:10,12
**demand** 108:4 148:10
**demands** 92:6,15
**denied** 147:14
**department** 21:5 45:8
**departments** 67:15
**depend** 6:6
**depending** 54:11 128:20
130:21
**depends** 7:15 11:17 30:9
130:25
**deposition** 1:9 4:4,13 13:9
33:7 77:20 127:13,17
150:3 152:5
**depositions** 5:19 72:3 127:12
**described** 7:3 22:22 28:5
44:3 48:10 49:10 97:5
101:1
**description** 3:11 70:15 73:14
81:6
**design** 15:21 16:23,24 21:13
26:10,12 28:17 32:24
33:11,21,22 35:6,8,11,17
36:14 42:6,10,15,23 43:8
43:15,19,20,23 44:14,15
45:6,23 46:15,23 47:6,6,10
47:16,21 48:12,18,22
49:15 50:5 51:6 57:1,9,24
58:8,16 61:1 64:1,14,20
65:1,3,4,9,19 67:3 68:13
89:17,20 90:9 93:22 99:14
111:2 122:1 124:17,21,23
125:5,6,8,10 139:13,16

designation 31:19
designed 47:11 48:18
designer 109:13
designs 26:11
desired 121:17
desk 63:18
despite 92:6,14 146:3
detail 88:6
detailed 69:15 135:3
details 26:1,15,23 86:23
determine 79:8 80:14 120:24
developed 38:12
developer 34:9 47:18
developers 21:1 47:3 59:1,2
development 61:5
dicey 129:20
dick 133:7
didnt 24:9 29:19 34:5 44:6
  44:10,10,16 45:7 48:4,21
  53:21 55:3,19,20,25 56:15
  71:21 98:10 121:5,18
  125:1 133:1 135:3 149:4
difference 104:7
differences 17:1 125:3
different 7:8 11:20,20,20
  21:22 29:17 34:6,13 35:21
  36:1 40:7 52:17 61:19 62:7
  63:12 91:21 93:20,20
  102:11 105:4 106:10 114:1
  114:2 120:9 123:12,12
  124:23 125:1 129:12,13
differently 16:17 17:5 58:12
digits 119:15 120:6
direct 30:8 75:5,10 94:4
  128:17 134:18
direction 34:19 151:7
directions 111:9
directly 35:24,25 101:4
director 47:13
disagree 45:24 59:8 65:7
  92:23 93:3 94:1 113:16
  140:6
disagreement 66:2
discourages 93:7
discovered 99:19
discovery 4:5 127:9
discuss 69:23 133:3
discussion 26:16 28:12 33:5
  51:18 62:23 67:19
discussions 28:22 56:16
disk 69:14 71:23
disposal 56:6
dispute 137:24 148:15
dissertations 62:6,9

district 1:1,2
division 23:17 32:17 34:5,12
  35:2,5 36:7 37:15 53:14
  137:17
doctors 10:20
document 41:5 60:10,13
  72:2 81:9,12 85:18 90:6
documents 12:9 41:1 71:22
  117:10,11
doddered 147:13
doesnt 11:25 54:13,15 57:2
  58:21 69:15 76:7,15 85:4,8
  85:9,10,13,14,15,15 88:15
  95:13 105:23 113:24
  115:13,15 123:21 148:4
doing 6:24 16:12,13,19,23,24
  17:6 25:23 29:12,15 43:19
  46:24 66:21 69:16 97:16
  103:1 125:6 137:1,3,15,16
  139:13
dollars 47:14 94:18
dont 5:22 8:19 9:7,18 11:2
  12:19 15:3 16:8 21:12 24:5
  24:7 26:1,5,14,23 27:2
  28:14,16 29:6 31:9,12,23
  37:9,21 40:6,23 41:1 42:25
  44:25 45:9,10 47:19 50:11
  50:19 51:6,9,17 57:19 60:1
  61:17 65:15 66:19,22
  74:24 77:19 78:24 79:11
  82:7,12,18 86:11,20 88:1,4
  89:3 90:11,18 91:11 93:8,9
  93:25 94:6,7 103:25 105:3
  107:12 109:21,22 115:12
  117:17 120:10 121:24
  122:4 123:14,15 125:8
  126:9 127:2,12,18,19,19,21
  128:5 131:7,16 138:22
  139:14 140:19 146:9,15,18
  146:24 147:21 149:24
door 137:25
dot 82:8
dotd 26:6
doubt 107:12
dp 17:11
dpae 15:16,19 18:6 19:3 20:6
  20:14 102:12 108:3 112:3
  116:14 124:14
dpic 89:15,22,25
draft 13:16 22:17 118:4,9
  119:23 120:18,22 122:25
  124:10
drafted 36:22 99:4
drafting 23:3,5,10,11,21

37:7 61:5,9 99:7
draw 113:3
drawing 102:15
drive 69:14
driven 129:8
due 6:23
duly 151:4
duties 78:13 146:1
duty 103:17

## E

e 2:1,1 3:1,10 10:1,16 29:1
  57:15 66:24 83:7,13 88:8
  113:2 128:1 144:5 151:1,1
  152:6
earlier 36:25 43:12 44:9 51:4
  51:18 60:25 65:6 71:24
  98:16 107:18 116:17
  122:24 124:16 139:9
easier 121:14 125:10
edict 59:14
effect 55:13 102:20,22
  104:22
effective 46:4 102:18 118:12
egeo 13:17 116:11,21 118:2
  119:14,25 120:23 122:16
  124:12
egmp 14:15,21,23 15:4,25
  17:17 19:19 20:18 116:25
  119:12 140:13
eight 90:19
either 24:7 27:24 30:8 49:15
  50:20 52:15 75:17 85:21
  88:23 93:13 103:25 106:25
  111:20 113:11 132:2
email 70:9,11,17,19
emphasis 35:3
emphasized 134:13
employed 151:14
employee 75:3
employees 74:20,20
employer 32:21 74:1,6,22
  75:5,10
encountered 38:7
encourage 93:8
ended 29:7
endorsement 11:25 12:23,24
  13:21 14:3,11,18 15:25
  16:2 18:3,7 19:2,21 20:18
  21:9 22:7,9,22 23:12,13
  24:1,2,6 29:20,23 36:24
  37:2,6,17 51:20 55:9 66:11
  66:16 73:1,16 75:25 87:11
  102:8 107:11,18 109:15

111:21 112:5,10,20 115:5
  116:25 117:2,7 123:1,16
  123:22 124:11 127:25
  138:9 139:3 143:13 144:4
  144:7,13 145:24 146:25
  147:5
endorsements 12:24 17:8,24
  18:1 20:2 23:6,16,22,25
  24:3,18 36:23 42:17,23
  43:7,15 44:14 45:5,22
  46:16 47:25 51:7 53:18
  54:9 61:6,9 76:17 87:17
  97:19,20 98:4,20 100:18
  107:15,16,21 122:11
  123:11,12 134:4 140:11
ends 27:23
energy 2:7
enforced 99:23
engineer 9:9 10:7 16:12 17:6
  20:7 26:3,21 27:16 29:24
  33:17 37:18 39:19,25
  51:22 54:25 66:5 109:11
  117:3 122:3 123:1,24,25
  124:2,4 136:19 146:5,12
engineering 8:10 14:25 16:6
  16:7,14,25,25 81:5 109:17
  124:18,19 125:13 137:14
engineers 8:14,15 10:17
  15:23 16:16,18 17:2 20:19
  20:23 21:10,13,14 25:21
  32:13 33:15 34:15 40:20
  57:12 58:2,5,14 89:6,9
  90:2,22 91:10 122:21
  123:20 124:17,21 125:9
  147:7
enter 77:1
entire 32:3 63:15 131:10
entities 18:9 26:20 42:6
  44:19 77:3 112:12 114:2
  115:8 116:4 123:22 136:5
  141:23
entitled 1:12 81:16
entity 26:20 27:4 34:10
  54:18 108:24 113:5,8,10
  113:11,11,19 115:17,18,21
  127:16,25 135:19 143:16
environmental 21:11
eroding 50:18
error 99:14 106:13,20
  108:22
errors 6:24 64:1 91:2,4 95:4
  104:15 105:19,24 112:17
  135:19
es 88:6,25

Louis George Fey, Jr.
May 17, 2013

especially 86:25 94:3
esq 2:3,7 153:24,24
essen 1:16 2:4
establish 35:1
evaluate 121:6
event 25:10 137:24
eventually 139:24
everybody 53:16 76:24
exact 26:15 121:12
exactly 26:13 31:2 50:24
  80:3 93:10 138:4
examination 3:4 5:5
examined 5:3 69:1
example 13:2,24 17:3 22:8
  43:20 48:25 54:15 119:17
  121:14 136:25
examples 8:18 18:2 24:11
  27:14 51:19 52:25 119:2
  123:4
exception 74:16 138:14
  152:12
exceptions 53:25 59:11
  88:20 138:19
excess 47:13 73:10,16 83:25
  143:7,10,13,21
exchange 22:15
excluded 132:16,18 147:19
excludes 138:9 147:8
excluding 4:8 70:19
exclusion 106:7 131:17,18,21
  132:2
exclusions 73:15 120:25
exhibit 3:12,13,14,16,17,18
  13:9,12 60:10,13 67:23,24
  70:21 90:15,16 92:10,11
  92:12,13 120:2,4
exhibits 60:2,14
exist 85:15
existed 66:9,10
exists 66:9
expanded 134:9
expenses 103:12,14 104:12
  144:10
experience 16:15 23:2,5,9,21
  32:3 91:9 115:6 116:3,5
  117:14 126:10 136:12,13
expert 5:16 109:14 117:13
  137:13,14 147:15,18
explain 27:21 55:9 112:6
  135:1 141:1 147:25
explained 133:15
exposure 29:13 38:8 47:9,11
  49:8,14 54:6 124:20,24,25
  137:2 139:5,17,22,23

148:3
exposures 121:25 136:24
  149:3,6
expressly 147:8
extend 91:13
extended 141:22
extent 7:18 38:18 53:24
  93:25 97:18 100:21 106:22
  111:7 112:15 128:24
  134:22 137:22 138:1
eye 79:23

F
f 151:1
fact 18:2 23:17 44:18,20
  46:18,20 49:5 83:3 88:1
  99:20 116:3
failure 11:24
fair 7:22,25 20:19 53:11 59:7
  59:9 80:21 96:3 104:10
fairly 28:8 126:18 137:2
familiar 31:7 39:23 86:23
  88:5 89:4,15 90:4 97:12
  112:23 113:12 127:8
  129:23 131:18 147:22
  148:12
far 46:21 117:20
farm 147:13
fashions 35:21
fault 138:2,2,3,3,7
favor 84:18 85:2 95:14
favorable 145:15
fc 61:15 62:4
features 91:17,22
federal 4:6 152:7
feel 97:7 126:18
feelings 65:25
fees 103:12,14
felt 24:14
fey 1:10 5:1,7,9 9:20 10:2
  45:18 72:7 100:11 149:13
  151:3 152:3,19
feys 3:12
fiery 47:15
fights 131:17
file 76:23 77:5 141:8,12
filled 63:5
final 119:24 120:22
finance 31:24
financial 151:15
find 18:2 34:17 37:22 39:5
  42:2 141:11
fine 71:23 110:17
finished 98:21

firm 1:16 2:3 10:24 16:6,7
  43:16 44:15 45:6 46:23
  57:15 64:12 65:3,4 67:3
  91:3
firms 42:16,23 45:23 46:15
  51:7 57:9,24 58:8,16 61:1
  65:1,9,19 68:13 77:8 89:20
  111:2
first 11:5 13:18 15:12 24:1
  25:7 27:19 34:24 40:10
  44:25 57:23 64:17 65:7
  66:2 68:5 69:23 70:8,14
  71:4,6 72:11 77:25 79:1
  82:19 83:4 88:18 91:1,18
  97:3 110:8 111:12 114:11
  118:12 122:15 127:2 130:9
  130:21 132:16 134:7
  135:21 138:21 139:3 140:3
  140:5,12 142:5 146:14,18
firsthand 116:2,5 117:14
five 27:11 66:20
floating 87:18
flow 78:1,18 79:7,24 95:16
  95:22 100:15 101:22 104:9
  104:21 105:4 106:23
flows 94:16
focusing 144:20
followed 124:8
following 18:9 53:19 54:18
  78:8 82:2 94:14 112:12
  116:21 141:22 144:9
follows 5:4
followup 100:14
foregoing 151:5 152:5,6
forever 40:9
form 3:18 6:6 7:9,15 11:18
  13:3,17 14:2,14,17,20,24
  15:15,19 16:2,9 17:11,12
  17:17,18,23 18:11,18 19:7
  19:23 20:8,10,14 21:13
  39:9 52:10,11,24 53:8,16
  53:25 55:2,3,5,7,13,13,17
  55:19 56:5,6,14 59:12
  70:22,24,25 71:5 78:1,10
  82:20 83:4,16 87:19,20
  108:8 112:2 113:2 116:7
  116:11,14,16,17,22 118:2,3
  119:25 120:7,12,19,23
  121:20 122:4 124:5,21
  125:1 128:13,16,19,20
  129:10 132:21 139:8 141:3
  141:11 144:4 145:12 147:1
formalities 4:8
format 151:10

former 7:17
forms 7:8,12 8:5 11:20 13:21
  15:2,5,6,8 21:9,14,25 22:1
  22:3,14,24 24:13 54:17
  55:15 62:22 66:13 107:24
  117:16,20 119:5 121:12
  123:8 124:23 129:13
forth 151:4
found 63:24 97:8 141:8
four 27:11 28:3 69:7,17
  85:17 102:13 119:15 120:6
  131:16
fourth 3:13 42:20 45:19 57:8
  59:7 60:8 125:16
frame 37:14 39:15 51:11
frankly 102:10
free 97:7
freely 38:10,10
frequently 93:5
front 9:18 66:16 71:8
frown 88:9
frowned 25:8 67:16 93:5
frowns 58:19
full 77:25 80:24 91:23 94:11
  123:7 125:16
fully 38:2 91:8,11 97:25
function 91:8,11 139:13
fundamental 133:18
further 36:20 151:6,9,13

G
g 2:3
gamut 20:25
gas 17:3,7 20:20,24 21:10
gateway 61:19
gateways 62:3
gather 77:9
gc 26:9,25 33:18 34:8,9
  47:18 139:12,22 146:21
gcs 21:1 27:1 39:4 47:4
general 6:17,20 7:9,22 31:23
  33:18 34:3 35:22 36:12
  38:17 47:1 48:10 49:11
  50:19 56:19,20,21 57:13
  57:20,20 58:10 59:10
  69:11 72:17 80:25 81:11
  84:17,19 85:3,11,12 88:19
  91:25 97:21 134:21 138:17
  144:16 145:1
generalizations 88:16
generalize 87:3
generally 6:7 7:16 26:16
  29:15 64:13 65:11 69:18
  87:2 119:2 121:5 146:11

**Louis George Fey, Jr.**
**May 17, 2013**

generated 107:15
george 1:10 5:1,9 151:3
    152:3,19
getting 28:1,19,21 29:5 38:3
    38:19 39:10 49:2 138:24
give 8:18 13:2 52:14 54:10
    54:14,16 56:9 77:4 130:24
    152:4
given 5:19 116:7 119:1
    152:11
giving 8:22 42:4 51:19
gl 47:9 55:7,8 58:23,25 72:22
    81:4,20 93:19 94:13,20,22
    96:8,11,13,14 97:20 99:7,9
    134:8
glance 77:5
go 7:15 11:2 29:14 39:12
    41:5 60:5 63:22 77:11
    87:13,21 90:14 91:16,22
    93:17 99:22 100:6 102:24
    137:9 139:18
goal 54:9
goes 42:13 53:12 55:13 65:14
    97:5 99:17
going 7:16,23 11:19 15:9
    17:22 19:22 25:1 28:18
    29:11,15 32:3 39:22 40:17
    40:25 41:4 47:4,5 50:16
    54:14,16 55:4,23 56:9,13
    60:4 63:9 64:19 72:3,7
    76:24 79:9 81:9 82:13
    87:12 90:6 91:16 93:18,19
    93:22 97:15,21 99:14,19
    110:22 111:9 119:24 121:6
    130:23 131:5 138:17,23
    139:2 146:15
good 50:15 62:24,25 76:23
    140:10
gotten 126:8,13,16,20,21,22
    127:1,22 146:16
gough 64:2,8,10
governing 42:6
governmental 42:11
grab 141:11
grabbed 24:10
graphic 64:18
gray 125:7
great 39:11
group 1:4,4,6 5:10,13 62:5
    72:9,10 82:15 84:15 90:10
    115:3,20,21 153:1,1,3
guess 14:25 15:24 44:22
    61:18
guessing 9:6 30:1 64:11

guide 88:17,19,19 89:12
guideline 3:17 59:20 90:1,7
guidelines 89:8 151:10
guys 137:4

**H**

h 3:10 64:1
hadnt 38:2,7,8
halfway 36:20 94:12
hand 15:9 40:17 72:7 82:13
handbook 63:15
handed 70:1 81:10
handle 32:19
handling 80:15
hands 20:3 80:19 123:6
handwriting 132:23,25
handy 24:10
hang 104:18
happen 50:22 75:5
happened 96:5
hard 136:20
hardcore 21:5
harder 119:3
harm 135:9 137:5
hartford 72:16,19 73:4,11
havent 41:21 86:24 120:9,21
    127:11 135:11
hazardous 122:1
head 30:20 50:7
heading 64:17 90:25
hear 131:14
heard 31:11 40:4 61:16
held 67:19
help 94:8
helped 32:16 35:1
hereinafter 141:24
hereinbefore 151:4
hereto 152:14
hes 30:16 44:22 65:11,13,14
    65:24
hesitant 125:4 130:20
hey 28:13 54:5 76:14 80:18
high 125:7
higher 7:13 29:15 75:3,8
    124:24
highway 43:21,25
hill 63:20 9:1
hiring 28:13,15 140:1
holden 115:15,17
holder 72:10 75:22 82:16
horrible 30:17
hours 40:10
hundred 11:1
hypothetically 97:23 106:3

**I**

id 9:6 11:2 28:9 30:1 63:22
    86:5 130:1
idea 10:24 23:18 74:9 141:14
identification 13:12 60:14
    67:24 90:16 120:4
identified 115:5
identifiers 124:6
identifies 83:12
identify 14:8 79:4 83:7
identifying 30:24 78:25
idiosyncrasies 90:20
ifneeded 49:16
ii 118:20
ill 5:21 15:12 37:13 41:6
    45:13 98:17 105:2 150:1
illustrative 121:9
im 8:22 9:4,6,22 10:14,17
    12:21 14:25 15:9,18 17:10
    17:12,15 21:17 23:1,11
    24:11 27:2 30:17,20,24,25
    32:3 40:9,17 42:3 43:10
    49:6,10,18 50:9,23 51:3
    58:13 64:11 69:16 72:3,7
    75:10,20 78:8 79:5 81:9
    82:8 85:20,20,21,21,24
    88:9 89:10,16,23 90:6
    94:11,14 98:10,11 101:15
    103:23 104:19 105:12,14
    115:9 116:20 118:16
    119:24 121:11,13 124:13
    124:25 125:22 126:19
    135:11 140:10 145:21
    146:13 148:13 149:11
impact 79:24
implement 47:8
implementation 47:10 49:24
implemented 46:2
imply 85:4
important 92:3
improper 6:23 48:15 139:25
improperly 6:22 48:18
imputed 110:6,14
incident 105:20
include 7:12 56:21 61:1,8
    66:13 82:1 113:9 135:16
    141:22
included 6:18 12:23 18:9
    24:4 35:6 81:5 112:13
includes 134:1
including 10:9 38:6 46:3
    53:5 113:6 131:15
incorporated 78:16 79:19
    80:5

incorporates 109:3
indemnification 50:21 65:3
    103:9,13 104:1 105:18
indemnify 103:6,11,20
    104:11 105:23 106:19,24
    132:20
indemnity 35:10 41:24 47:22
    103:15 104:13 106:4,8,11
    132:21
independent 6:5 12:15 106:4
    107:1 111:23 128:11
indicate 76:7 84:22 120:7
    140:23
indicates 72:19 73:16
indicating 72:9 84:9 140:25
indication 75:16,24
individual 22:2 118:1
industries 110:25
industry 16:16 21:24,25 38:3
    38:6 40:7 43:3 46:20,21
    53:13 58:19 59:14,15
    61:15,20 62:5 63:1 68:15
    87:18 90:3 93:7 112:22
    115:6 117:4 121:13 139:21
    145:9,14 148:2 149:9
industrys 23:25 42:15,21,22
    45:21 46:14
industrywide 43:4
information 77:2 85:8
inhouse 77:8
injured 75:2
inquiry 12:1
instance 25:24,25 67:8 114:6
    117:22 120:25 122:24
instances 28:23 29:3 48:11
    54:24 118:1
institute 62:16
instructing 32:5
insurable 41:24
insurance 1:4 5:12 9:15,16
    9:24 10:8 16:15 17:4 20:6
    20:22 21:23,24 31:13 32:5
    32:6 36:24 42:12,14,20,22
    43:3 46:19 56:25 57:10,25
    60:23 61:20,22,23 63:1
    64:10,14 68:19 71:13,16
    72:9 77:2 79:21 80:8 81:15
    81:16,23 82:2,10,14 83:18
    85:7 86:2,14 88:13 89:17
    90:7,10,13 91:2,3,12 92:1
    92:14,16,18 95:2,15,20,23
    96:11,23,23 97:6,24 98:7
    98:22 99:4,5,8 100:12
    101:10,16 103:25 111:7,15

Louis George Fey, Jr.
May 17, 2013

123:13 125:25 129:19
134:16 135:21 137:13
143:10,14 144:25 148:2,3
153:1
**insured** 6:2,19 7:2,9,11,18
7:20,21,23,24,25 8:6,25
11:7 12:5,19 14:4 16:3
17:19 18:18,25 19:13,16
19:16,17,18,18 20:15
22:15,21 23:15 27:15
28:20 33:16,17 36:12,23
37:17 38:1,8,23 39:5,8,18
42:12,17,23 43:15 44:14
45:22 46:7,16 48:6,24 49:2
49:17 50:5,13,17 51:7 53:1
53:3,6,19,21,23,23,24 54:7
54:19,20,20 55:11,21,24
56:3,17,20 57:14 58:10,15
58:24 59:17 60:19 63:14
63:20 64:25 65:2,9,20 66:4
66:14,24 68:7,13 72:9 73:1
73:21,24 74:2,11,16,19
75:18,25 76:4,10 79:12,13
81:4,20 82:1,15 83:2,18,23
84:16,18,23 85:3 86:12,17
87:10,17,20 88:2 92:9,20
92:24 93:3 94:1 97:17,25
102:23 103:1 106:9 108:5
108:12,23,24 109:4,10
111:13,25 112:5,8,10,24
113:2,2,4,9,25 114:8,9
115:2 116:19 118:21,22
119:4 120:13,14 121:1,16
123:25 127:15,25 128:21
128:24 131:17,17,21,21,25
132:1,2,7 133:12,13,18,20
134:23 135:8,16,20 136:3
136:18 139:3 140:11 142:2
142:4,7,7,8,11,15,19,21,23
142:24,25,25 143:1,3,4,4,5
143:17 144:7,9,12,24
145:22,24 146:7 147:5,9
**insureds** 17:10,25 18:7,9,12
24:20 25:6,9,13 29:11
37:22 38:4,10,17 39:1
40:13 44:4,19 47:20 48:7
53:2,10 57:11 58:1,8,19,22
65:24 66:14,17 88:8
109:11 112:11,13 113:7,18
113:22,22 114:5,16,20
115:2 116:16,19 123:19,23
129:20 134:12 140:4
141:24,25 142:2 143:19,20
**insurer** 83:4 85:25

**insurers** 61:7 72:14 83:8,12
83:13 89:3 123:11
**insuring** 46:3 135:17
**intended** 110:5,11
**interest** 151:15
**interior** 109:13
**intermingled** 125:11
**internally** 122:5
**international** 62:15,16
**interpret** 32:19 96:5 139:7
**interpretation** 58:17 79:16
80:6 85:1,5 96:10 112:19
113:15 134:9 138:16
**interpreted** 112:21
**interpreting** 58:12,13 145:12
**interrupt** 98:11
**interruption** 32:25
**intro** 5:21
**invariably** 32:23 33:10
**investigations** 32:8,9
**invites** 8:22
**involve** 32:23 35:16 127:4
**involved** 16:24 23:11,15
26:13 27:4 30:3,22 31:1
32:10 34:10 47:13 55:25
61:4 66:8 136:22
**involvement** 44:16 45:8
**irmi** 3:16 40:8 61:16 62:1,13
62:17 63:3,9,14,24
**ironshore** 30:6,7 126:10,15
126:25 127:24 144:1,5
**isnetworld** 77:1
**isnt** 6:1 11:6,13 18:24 20:19
21:7 63:9 80:3,5 132:1
133:17
**iso** 15:5 62:2 107:20,22
141:3
**issue** 3:13,15 11:7,14 20:5
28:8 29:10 30:23 32:16,23
33:11,21 40:15 45:1 50:5
57:21 63:12,13 67:2
100:24 101:8,22 102:2
117:8 124:12 131:22
**issued** 20:1 121:20 124:14
127:15
**issues** 16:23 20:3 26:13
35:18 36:8,15 50:13,19
60:20 62:9 79:15 107:25
124:19 125:5,12 133:16
134:2 144:16 147:20
**item** 78:1 81:2,2,6
**items** 69:7
**ive** 28:12 39:21 40:16 63:18
64:3 65:15 66:7,7 81:10

86:3 89:10 103:22 113:24
117:18 127:6,10 130:19
136:14 138:15 145:7 149:5

---

**J**

**jack** 11:4
**james** 6:12 68:6,13,18 74:10
78:3,3,5,23,25 79:4,19
81:1,3,12,19 82:6,10,15
84:15,22 85:16,20 86:11
88:2 94:17,25 95:15 96:9
99:4 104:4,20,24 106:19
106:20,25 131:25 132:2
**jamestbe** 78:5 81:1 96:10
101:13 103:24 105:14
**jason** 44:21
**jeopardize** 103:2
**job** 93:16 94:7
**jobs** 25:23
**jog** 41:14 43:5,11
**joint** 113:6,9,10,12,16,19,19
113:20 115:4,10,11,12,13
116:1 138:6
**jr** 1:10 5:1,9 151:3 152:3,19
**jump** 49:18
**jumping** 49:18
**june** 46:4,10 119:14,18 120:9
121:20
**juris** 145:11
**jurisdictions** 46:1

---

**K**

**keep** 20:2 79:23 133:1
**kept** 20:1
**kind** 16:13 21:8 25:8 26:15
27:10,22,23 28:18 30:24
30:25 31:1,25 32:22,23
33:10 35:21 38:22 39:9
40:14 47:15 48:15 53:12
56:2 59:1,3 62:1,3,8,19
66:3 67:4,6,15,16 69:9,10
77:4 79:15 93:22 94:1,4
95:10 105:10 107:19
109:22 111:5 121:11
125:11 132:21 134:18,23
134:24,24 135:5 137:8
139:25 148:2,15
**kinds** 17:21 40:1 47:16 145:1
**know** 7:13 8:4,24 9:19 10:11
10:24 11:2,3 12:9 14:23
15:3,19,22 16:5,23 19:12
20:10 22:19 24:17 25:22
27:17 29:19 31:5,8,12
32:15 37:8,9,16,21,21 39:7

39:16 40:14 43:5 44:10,11
44:17 45:4,9,10 46:18,20
48:17 49:19 50:11 51:6,9
51:12,17 52:5 61:17 62:11
64:6,8 65:24 66:9 67:1,6
70:4 76:13 77:15,17,19
78:21,24 79:11 80:1,9 82:6
86:11,20,20,21 88:1,4,5,7
89:2,3,12 93:22 107:12
109:16,21,22 114:24
115:12,14,17 117:24
118:11,14 119:7 120:21
121:19,24 122:4 124:6,10
126:9,23 127:2 139:11
140:24 141:2,13 145:13
146:10,16,24

---

**L**

**l** 2:6,6 4:1
**labeled** 119:23
**labor** 137:17
**lack** 87:8
**ladotd** 6:13
**laid** 69:8
**land** 109:12 121:22,24 122:3
124:19,24 137:1
**landscape** 109:12
**lane** 1:16 2:4
**language** 39:14 60:18 66:18
80:17 102:1,21 112:20
113:13 124:1 130:13,17
131:11 134:23 145:12
**large** 21:3,22 33:17 34:8
47:5 88:10
**largest** 31:14
**latent** 99:18,18
**law** 1:16 2:3,6 10:24 49:21
61:16 62:11,21 64:11
149:9
**lawry** 30:13,14
**lawsuit** 5:12 12:6 138:4
**lawyers** 10:20
**leave** 39:12
**leaves** 137:25
**legal** 61:21 80:2,5 113:5,7,8
113:9,11 147:20
**legally** 108:24 109:10
**legislative** 42:4
**letter** 83:5 124:15
**letters** 83:7 124:8
**level** 125:13
**lexington** 9:5 30:8 85:24
126:11,15,25
**lexus** 49:21

**Baton Rouge Court Reporters, LLC**
**225-292-8686**

**Louis George Fey, Jr.**
**May 17, 2013**

liabilities 7:10 46:8 53:6 110:6,12,13
liability 3:18 5:11 6:2,8,9,11 6:12 7:7,25 8:9 10:14 11:6 12:25 13:25 14:11 15:2 18:10 22:20 23:6,24 24:19 25:19 28:14 29:2 31:10,21 32:11 34:11,21 36:13,17 37:8,16 38:17 39:17 42:16 43:8,16,24 44:5,17,18 45:23 46:15 48:11,23 49:3 50:1,6 51:12,21 53:9 55:5 55:17,23 56:10 57:12,14 57:21 58:2,6,10,14,20 59:17 63:21,25 64:14,25 65:13,18,23 68:8 72:8,17 73:17 75:17,19,24 82:2,4 82:14 83:25 84:17,24 85:5 85:13,14 86:1 87:6 88:25 90:3,21,25 91:2,12,20,25 92:1,5,13,15,18 94:18 95:4 99:3,11 106:7 108:16 110:2 111:1,21 112:14 113:7 114:17 115:3,7 117:23 119:25 122:21 123:20 125:18 128:10 129:7,20 130:11,14,18 131:5,12 132:15,15,17 133:13,20 134:7,11,16,19 135:2,18 138:9,10 139:8,9 140:5,21 143:17 144:13,15 146:12,14 149:3
liable 74:21 108:25 135:8
library 41:18
licensed 49:12 91:7
life 41:20
light 21:7
likelihood 6:3 11:14 99:13 131:4
likewise 77:25 100:15 106:12 106:22
limit 37:13 50:18 57:22 131:5
limitation 142:6,13
limitations 91:8,12
limited 46:17 57:16 70:19 76:6 85:3 104:14 105:18 106:12 138:10 144:7 147:19
line 11:5 51:18 94:9 153:8
lines 8:9 21:13 31:22 123:12
lingo 10:12
lipscomb 8:20
list 8:21,24 12:9 18:7 62:14

71:21 97:6 111:13 114:4 128:4 141:23
listed 18:17 49:19 69:18 84:16,23 88:2 92:9,10,19 96:17 97:10 98:18 112:10 117:6 126:15 137:12 143:16
listening 17:16
listing 82:14
lists 73:7 75:23 82:3 85:25 113:3 115:14 116:18
litigation 15:12 111:6
little 8:2,8 15:7 29:17 31:1 36:20 40:15 52:21 54:12 54:12,12 66:21 105:11 115:9 133:25 138:12 139:21 144:14 145:10
live 130:6,8
livingston 152:4
llc 1:4 9:20 72:9 82:15 84:15 115:21,22,24 153:1
lobbing 147:14
locations 73:15
long 1:16 2:3 10:24 55:20
longer 66:21
longwinded 98:16
look 13:23 15:9 21:16 29:4 29:10 32:1 34:24 41:22 57:2 60:16 63:22 70:14 71:3 72:15 73:3,19 78:8 79:6,10,15 80:9,13 83:3,11 84:8 86:5,13 87:1,4,13,19 88:16 91:15,23 92:11 93:18 95:1,23 103:4 106:11,17 108:2,19 109:23 111:10 112:3 113:1 120:11 122:11,13 124:5 129:17 130:9 131:15 132:14 135:6 135:13 136:24 138:12,25 140:2,8 141:1,17,19 143:8 146:25
looked 8:20,23 53:18 79:14 82:21 97:7 116:9 117:16 120:19
looking 14:14,20 18:4 19:3 21:17 33:19,22 45:18 54:18 59:6 70:13 75:21 76:8 79:22 80:8,11,23 82:25 94:10,11 96:2,22 104:16,23 119:18 125:15 130:16
loosely 134:25 139:21
loss 49:3 65:2
losses 103:6,20

lot 10:11 20:11 21:8,25 30:1 30:6,9 31:16 38:10,10,13 41:3,4 46:1 47:11,14 49:19 54:5 62:7,20,21,21 66:8,10 66:13,19 74:13,15 77:3 91:9 125:10
louis 1:10 5:1,9 151:3 152:3 152:19
louisiana 1:2,13,17 2:4,8 5:2 46:4,9 47:19,20 48:25 50:4 102:9,14 107:11,25 110:21 151:2,12,18 152:8
louisianas 49:24
lovely 149:22
low 124:25 125:13
lower 121:25
lunch 100:8,11

**M**

m 1:19 2:7 150:3
main 125:2
maintain 97:4,10 98:6
maintained 96:25 100:13 142:1
maintenance 43:20 44:1 47:7
major 47:12
making 35:9 38:4,25 39:1 76:24 96:20 110:15 132:3
management 21:4 39:23 40:20 41:18 45:19 62:15 62:16 89:5,5 90:1
manager 50:16 79:5 109:13 111:8
managers 59:3 77:8
mandatory 107:21,24
manifest 99:4
manual 88:17,17
manuscript 15:6 17:23 21:18 21:21,22 22:3,6,9 23:3,5 23:10,13,22 56:5 107:18 123:8
manuscripted 22:25
manuscripts 21:19 22:21
marked 13:12 60:14 67:24 90:16 120:4
market 68:20
markets 126:12 136:3
material 120:11
matter 69:13 77:21 88:15 114:25 124:12 138:7 151:15 152:11
matters 139:1
mccabe 2:7 33:4 40:21,25

41:9 59:12 60:1,4,7 67:21 72:5 128:13 149:17,21 153:24
mco 145:18 146:4,17,22,24
mcos 146:10
mean 6:11 9:2 12:7 17:21 20:10 21:21 22:24 24:9 28:8 29:5,12 31:6,13 32:16 34:8 37:21 40:6 41:17 43:17,18,24 46:20 51:14 58:13 59:4,13 62:20 63:5 69:9 76:19 84:2,6 85:14 98:10 103:14 111:3 115:18 118:18 125:6 126:19 130:25 135:3,24 136:4,14 139:7
meaning 8:6
means 108:4,21 109:9 111:5 113:2
meant 46:19 82:25
mechanism 39:2
mechanisms 38:5
media 138:20
mediated 148:15
member 31:3,6,12,15,16,17 36:21
memorized 86:24
memory 41:14 43:6,11
mention 10:1 61:14 85:14 107:9
mentioned 13:25 24:3 29:21 36:6 49:23 62:13 81:3
mentor 35:1
method 151:6
middle 1:2
midway 57:8 109:23
mike 8:25 9:1
million 47:14 50:20 94:12,18 94:19,20,22 95:3,4
mind 8:19
minimal 12:19
minimum 12:7 128:16
minute 40:17
misconduct 106:14
mistake 110:16
misunderstanding 99:2
modifications 51:25
moment 67:18 70:4 72:12 87:22
money 108:4 148:8
montgomery 2:6
month 44:21
months 130:2
mot 44:7 47:7,17 67:4

**Louis George Fey, Jr.**
**May 17, 2013**

163

motions 147:13
mots 46:24
move 14:10 28:2 29:7
multiline 32:8,9
multiple 63:11 79:23 123:10

**N**

n 2:1 3:1 4:1
nadeau 2:3 3:5 5:6 13:8,13
  33:1,3,8 40:23 41:3,10
  45:12,16,17 60:3,5,8,15
  67:17,20,22,25 72:1,6
  87:21,24,25 90:14,17
  100:6,9,10 120:1,5 122:6,9
  122:10 129:5 149:13
  153:24
name 5:7 8:19 16:8,11 29:19
  42:11 44:18,22 50:7,9,17
  55:9,24 65:1,19,23 67:10
  73:23 74:16 81:3,19,25
  90:12 92:19,24 126:5
  131:25 149:2
named 6:1 7:11,20,21,25 8:6
  11:8 17:19 18:25 19:18
  26:21 28:20 29:1,11 42:12
  47:25 48:5,7 49:1,16 53:6
  53:20,24 54:18 55:20 56:3
  68:7 74:2,2 76:9 111:20
  112:9,24 113:2,4,6,17,25
  114:5,8,9 115:1 116:19
  118:22 120:14 121:1
  133:20 134:23 142:4,15,21
  142:23 143:1,5 144:3,11
  144:24 152:3
names 8:21 9:8,11 29:22
  30:17,18 51:14 53:1 66:22
  86:11 89:1
naming 44:24 68:12 89:19
  108:5
narrow 53:22 54:7 56:16
  85:10
narrowly 91:17
nature 92:17 107:5 121:9
  140:3
necessarily 17:18 48:14
  137:13
necessary 75:14
need 25:14 34:17 42:11 56:2
  75:6 79:7,12 80:19 90:22
  93:15,25 94:2 127:7
  132:11,13 136:14 137:10
  140:8
needed 24:13 56:19
needs 79:13

negligence 6:5 7:13 8:3
  11:10,16 12:16 14:6 46:9
  53:10 64:20 92:22 106:5
  107:1 112:8 128:12 132:20
  147:9
negligent 91:4 104:15 105:18
  105:24 106:13,20 110:7
  135:19 140:1 145:5
negotiate 28:24 30:3,4 127:4
negotiated 22:12
neither 125:19 151:14
network 31:11
nevada 41:24 42:5 43:3 46:6
  46:12,20 59:22,23
never 41:20 89:10 127:14
  136:14
new 2:8 141:11 147:25
nicole 41:7
nine 90:19
non 17:6 20:24,25 23:10
  91:10
noncontributory 39:8 52:12
  52:13 55:12
nonrelated 115:1
normally 27:21
north 5:2
note 73:14 136:2
noted 152:13
notes 84:12
noticed 118:2
notification 130:15
november 86:8,8
number 14:24 15:16 37:4
  39:11 43:18 73:6 107:14
  120:7 124:6 136:20
numbered 1:12
numbers 119:15 124:8
numerous 25:18

**O**

o 4:1
object 59:12 128:13
objections 4:12
obligation 68:12 133:22
obligations 78:3,12,13 79:9
  80:14 105:6
obtain 20:15 51:19 54:24
  66:23 88:22 96:16 125:17
  129:9 131:3 149:2
obtained 11:15,24 12:4 16:1
  16:2 20:6 27:15 31:19
  51:13,24 97:25 98:18,19
  112:5 128:9
obtaining 10:8 139:2

obviously 16:21 86:3 110:21
  117:6
occurrence 99:21 102:23
ocp 49:7
offer 5:16
offering 80:2
offers 56:25
office 8:11 21:25 96:2
officer 151:3
offices 1:15 2:6
oh 98:12 102:15 140:7
  146:22,24
ohio 62:6
oil 17:3,7 20:20,24 21:10
  117:4
okay 8:7 10:1 12:3,3,9 13:7
  14:2,8,20 19:15,19,20 41:9
  41:22 45:11 54:23 64:23
  65:17 68:1 70:19 71:1,21
  74:4 75:12 77:20 89:12,18
  89:21 95:19 96:21 98:25
  102:16 104:8 105:2,9,16
  108:9,20 109:25 111:11
  114:11,24 116:9,20 118:11
  119:20 124:10 125:15
  126:14 129:6 136:11 137:6
  137:9 145:6 146:25 150:1
omission 106:13,20 108:22
omissions 91:3,5 95:4 104:15
  105:19,24 112:17 135:19
once 19:16 53:2,22 54:19
  95:20 139:20
onerous 20:21
ones 21:14 22:10 24:10 29:12
  29:13 62:2 126:14
online 130:4,5
open 137:25
operation 21:15
operations 29:17 31:24 32:9
  32:10 49:6 59:1 73:15
  76:23 99:9 147:6
opinion 63:5 80:4 111:15
opinions 69:19 151:12
opposed 99:21
ops 54:15
option 28:2,19 83:23 125:16
  125:23
options 17:22 28:4
order 29:8 79:8 102:18
organization 135:20 145:23
original 71:7 151:17,17
orleans 2:8
outcome 151:15
outlined 80:25

outset 80:1
outside 94:3
overall 33:14
oversee 48:21
oversight 6:21 7:4,6 12:17
  12:22 13:4,25 48:15 49:7
  94:4 134:2
oversimplifies 137:16
owen 115:14,17
owned 114:2
owner 35:22 47:18 48:10
  64:24 65:1,2,4,6,8,19
  88:23
owners 33:19 35:23 36:5
  47:1,4 49:11 57:10,25 58:7
  58:16 59:1,2 64:17 65:23
  91:10 114:4

**P**

p 2:1,1,6 4:1 150:3
page 3:2,11 15:16 21:17 32:1
  34:25 41:22,23 45:21 57:3
  61:3 68:1 69:22 70:9,10,14
  71:4,5,6,8,12 77:24,24
  78:9 79:1,17 80:24 81:16
  90:24,25 91:15,23 92:12
  94:10 95:3 102:6 103:4
  106:17 107:4 108:2,7,8
  109:23 111:10 112:4 113:1
  114:11 116:2 120:12
  122:13,19 125:15 130:9
  131:15 140:2 145:22
  151:17 152:13 153:8
pages 70:21 71:2 90:19
  102:13 131:16 151:5
paid 148:8,11,17 149:6
paragraph 32:4 34:25 36:21
  42:9 57:8 60:17 61:3,14
  70:15 77:25 78:11 80:23
  80:24 81:23 91:24 94:11
  96:7,7 103:5,19 110:1,17
  111:12 114:11 116:2
  122:19 123:7 125:16,24
  143:8
paragraphs 122:15
parent 114:3
parish 152:4
parlance 144:25
part 14:5 16:24 33:14 57:23
  99:4 113:11
participation 113:5
particular 20:10 22:7,8
  35:19 46:11 51:14,14 54:1
  54:3 57:17 87:13 97:14,16

Louis George Fey, Jr.
May 17, 2013

104:24 107:22 125:12
126:18 136:24 146:22,24
**parties** 4:4 46:3 68:12 107:1
111:6 114:2,16,19,20
115:1,16 151:14
**partnership** 115:4 116:1
**party** 29:1 30:3 52:1 53:20
132:19 148:7
**partys** 132:20
**passed** 42:5
**patent** 99:17
**paul** 40:18 45:20 60:11
**pay** 139:24 148:10
**payee** 147:22 148:21
**payer** 148:5 149:5
**pays** 64:1 148:3
**peculiar** 87:12
**people** 9:14,16 38:9 44:24
139:20
**perform** 101:4 109:10,16
**performance** 91:5 96:25
97:4,11 100:14,25 108:22
113:7
**performed** 99:15 129:1
142:3,14,18 148:12
**performing** 142:22
**performs** 118:22 120:14
**period** 54:22 86:9 97:15,16
97:17,22 98:8 99:10,11
100:1,4
**periods** 107:24
**person** 53:19 80:12 103:15
108:24 130:3 135:18
143:16 145:16,23
**personal** 151:7
**personally** 31:17
**personnel** 32:6
**persons** 141:23
**perspective** 29:18 56:17
79:21 80:8 93:4 95:21,23
111:15 121:22
**philosophy** 88:19
**phone** 30:25
**phrase** 22:5 55:6 61:18
**phrased** 59:24
**phrasing** 65:22
**pick** 39:4 44:6 93:2
**piece** 106:8
**pieces** 63:11
**pileups** 47:15
**pioneer** 38:22
**pioneers** 38:1
**pipeline** 17:3
**pipelines** 20:20

**pl** 9:1 10:9,13 11:9 13:3 15:5
23:9,22 27:16 29:24 30:11
30:18 36:11 37:18,23
39:19 42:24 44:15 45:6,8
51:8 55:10 58:8 61:9 65:9
67:14 68:14,19 76:10,16
81:4,20 85:19 86:21 87:14
88:2,6,8 89:20 92:9,17,24
93:19,23,25 94:13,20
96:17 99:5,7,20,22 107:5
108:15 114:20 116:18
118:3 125:21 126:2,6,6
131:4 132:1 134:10 135:10
135:23 136:18 138:18
143:19
**place** 47:9 74:25 75:2,6
89:16 126:20,23 131:1
**placed** 20:9 30:2 66:5 92:5
126:24 127:1
**placement** 30:7 67:4
**plaintiffs** 1:11 2:2
**plan** 31:3,5,7,17 143:14
**planner** 109:13
**plants** 16:12
**plate** 33:23
**please** 5:7,22 14:1 33:9
**plume** 61:15,25
**plus** 100:1 133:21 144:16
**point** 13:25 40:12 67:3 102:7
119:6,8,10,22 123:17
124:20 130:17 131:3,10
132:16 134:8,12 135:6
136:2,6 138:21 139:4
140:3
**pointed** 91:20 98:25
**points** 34:18
**police** 111:5
**policies** 17:10 21:9 22:4,6
23:3,5,7,10,22 24:19 29:25
34:2 36:8,9 37:3,18,23
38:17,18 39:19,21 40:13
42:24 43:9,16 44:5,15,20
44:24 45:6 49:7 50:14 51:8
53:15 57:12,21 58:3,6,10
58:15,20,25 61:10 63:21
66:15 68:14 74:8 81:20
82:3 83:22 84:17,20 85:13
86:4 88:8,15,25 98:3 107:5
111:1 114:17,20 115:3
122:5,21 123:15,20 124:13
125:8 139:14 146:12
**policy** 6:3 7:11 11:9,20 12:25
13:17 14:4,12 15:11,15
17:25 18:3,4,19,22 19:10

20:1,5,8,15 21:18,22,23,24
22:8,15 23:2 25:10 26:22
27:16 28:21 29:2,14 36:10
36:24 39:17 42:12,16
45:23 46:3,15 49:15,17
50:6,18 51:21 52:1 53:1,21
54:21 57:11 58:1,8,16,21
58:23 65:5,9 67:11,14 68:8
68:19 72:20 73:6 74:2,19
74:23 75:6,14,17,19 76:3,4
76:10,16,17 81:7 84:5,24
85:8,19 86:6,8,9,21 87:2,4
88:2,6,7 92:6,9,17,18,24
93:2 97:15,15,16,17,21,22
99:23 100:1,4 101:25
102:1,5,8,12 106:6 107:6,7
107:11,24,25 108:2,8,11,15
108:16 109:15 110:1,5,10
111:12,16,22,25 112:4,6,7
112:18 113:1,24 114:5
115:12 116:15,18,18,19
117:7,23 118:6,9,11,14,20
119:7 121:2,23 122:16,25
123:5,23 124:1,11,12
125:18,21 126:2 128:10
130:11 131:4,21 132:1,4,7
132:12 133:12 135:23
136:19 138:6 139:23
140:12,21 141:21 142:5
143:1,4,14,18,21 144:5
145:18 146:4,17 149:1,17,7
**policyholder** 146:1
**pollution** 108:6,13,15,16
**poor** 59:19
**pose** 123:9,10
**position** 42:15,22 43:7,14
44:13 45:22 46:14 114:19
114:25 123:18 136:10
146:10 149:6
**positive** 82:8
**possible** 36:15
**possibly** 33:18
**potential** 69:2
**potentially** 38:9
**power** 40:12
**poydras** 2:8
**practical** 32:2 139:1
**practice** 68:14 89:4 90:1
91:7,9 93:8
**preceding** 109:8 152:9
**precluded** 106:5
**predecessor** 115:20
**premium** 22:16 38:19 56:13
127:5 130:24 137:7 141:20

**prepared** 70:23,25 89:25
107:19 141:3 151:7,10
**presentation** 129:17,21,22
130:4,10 131:2,6,10 133:2
134:13 135:1
**presented** 39:13 132:5
**pressed** 116:4
**presume** 83:16 110:22
**pretty** 27:3 37:25 46:13
58:24 62:24,25 76:19 87:4
87:9 88:12 94:8 110:22
111:4 125:6
**prevent** 46:2 111:6 114:6
**previous** 92:22 102:25
**primary** 39:8 52:12,13 55:12
143:19
**prime** 74:10 78:4,14,15,16
78:22 79:1,2,18 95:8,16
96:18,22,24 97:24 98:19
100:12,18,20 101:5,13
103:24 104:10 105:14
106:12 125:20
**principals** 114:4
**principle** 147:25
**principles** 140:4
**prior** 46:10 49:23 50:1
102:20,21,22 115:21
**probably** 6:18 8:11 15:23
23:25 28:9 29:14 40:9 52:4
64:10 93:1 98:16 119:21
122:1 126:8 130:2
**problem** 29:11 33:19,23 38:7
57:20 125:14 136:21
**procedure** 4:7 88:7 151:12
152:7,8
**procedures** 122:5
**process** 11:3 30:22
**procure** 96:12
**procuring** 9:16
**produced** 71:2 118:3
**producer** 64:9
**producers** 30:21
**productscompleted** 147:5
**profession** 40:11
**professional** 3:18 5:11 6:2
8:9,13 10:14,19 11:4 12:25
14:5,11 15:1,21 16:22
17:10 18:11,20,21,24 19:1
19:6,12 20:11 21:13 22:20
23:6,24 24:18 25:2,4,9,19
26:8 28:14,16,16,21 29:2
29:10,12,16,17 30:1,7
31:10,21 32:10,23 33:22
34:1,6,7,11,21 36:13,14,17

**Louis George Fey, Jr.**
**May 17, 2013**

37:8,16 38:18 39:16,21
40:13 42:10,16 43:8,15,16
43:22,24 44:4,7,17,18,24
45:23 46:15 47:6 48:4,8,18
48:22 50:6,16 51:12,21
52:6,22 53:2,3,5,7 54:17
54:21 55:4,23 57:12,21
58:2,6,14,20 59:17 63:19
63:21,25 64:14,18,25 65:2
65:5,13,18,22 66:13 68:8
70:2,16,20 73:17 75:19,24
78:12 82:4 84:23 85:5,14
86:1,4,25 87:5 88:24 89:17
90:3,10,21,25 91:1,5,12,19
91:25 92:5,13,15,18 94:18
99:3,10 104:16 108:23
109:5,7,9 111:1,21 112:14
112:16 113:8,18 114:17
115:2,7 117:23 118:22,24
119:24 120:15,16 121:25
122:21 123:19 125:9,17
126:12 128:10,22,25
129:20 130:11 137:20,24
139:11,14,16,23 140:5,20
140:25 142:3,14,18,23
143:9,17 145:3 146:12,13
**professionals** 8:12 10:21
25:23 28:13,20 33:24,25
35:6,8,11,24 36:1,11 42:7
43:19 47:21 48:12 49:12
49:17 57:1 64:20 91:7,14
93:9 124:18,22,23 125:11
139:15 142:21
**program** 143:15
**prohibit** 132:2
**prohibited** 42:17,23 43:8,16
44:14 46:17 59:9,10,15
**prohibiting** 45:22
**prohibition** 151:11
**prohibits** 59:24
**project** 25:5,13 26:2,6 27:4,5
27:7,18,25,25 28:5 29:21
33:18 47:4 54:2,3 59:3
60:21 64:21 71:17 76:22
77:15 99:8 125:13,17,21
126:1,18 137:18,20
**projects** 26:12 35:20 43:21
47:5 64:15 76:20 77:10
**projectspecific** 63:25
**proper** 32:20 39:1 65:21
**properly** 48:21
**proposal** 16:5,9 19:22,24
116:8 117:15 118:7,8
122:25

**proposition** 129:21
**prospect** 9:10
**prospects** 9:16
**protect** 93:24 133:19
**protected** 137:3
**protection** 65:5 112:2
**protects** 91:3
**provide** 16:22 22:11 28:1
38:16 48:24 52:9,11,13
57:10,13,24 58:3,6,15 65:4
79:9 85:22 93:18,19 94:12
94:19 95:14 96:8 103:15
104:2 106:4 110:5,11
111:16 130:14,20 136:4
142:17,20
**provided** 4:11 6:4 11:9,11,18
12:4 19:24 29:20 55:7
70:16 71:15,16,24 76:8,9
78:22 82:10 83:2,18 85:19
87:11 111:22 112:1 117:16
118:6 124:11 126:1,6,6
128:11 129:18 141:25
143:12 147:8
**provides** 39:24 57:14 85:17
87:14 110:2 133:22
**providing** 40:2 56:8 72:16
137:19,23 147:15
**provision** 66:15 78:1,18 79:7
95:2,16,22 97:8 98:22 99:8
100:16 101:18,18,22
102:10 104:9,21 105:4
106:24 107:10 110:4,5,10
110:10 111:25 125:3
**provisions** 11:21 35:10 47:23
54:8 55:4 58:11 71:13
73:16 79:24 80:10,14
84:13,14 85:1 86:23 87:7
92:7,16 98:1 106:23
**prudence** 145:11
**public** 42:6
**publication** 39:24 40:18,20
41:16 42:19 45:19 56:23
57:18 58:5
**publications** 40:8
**published** 57:3 90:12
**pure** 48:23
**purely** 149:5
**purport** 74:11
**purpose** 17:8 133:18
**purposes** 4:5,6 120:11
**pursuant** 4:6 66:11 78:15
79:16 101:5 106:6,23
152:6
**pursue** 148:5,24 149:3

**push** 27:23
**pushed** 29:5
**put** 39:10 40:1 47:8 63:9
67:15 76:22 80:3 93:6
107:22 114:8 125:8 126:20
126:22 129:10 133:11
136:20 139:18
**puts** 21:25
**putting** 137:5

_____

**Q**

**qualifications** 8:7
**qualified** 109:10,16,18
121:23 132:6
**qualify** 122:3
**quarter** 3:13 42:20 45:19
59:7 60:9
**quarterly** 28:10
**question** 17:16 34:23 36:4
42:18 43:10,12 45:3 49:9
55:15 57:7 58:4 72:11 76:6
77:15 82:19 90:23 98:16
100:15 103:7,24 105:3
109:15 117:21 121:7 129:6
131:9 133:3,11,14,17
135:21 140:5
**questioning** 11:5
**questions** 5:22 14:9 37:13
40:16 85:21 122:12 123:9
130:8,12 149:14
**quick** 41:6 45:12 77:5 122:6
122:12
**quickly** 140:8
**quirks** 87:7
**quite** 114:17
**quoteunquote** 78:17 90:2

_____

**R**

**r** 2:1 151:1,4
**ra** 145:18 146:4,10,17,22,24
**rates** 62:8
**reach** 69:19 148:15
**read** 32:3 41:20 57:7 63:17
64:3,4,19 77:20 95:3 110:9
120:14 127:11 149:17,19
149:23 150:1 152:5,6
**reading** 4:8 40:9,10 42:3
43:11
**reaffirms** 41:24 42:14 46:14
**real** 41:5 89:19
**realized** 54:5
**really** 26:14 53:24 64:1 79:7
88:15 93:21 115:13 133:17
135:24 138:6,7 145:9

**realm** 109:22
**realms** 94:3
**reask** 105:2
**reason** 22:13 26:12 84:3,6
107:12 118:19 124:22
137:8
**reasons** 92:3
**recall** 12:17,20 16:8 19:21
25:23 26:3,8,18,20 27:2,14
29:5,22 44:9 51:22 56:7
67:8 117:17,22 128:5
130:15 136:5 140:19
141:15 146:9
**receive** 72:12
**received** 122:25
**receiving** 77:16
**recognized** 38:8
**recommend** 40:2 74:14
93:16 99:9 111:8
**recommendation** 94:5
**recommending** 49:6 131:7
**record** 5:8 14:9 21:20 33:1,3
33:4 45:16 67:17,19,20
87:21,24 98:15 100:7,9
122:9 147:12
**recorded** 130:7
**recovery** 6:25
**refer** 14:10 22:3 35:14 71:11
105:11,13 145:8
**reference** 78:17 79:19
**referenced** 70:9
**references** 70:17 80:18
**referred** 62:17 70:5 107:18
141:24
**referring** 10:14,17 12:24
14:17 46:5 59:22 78:18
81:13 101:15 104:19
105:14 119:11 122:16
139:19
**refers** 86:7 138:19
**refineries** 16:13,16 20:20
21:4,4 122:22
**refinery** 17:4 20:25 117:4
123:2 124:2
**reflect** 85:10
**reflection** 85:8
**refused** 29:3
**refusing** 137:10
**regard** 60:20 94:4 113:5
**regarding** 103:9 117:15
130:13,17 131:11
**regardless** 48:1
**regular** 22:22
**regularly** 28:9 122:22

Louis George Fey, Jr.
May 17, 2013

regulations 62:8
reimbursement 104:6,25
    105:7
relate 12:15 31:21
related 8:3 11:12 17:7 34:14
    36:23 60:18 63:15 110:20
    151:14
relates 35:1 57:8 138:20
relating 23:6 46:11 88:7
    130:16
relationship 115:16 130:13
    137:17
relationships 151:11
release 149:2,2,4
relevant 107:6 108:17
reliable 63:3
relied 12:10 71:22
relocation 148:11,16,17
relying 139:15
remains 11:17
remember 9:8,10,10 16:11
    16:12 19:25 26:1,13,15,16
    26:23,25 27:6,8 29:19
    30:19 44:11,22 66:22 80:3
    118:16 128:2
rendered 142:21
rephrase 5:23
replay 130:7
replies 138:2
report 3:12 10:13 13:10,15
    13:16 14:10 18:1 21:16,18
    24:4 31:20 32:1 34:25
    49:20 60:16 69:20,21,22
    70:6,10 71:11 77:24 78:19
    80:2,24 81:13,18 91:20
    94:10 102:7 103:4 107:3
    109:24 117:3 122:12
    125:15 129:19 147:23
reported 1:11,15 50:4 91:19
    151:6
reporter 1:13 149:22 151:2
reporting 100:1,2 151:6
repose 99:10,12
represent 5:10
require 39:7 47:20 74:11
    92:2 95:13 97:13 101:10
    101:18 103:19 104:20,22
    104:22 105:6,23 125:20
    132:19 135:7
required 22:12 24:25 53:20
    57:9,15,24 58:22,24 66:12
    66:18 80:10 81:3,19 94:12
    94:19 95:14 96:16,24,24
    97:6,10,18,24 98:20

100:13,18 103:5 104:2
    106:3 107:10 110:21
    111:16 118:24 120:17
    131:24 151:10,17
requirement 25:4,6 28:25
    39:6 104:8
requirements 20:22 21:2
    48:1,5 52:8 81:15,24 92:5
    92:8 95:15 96:23 100:12
    106:11
requires 51:1 52:9 93:12
    95:3 98:7 102:3 104:4,5,21
    104:24,25
requisite 10:8
research 61:19 62:3 86:15
    141:8
reserved 4:12
residential 17:6 20:24
resource 30:21
resources 61:15,21
respect 42:15 46:14 48:12
    84:16 99:3 118:23 120:15
    146:11
respective 106:25 113:8
respects 18:10 112:14
    135:18
respond 143:18
responds 135:4
response 42:1 106:16 130:21
    137:16 146:14
responses 127:9,14
responsibility 49:8 104:11
rest 15:1 46:21
restricted 38:15
restrictions 24:23 92:14
restricts 134:10
result 6:24 81:2 110:7 122:2
resulted 28:11
resulting 60:20
retained 5:15
retainer 69:12
retroactively 99:22
reverse 71:6
review 70:4 90:23 92:3
reviewed 12:10 71:22 120:21
    120:22
reviewing 10:7 32:7 79:5
right 6:9,16 7:21 9:7,18,21
    10:5 11:21 12:12 13:21
    19:10 23:3,23 34:19 35:6
    37:11,13,20 38:4 41:12
    45:24 48:13 49:21 50:2

52:20,24 58:18 60:24 61:1
    61:10,13 63:23 64:15,21
    65:10 66:1,25 67:12,13
    68:9,15,24,25 69:24 71:4,4
    71:12 72:5,15 73:4,8,11,13
    73:17,22 75:11,19 76:1,11
    77:12 81:13 82:17 83:9,11
    83:14 84:24 86:2,24,25
    90:9,13 92:25 94:21,24
    95:12,17 96:15,18 98:11
    98:23 99:16,24 100:22
    102:4,5,20 104:4,17
    105:21,25 110:14,15,23
    111:17 116:10,12 117:4,8
    118:8,10,25 122:22,23
    124:3 133:10 137:20 138:4
    139:6 140:15 142:11 143:1
    143:8,11 145:12,20 147:2
    147:4,10 149:13,24
rightly 29:14
rights 102:17 103:2 148:7
risk 21:4,8 38:5 39:2,23
    40:19 41:18 45:19 50:16
    62:15,16 64:18,19 77:8
    79:5 89:5 111:8 125:7
    127:3
road 25:23 47:4,5
roadway 16:19
role 10:5 17:1 33:13 60:22
    136:21
rolled 54:4
rouge 1:17 2:4 5:2 151:18
route 56:4
routing 153:24
row 75:23
rplu 129:22
rpr 151:22
rule 7:22 59:10 88:20 95:21
    138:13,17 148:2 152:6
rules 4:6 151:10,12 152:7
run 11:3 28:9 29:2,6 48:3,6
    135:9 136:11
runs 20:25
russell 8:25 9:1
ryan 2:7

───────────────
S
───────────────
s 2:1 3:8,10 4:1 61:15 62:4
    151:2,4,22 152:13 153:7
sage 61:15,16
sat 96:1
satisfied 48:2
saw 39:21 123:5 127:18
saying 17:11,12 23:1 50:23

51:3 65:13,14,15 75:10
    94:20 95:14 96:9 98:17
    121:11,13 125:22 126:9
    127:6 130:19 136:8,10
    138:15,17
says 18:8 19:1 32:4 41:23
    54:11 55:14 56:24,25 57:9
    58:21 59:15 60:18 61:4
    63:25 70:10 74:17 80:20
    92:18 97:3 103:11,19,24
    110:19 114:12,15 128:21
    128:23 130:10,17 131:11
    134:8,22 135:7 138:1,13
    141:20 143:12 144:3,8,17
    145:23 147:4
sb146968a17 147:1
sbjs 103:20
scenario 132:21
scenarios 36:2 48:10 52:18
    110:20 135:4
schedule 145:25
scientist 109:13
scope 16:21 53:22 54:7 55:14
    55:16 68:2 69:15,18 77:18
    104:13 105:17 134:17
    141:17,19 145:25
scratch 137:22
seal 151:17
sealed 3:13,14 40:4,19 41:15
    56:24 60:9,12
search 24:9
second 13:23 32:4 34:24 42:9
    42:18 52:23 60:17 61:4
    65:17 66:2,3 68:11 70:10
    71:5,12 79:17 80:24 81:23
    83:15 91:23 95:2 102:6
    122:19 123:9 132:17
    134:10 136:2 142:13 143:8
section 34:6,13,14,21 37:8,17
    39:17 41:23 42:2 64:17
    71:11 79:3,17 81:16,21
    84:13,14 85:2 90:24 91:1
    91:16 95:2 96:23 97:11
    98:5,18 101:9,16 103:8
    104:1,1 108:3 109:8 113:2
    118:20 120:12,18 144:8
see 7:9 13:5 27:20 42:7 48:19
    48:20 57:4 66:19,19 69:2
    70:12 72:20 74:13,15
    75:10 77:6 78:6 79:7 80:20
    81:7 82:7 84:8,15,20 87:13
    95:5,24 103:25 108:6,25
    109:5 111:4 120:19 122:2
    125:2 127:4 135:22 138:20

Baton Rouge Court Reporters, LLC
225-292-8686

Louis George Fey, Jr.
May 17, 2013

139:5 140:16 145:19
**seeking** 6:25 145:16
**seen** 11:17 39:21 41:15,21
50:4,10 57:17 71:2 82:9,16
85:24 86:4,6,9 113:24
122:20 123:22 124:13
135:11
**selfinsurance** 143:15
**seminar** 8:22 40:12 49:6
**send** 8:22
**sense** 23:14 84:7
**sent** 80:16
**sentence** 32:4 34:24 42:19
58:1 60:17 61:4 65:12 66:3
96:8 97:3 102:25 105:9
110:18 111:14 114:12
**sentences** 57:23 58:13
**separate** 115:11,17,18
133:16 137:19,23
**september** 119:9,13
**series** 37:5
**service** 21:25 53:5 129:1
**services** 9:24 16:22 18:11,20
18:21,25 19:2,6,13,13
24:12 52:6,22 53:2,3 54:21
60:23 70:2,11,16,20 80:25
81:6,7,11 91:6 97:5,11
98:2 99:15,24 100:4,14
101:1,3 108:4,23 109:5,7,9
109:9,17 112:15,16 113:8
113:18 118:22,24 120:15
120:16 125:10 128:22
137:20,24 140:25 142:3,14
142:18,21,23 147:15
**set** 23:17 32:17 35:20 115:11
151:4
**settle** 93:23
**setup** 36:2
**sharing** 148:16
**shes** 138:16 139:19
**shoes** 85:16
**short** 75:13
**shorten** 98:17
**shorthand** 84:11
**shouldnt** 110:9 125:14
**shove** 27:23
**show** 17:9 25:3,15 56:23
63:23 76:15 81:9 90:6
119:24
**showing** 72:10
**shows** 72:25 75:22 83:16
**side** 9:1 13:3 30:11,18 71:6
**sides** 63:12
**sign** 149:18,20,23 150:2

**signature** 151:17
**signatures** 71:5
**signed** 40:4 68:20,23
**significance** 145:21
**signing** 4:9
**signs** 47:8
**silver** 61:15,25
**similar** 55:8 74:7 103:7
107:16 132:18
**simply** 11:23 52:1 92:7,16
**single** 38:13 39:1 87:1
**sit** 9:7 29:21
**sitting** 44:23
**situation** 26:9 29:7 33:21
48:6,9 50:23,24 74:22 75:7
93:21 114:1 125:12 132:19
**situations** 7:1 48:3 49:10
129:14
**six** 66:20 130:2
**sjb** 1:4 5:10 6:23 7:11,11,19
8:6 12:11,14 69:24 70:2,11
71:16 72:9,11,17 74:10
76:9,14 77:16,17 78:2,2,23
81:2,19 82:21 94:12,19,23
95:13,14 100:16 101:2,5,9
101:12 103:5,10,19 104:2
104:17,25 105:5,23 106:3
106:23,24 109:16 110:3,8
110:9,12,13 114:11 115:13
115:14,15,19,20,21 121:16
121:22 124:14 125:16,18
125:25 126:7 129:1 131:24
132:4,6,10 137:15,18
138:1,1 148:9,11,14,17
153:1
**sjbs** 6:2,15,21,22 11:12 12:8
12:18 68:7 75:21 103:7
105:18,19 126:2 128:9,18
**sjbtbe** 78:4
**skip** 5:21
**slash** 115:14
**slide** 130:10,16 132:14 134:7
135:7,13 136:2
**slides** 134:6 138:12,25
**slight** 104:6 137:2
**slopover** 139:24
**sole** 7:13 14:6
**solely** 18:10 34:14 112:13
113:6 118:22 120:15 135:8
**somebody** 46:6 49:1 50:17
59:16 73:23 74:18 76:22
125:5 133:8 141:3
**somewhat** 90:2 120:9
**sorry** 17:15 43:10 61:12

**sort** 94:16
**speakerphone** 26:17
**speaking** 6:7 7:16 65:11
119:2
**special** 21:9,9 22:21 73:16
84:13,14 85:1
**specialize** 8:8 89:20
**specialized** 21:15
**specialty** 51:12 86:1
**specific** 21:14 45:3,4 61:20
86:23,23 87:7 91:6 119:5
121:3 128:16 134:21 138:8
141:4,5
**specifically** 19:10 21:10
31:21 33:14 39:20 45:20
54:14 63:1 64:7 88:21
90:21 101:9,16 117:24
128:2 145:24
**specifics** 27:17 128:5
**specify** 69:15 92:1
**specimen** 144:4 145:18
**speed** 105:11
**spend** 40:10 41:4,19
**spent** 32:5
**spire** 133:7
**split** 36:18 53:14
**spoke** 139:9
**st** 40:18 45:20 60:11
**stamped** 3:13,14 40:19 41:15
56:24 60:9,12 118:4
**stand** 62:14
**standard** 22:24 23:10 33:6
52:5 53:16 58:25 70:22,24
70:25 83:3,15 87:6 93:2
107:19 110:4,10 141:3
**standpoint** 16:17 47:10
121:20
**stands** 14:23 15:4,20,22 83:5
**start** 30:21 88:18
**started** 39:3,10 53:13
**starts** 65:12
**state** 1:13 5:7 26:2,6,11 27:3
27:5,7 28:5 29:21 32:2
34:25 36:21 42:14 47:18
68:5,11,17 69:1 77:25
103:5,10 107:16,22,25
111:14 116:2 125:24 128:8
147:13 151:2
**stated** 80:1 127:14
**statement** 8:1 18:16 45:21,24
46:11,13 58:4 59:8 65:8,18
80:4 81:18 90:24 91:1
92:23 95:7 103:18 114:18

75:20 85:25 102:15

127:16 136:7 138:25 140:6
**statements** 52:17
**stateofheart** 53:16
**states** 1:1 31:14 42:9 47:19
55:10 57:24 64:24 70:15
78:11 81:24 84:15 91:24
92:12,14 108:4 139:1
**stating** 79:2
**status** 6:3 20:15 27:15 38:1
38:23 39:8,18 51:13,20,24
56:9 58:15 66:10,24 73:21
74:12 75:13,18 76:18
83:18 85:18 117:15 126:16
127:15 132:3 136:4 142:24
143:3
**statute** 46:12 49:1,25,25
59:23 99:10,12 107:13,14
151:10
**statutes** 46:2 107:15,23
**statutorily** 74:21 107:10
110:21
**statutory** 32:21 74:22
**stenotype** 151:6
**step** 12:3 33:22 93:23,23
**stick** 105:10 141:11
**sticking** 51:11
**stipulated** 4:3
**stipulation** 3:3
**stipulations** 33:6
**stop** 14:8 94:13
**stopped** 66:21
**stops** 83:24 84:3
**straightened** 133:16
**strange** 55:21
**street** 2:8
**stricken** 25:11 27:20 28:11
51:1
**strike** 52:11 74:14 93:10,13
93:16 94:5,6 100:5 137:10
**stringent** 21:2
**strongly** 131:7
**stucco** 24:1
**studied** 120:10
**studies** 31:20
**study** 121:5
**stuff** 30:2 31:16,23 32:22
59:3 62:8 63:9 93:6 94:2
117:20 129:3
**subconsultant** 6:15 101:5
110:8
**subcontract** 70:1,5,20,22,25
71:7,12 74:10 78:2,9 79:18
79:20 94:15 95:1,8,12
100:16,21 101:9,15,23

103:9 104:2,9,16 105:5,5
105:10,12,17,20 106:3
125:20
**subcontractor** 34:9 35:23
39:5 70:17 75:1 78:12
81:24 97:3 104:16 106:14
**subcontractors** 142:22
**subject** 15:11 20:21 102:2
**submit** 76:21
**subrogation** 32:21 69:2
72:20 73:8,21 75:18 76:1,3
76:11 82:1 84:18 85:2,12
98:4 100:19,24 101:8,11
101:19,22 102:3,9,17,18,24
103:8 107:9 110:18,19
111:1,3,8 147:6 148:5,7,24
149:1
**subscribe** 22:1 40:8
**subsection** 113:4 118:21
120:18 145:23
**subsequent** 107:23
**subsidiaries** 142:22
**subsidiary** 114:7 142:4
**substantially** 114:3
**substantively** 102:11
**subsurface** 109:16 137:14
**successful** 139:2
**sue** 75:8 132:13
**sued** 33:15 65:2 145:4
**suggest** 97:9
**suggests** 99:2
**suing** 48:17,21
**suite** 1:16 2:4
**summary** 85:11 95:10 140:2
**supervised** 6:22
**supervising** 32:8
**supervision** 6:17,20,23 7:3
56:21 128:18 134:2,18,21
139:25 144:16 145:2,5
151:7
**supervisory** 129:3
**support** 149:10
**supposed** 85:7
**sure** 5:25 9:4,6,14 10:22
14:25 17:8 20:9,13 24:8
27:3 32:12 36:13 38:4,21
38:25 39:1 41:6 47:3 50:15
52:16 61:8 63:5 67:22
76:24 77:12 84:10 87:16
88:9 89:10,24 91:13 94:14
96:19,20 110:15,24 112:25
113:14 116:20 121:24
124:5,9,13,25 125:22
131:19 135:11 138:5,22

144:25 146:13 147:24
149:11
**surprise** 31:15 90:5
**surprised** 115:9
**surveying** 16:25 70:11 81:5
121:24 122:3 124:19
125:13 137:1,15
**surveyingtype** 26:14
**surveyor** 109:12 121:22
**surveyors** 16:18 20:23
124:24 147:7
**survive** 115:25
**survivor** 115:24
**suspect** 64:9
**swear** 30:16
**sworn** 5:3 151:4 152:11
**synopsis** 69:9
**synthetic** 24:1
**systems** 76:25

---

**T**

**t** 3:10 4:1,1 151:1,1
**tail** 99:25 100:1,2
**take** 5:19 13:23 15:9 33:23
35:15 40:23 45:12,24 49:7
54:23 56:1,4 57:7 62:22
63:3 65:6 70:3 77:4 90:18
90:22 92:22 95:25 104:14
109:23 114:13 122:6
131:15,18 140:9 149:4
**taken** 1:11 4:5 25:8 33:2
45:15 87:23 100:8 122:8
151:3
**takes** 114:9
**talk** 8:7 25:12 31:20 117:19
118:1 130:22 136:22,23
146:13
**talked** 22:14 23:14 44:20
49:5 116:16 124:16 134:14
140:13
**talking** 11:1 22:9 26:17
30:25 43:2 44:24 46:22
64:13 85:12 90:20 93:1
98:10,11 100:12 105:12
110:17 116:21,24 123:8,24
134:15 144:15 145:7
147:12
**tasks** 77:11 137:19
**tbe** 1:6 5:13,15,16 6:1,14
7:14 11:8,12 12:12 17:19
18:12 22:14 68:6,13,18
69:24 70:2,23,25 71:16
72:10 74:10,10 75:22 76:5
76:8,9,9,13 77:16 78:1,2,4

78:5,13,14,15,21,23 79:4
79:19 81:1,2,12,18 82:14
85:17,21 86:16 88:1 94:13
94:22 95:12 96:8,11,16
97:9,23 98:1,2,11,12,17,21
101:2,9,12 103:6,10,20
104:17 105:5,23 106:15,19
106:25 110:6,7,9,14
111:13,20,25 112:9,16
114:13 121:1 125:19
126:16 128:9,11 131:25
132:2,6,6,9 137:3,15,17
138:1,2,2 148:10,14 149:2
153:3
**tbe014** 71:5 78:10 79:17
**tbes** 6:4,13,15 11:10,15
12:15 82:9 84:23 86:6,13
96:25 101:3 105:24 106:4
111:23 149:2
**tbesjb** 78:9 79:20 94:15 95:1
101:15 103:9 105:12
**technical** 11:24 109:14
137:13
**technology** 138:20
**telephonic** 32:25
**tell** 15:17 41:25 79:6 86:4
93:9 113:15 136:17
**telling** 59:20 95:25
**tend** 22:25 139:12
**tender** 36:15 44:8 46:23
**tendered** 67:5
**tendering** 38:1,22 43:19,22
**tenders** 32:20 33:24,25 35:9
38:12,25 44:3 47:17,21,24
**tens** 11:1
**term** 10:13 19:6 21:17,18,20
61:16 98:8 109:3 113:25
136:3 139:20 145:14
**terms** 11:20 19:19 78:10,16
79:18 80:12 87:14,14 99:5
108:11 121:2 137:14
**testified** 5:3 36:25 72:12
86:20
**testify** 147:20,21 151:4
**testimony** 5:16 21:19 51:5
60:25 65:7 77:21 83:21
92:22 95:25 147:18 151:3
151:6 152:4,6,11
**thank** 149:16
**thats** 8:23 9:14,22 15:14
17:24 24:15 27:6 30:23
31:1 34:6 40:11 41:20 43:4
43:17 44:1,2 48:19,22 49:4
50:23,24 51:3 54:9,19 55:7

55:24 57:19 60:22 61:13
62:25 63:10 68:25 69:9
72:2 74:17 77:6,11 84:3
88:10,11 90:11,12 93:6,6
94:8 95:7 96:13 99:13
101:13 102:1,5,11 106:18
110:14,16,17 112:1,19,21
113:20 114:1,21 117:8,18
117:19 123:6 125:5,6,7
127:3,6,20,21 128:20
132:14,18 133:8 134:3
135:22 138:15 139:13,18
141:10,11,18 144:15 145:7
145:11 147:25 149:1,8,24
**theirs** 18:12 114:8
**theme** 111:4
**theory** 100:15 131:24
**theres** 7:8,12,18 12:20 22:5
24:5 25:5 28:17 29:8 30:2
30:22 33:10,23,25 36:1
37:5 38:12,19 41:23 49:14
55:8 56:12 59:4,14 62:20
74:2,4,25 75:2,6 79:6
83:22 87:3 88:20 93:21
94:22,25 99:25 103:16,23
104:6 111:7 117:24 133:12
134:16 135:24 136:21
137:7 138:13 139:12 143:9
144:25
**theyll** 25:14,15 47:7,8,8
56:11 62:22 74:15 77:4
145:8
**theyre** 18:19 19:17 21:3,5
25:13 29:13 49:13 53:2
54:19,21 55:3 62:3 88:16
93:1,22 97:14,16 109:18
110:21,22 115:9,18 126:9
130:7 131:1 136:9,16
137:1,3,10 138:5 139:15
139:17 149:5
**theyve** 22:25 25:12 41:18
**thing** 16:13 27:22 30:25
31:25 39:9 47:15 48:16,19
56:2 62:19 67:4,7 68:5,11
68:17 74:3,4 77:23 80:11
88:18 94:5 100:17 121:11
127:2 134:18 135:5 137:8
140:1 148:24
**things** 12:18 21:22 27:20
28:18 40:1 41:19 45:14
56:11,21 62:7,10 69:17
87:3,12 88:13 92:19 129:3
131:13
**think** 8:4,21 12:20 22:25

**Louis George Fey, Jr.**
**May 17, 2013**

24:5,7 27:3,12 28:6 29:6,8
30:12,16 31:9,23 34:23
40:6 43:2 45:7,25 56:18
61:7,22 65:11,21 67:1
68:25 71:7 82:12,18 86:22
87:16 90:11,11 93:1 94:2
95:10 98:17 102:10 104:19
105:3 120:10 123:4 126:15
126:21,23,25 127:12,18,20
127:21,22 136:8 137:16
138:22,23 139:11,18
145:17
**thinking** 17:15
**third** 30:2 52:1 64:23 68:17
81:15 94:11 123:7
**thought** 44:10 50:22 69:10
95:7
**thousands** 117:25,25
**three** 27:13 117:10
**threequarters** 71:3
**throw** 77:5
**thumb** 69:14
**tier** 7:14 29:15 75:3,8
**time** 19:21 20:4 28:6,22
33:24 34:2 36:12 37:14,14
39:15 41:4,12 42:19 43:7
43:13 44:12 45:4 49:3,23
51:5,11 54:4 57:7 68:20,23
86:17 87:16 90:22 93:17
99:14,19 114:6,10 119:6,8
119:22 127:3,6 134:9
138:15 141:10
**times** 25:18 30:9 35:7 62:13
74:15 97:4 136:17
**title** 40:19 90:9,11 92:12
131:16 134:6 139:1
**today** 9:22 29:22 37:23 38:11
119:3 120:11 121:15,21
**told** 87:16 114:21 123:14
127:10,19 146:18 149:5
**tool** 89:5,5
**top** 21:3 30:20 50:7 72:15
83:11 90:13
**topics** 10:11
**tougher** 25:1
**traffic** 43:21 44:1 47:7
**train** 35:2
**trained** 32:18
**training** 32:5
**transactions** 117:25
**transcribed** 127:13 151:7
**transcript** 1:9 4:9 151:8,9,10
151:17 152:10
**transcription** 152:10

**transfer** 38:5 39:2
**travelers** 3:13,14 23:15,20
23:21 24:2,5,11,15,17,21
32:17 34:6,7,11,18,20 35:2
35:13 36:6,22 37:3,7,10,16
37:19,25 38:22 39:3,16,20
39:24 40:18 41:11,17
42:21 43:6,14,14 44:4,13
44:13,17 45:5,5,8,20 51:5
51:8,9 53:13 54:8 56:24,25
57:4,13 58:5 59:19 60:12
67:2,6,6,11,14 97:20
126:12
**treated** 16:16 17:4
**trial** 4:12
**trick** 52:7,13
**trigger** 54:12 103:16
**trouble** 138:24
**true** 6:1 21:7 43:17 48:11
57:19 58:9 132:1 139:7
144:12 151:7 152:10
**truly** 79:12 139:4
**trumps** 102:12
**try** 5:23 25:7 36:17 92:1
98:17 148:15
**trying** 9:17 54:6 89:16 93:9
103:23 118:16
**turn** 15:15 30:4 33:25
**two** 27:12 29:16 40:10 49:14
56:11 57:23 58:13 67:15
71:2 98:8 115:25 125:2
133:15 142:3
**type** 6:25 7:6 11:25 21:15
22:20 29:16 48:23 49:8
52:6 57:13 58:3 59:9 80:11
83:18 113:12 125:20 129:3
134:2 135:22 139:24
144:16
**types** 6:8 12:18 80:14 83:8
134:19
**typical** 16:18 17:5 20:22 47:4
52:18 53:9 80:17 84:4
91:21 113:21 124:7 135:14
135:15,22,24
**typically** 10:6 17:4 20:20
24:18 25:15 29:10 33:13
33:16 34:3,8 35:15 36:3,8
39:19 49:12,13 55:1,16,22
56:8 63:9 90:19 115:7,10
137:5

_____

**U**

**u** 4:1
**uhhuh** 64:5 134:5

**ultimately** 11:6,13 26:21
27:5 29:20
**umbrella** 73:10 81:4,20 82:3
83:25 95:13 96:17
**unaffiliated** 115:1,8 116:3,6
123:21 127:15,25 136:5
**unattainable** 92:4
**uncommon** 38:19 39:4 46:23
77:6
**uncustomary** 92:4
**underground** 137:2
**underlying** 74:24 75:1
**understand** 5:10,22 10:12,16
31:3 38:21 52:16 88:10
91:8,11 126:21 134:15
137:12,18 139:12,17
**understanding** 7:5 69:11
70:8,22 71:8 84:2 89:25
115:25 120:6,8 151:8
**understood** 18:8 52:18 77:14
96:20 112:12
**undertake** 78:13
**undertaken** 78:14
**underwriter** 22:6,12 25:12
28:1 56:18 121:18 130:22
131:14 136:23 137:1,6
146:14
**underwriters** 64:25 65:13,18
65:23
**underwriting** 16:17 31:24
59:20 88:17 121:19,22
**unique** 91:17,22
**united** 1:1 31:14
**unreasonable** 92:4
**unrelated** 115:8 123:21
**update** 42:4 107:23
**updates** 40:9
**upset** 67:5
**use** 4:13 7:15 10:12,13 15:7
21:12 22:1,5,13,25 37:7
56:5,6 113:24 121:21
123:5 125:1 129:13 134:24
136:2 139:20 145:14,15
**uses** 15:5
**usually** 25:2 26:11 29:9
55:10 56:11 133:25 134:1
**utility** 109:17 137:14

_____

**V**

**v** 9:18 49:20
**v1875** 140:16
**vague** 31:2
**vaguely** 89:16
**valid** 95:22 151:16

**various** 32:20 35:18 60:19
61:5,6 62:9 77:10 89:2
**vary** 16:22
**vehicles** 73:15
**venture** 113:6,9,10,12,17,19
113:19 115:4,11,12 116:1
**ventures** 113:20 115:10,13
**verbiage** 39:7 134:20
**version** 7:17
**versions** 36:1 119:21
**versus** 1:5 67:6 131:17,21
132:1 153:2
**vetted** 38:2
**vicarious** 6:8,9,11 7:7,24 8:3
11:6 14:7 46:8 48:11,16,23
49:2 50:1 52:19 53:6,9
54:1,2 55:1,17 56:10,21
94:3 110:6,11,13 129:2,7
130:13,18,25 131:5,11
133:19 134:1,7,11,15,19,24
135:2,18 138:10 139:4,7,8
139:21,22 144:13,14,16
145:9
**violate** 140:4
**violation** 100:20 102:25
**virtue** 77:25
**voluntary** 147:22 148:5,21
149:5

_____

**W**

**waive** 102:17,24
**waived** 4:10
**waiver** 32:21 72:20 73:8,20
75:18 76:1,2,11 82:1 84:17
85:2,12 98:4 100:19,24
101:8,10,21 102:3,9,18
103:8 107:9 111:3,8 147:6
**waivers** 97:25 110:18,19,25
**walk** 93:15 94:6
**walking** 27:24
**want** 22:17 26:1 30:12 38:21
52:16 54:6,23 55:3 56:18
56:23 61:8 77:23 83:17
88:12 90:18,23 93:8 94:6,7
94:14 99:8,11 107:3 113:3
116:20 125:1 126:23
149:17,19
**wanted** 8:22 24:8 55:25
69:11 148:24
**wants** 137:3
**washer** 8:20 9:1
**wasnt** 27:3 39:6 49:4 75:6
86:13
**way** 23:17 25:4 39:17 47:11

Louis George Fey, Jr.
May 17, 2013

49:4,4 55:5 59:4,18,24
  61:18 71:3 75:2,5 79:3
  101:21 112:21 121:10,11
  130:23 145:15 148:23,25
**ways** 17:9 49:14
**webinar** 130:5
**website** 41:18
**went** 32:18 76:14 77:17
  121:5 128:4
**west** 49:20 61:16 62:11
**weve** 20:9 22:14 25:18,22,22
  29:6 66:15 89:2 126:10,11
  126:11,11,12 128:3 140:13
**whats** 69:21 91:24 137:4
**white** 115:15,17
**whitehead** 11:4
**wide** 56:25
**willful** 106:14
**willing** 129:10 136:4 139:17
**witness** 3:7,8 4:9 5:16 59:13
  109:14 122:14 128:15
  149:16,19 150:1 152:1,3
  152:13 153:7
**wont** 59:21 79:11 81:10 93:2
  115:7 136:15 137:8
**woodchase** 5:2
**word** 84:11 87:8 120:10,10
**worded** 59:18
**wording** 134:3,8,10 135:14
  136:1 138:8
**words** 56:1 75:1
**work** 6:15,18,20,21,22 7:10
  7:19 8:4,5 9:23 11:12 12:8
  12:18 13:4 16:12,14,16,20
  16:23 17:7,13 21:1 26:14
  29:12,16 30:10 33:14
  43:20 48:12,22 50:20 52:5
  56:22 68:2 73:24 74:3,8,17
  74:19,21,23,24 75:1,4,8,9
  85:13 96:25 97:16 98:21
  99:15 100:23 101:2 103:7
  103:21 121:25 122:3 125:6
  128:18,18 133:1 137:1,3
  139:16 148:12,16,17,23
**workday** 40:10
**worked** 23:12 39:11 43:13
  67:7 122:22
**workers** 73:19 74:12 75:14
  83:2,22,24 84:5,19 85:4
**working** 17:2 20:19,23 21:10
  34:21 76:21 77:10 117:4
  123:1 124:2 139:15
**works** 25:4 99:5 133:8
**world** 20:24

**wouldnt** 30:16 31:15 56:18
  73:23 74:18 85:18 90:5
  122:2,3 132:11 138:7
  145:4
**write** 21:8 22:2,7 34:5,7
  38:15 86:3
**writers** 87:6
**writes** 15:6 16:10
**writing** 9:15 11:4 23:15
  123:8
**writings** 40:7
**written** 21:23,24 57:16 59:5
  86:6 102:3,17,22 118:25
  120:17 124:20 127:14
**wrong** 12:21 43:4 46:19,21
  59:4,25 137:4
**wrongful** 108:5,12,19,21
  109:2 111:23 134:22
  144:11,19,23 145:2,4
**wrote** 54:8

<hr>

**X**

**x** 3:1,10
**xl** 3:17 85:25 86:1,3,7,17
  88:3,7 90:7,10 126:11,15
  126:25
**xls** 86:21 88:6,24 89:4,8,12
**xyz** 114:7,8 135:16

<hr>

**Y**

**yall** 19:22 30:10 130:16
  133:3
**yeah** 7:4 8:2 9:3 11:11 12:17
  15:18 17:21 21:12,21
  23:14 24:9,20 25:18 27:6
  34:13 35:20 37:4 38:25
  45:1,7,25 51:23 52:25
  56:12,12 58:9 59:4 61:11
  61:24 62:5,20 63:18 64:3
  65:11 66:7 67:9,15 68:25
  69:14 71:25 76:19 77:19
  79:21 84:6 86:3 89:16,18
  93:5 99:7,17 100:23 105:8
  110:13,16,24 111:3 114:14
  119:14 123:24 124:4,16
  125:22 127:18 130:19
  133:15 135:11 137:6 143:9
  146:18 148:13
**year** 46:4,10 130:1
**years** 27:10,11,13 32:2,5
  39:11 61:6 66:20 98:8
  118:1
**youd** 35:17 48:3,20 58:9
  119:5

**youguys** 128:6
**youll** 55:11,24 74:15,15
  111:4
**youre** 15:17 16:23,24 18:4
  28:18 33:11 46:6 47:4,5
  49:2 59:15 75:9 79:12,22
  80:2,8,11,15 81:13 85:16
  94:20 95:13,25 99:7
  103:16 104:4,23 111:14
  123:7 126:22 128:21,23
  130:11 131:18,20 134:15
  136:10 138:17,23 144:20
  147:15
**youve** 5:19 12:10 21:16,18
  24:3 28:6 29:23 41:15 47:9
  47:10 48:9 60:2 69:17
  86:22 100:1 117:14 123:22
  124:13 125:5 128:22
  134:14 136:18 146:16

<hr>

**Z**

**zone** 43:25
**zones** 46:25

<hr>

**0**

**000** 94:25 96:8,11
**014** 78:1
**02** 1:19
**0210** 18:6 19:4 20:14 112:3
  116:14
**04** 145:18
**050** 13:17 15:16 20:6 108:3
  116:21 118:2 119:14,25
  120:23 122:16
**0610** 13:17 116:21 118:2
  119:14,25 120:23 122:16
**09** 118:18 119:4 121:12,15
**0908** 15:16 20:6 108:3
**0910** 14:15,21 17:17 19:19
  20:18 116:25 119:12
  140:13

<hr>

**1**

**1** 3:12 13:9,12 15:16 21:17
  70:21 81:6 94:12,19,20
  95:3,4 112:4,4 135:17
  140:16 144:9
**10** 1:19 145:18
**10a** 106:17
**11** 15:16 92:12 108:2,8
  109:23 113:1
**1100** 2:8
**1108** 102:13
**1185** 39:9 53:17 55:7

**119** 102:13
**12** 111:10 114:11 116:2
  120:12
**120** 3:18
**1218l bajdld** 1:4 153:1
**13** 3:12 122:13,19 125:19
**1434** 151:12
**1445** 152:8
**1455** 4:11
**15** 70:11
**150** 151:5
**151** 3:6
**152** 3:7
**153** 3:8
**17** 1:19 145:22
**17th** 152:11

<hr>

**2**

**2** 3:13 57:3 60:10,14 70:15
  70:21 78:9 90:25 108:2,8
  114:11 120:12 135:17
  144:8 145:22,23 150:3
**2000** 37:10,14 39:15 44:12
  45:4 51:6,11 63:24
**2005** 3:13 41:11 42:20 43:13
  44:12 45:20 59:7 60:7,9
**2007** 37:10,14 39:16 44:12
  45:4 51:6,11 140:16
**2008** 86:8
**2009** 3:15 57:4 60:11 68:24
  70:3,12 72:8 75:21 81:11
  82:13 86:8,18 90:8 118:15
  126:3
**2010** 15:10 39:9 53:17 55:7
  119:9,13,14,18 120:9
  121:20
**20102011** 15:11 18:4 102:1
  107:6 112:4 117:7
**2011** 108:2 143:24
**2012** 46:4
**2013** 1:19 21:17 151:19
  152:12
**2136** 5:2
**24** 31:13 82:13
**2554** 151:4
**26** 86:8,8
**27** 8:11,16,24,24 9:12 10:1
**29** 70:3 81:11
**2e** 120:18

<hr>

**3**

**3** 3:14 60:13,14 71:11 90:24
  91:15,23 95:2 96:7 101:10
  101:16 106:17 108:3 113:1

<hr>

**Louis George Fey, Jr.**
**May 17, 2013**

118:21 120:18
**30** 32:2 61:6 130:14 152:6
**31st** 151:18
**3240** 145:18
**3300** 2:7
**37** 151:4
**3b** 95:3

**4**

**4** 3:3,16 32:1 34:25 41:22
45:21 67:23,24 103:8
116:2
**4041** 1:16 2:4
**405** 14:15,21 17:17 19:19
20:18 116:25 119:12
140:13
**449** 18:6 19:3 20:14 112:3
116:14

**5**

**5** 3:5,17 72:8 75:21 78:1,11
79:2,3,17 81:2 90:15,16
103:5 113:4 120:12
**500** 1:16 2:4 87:17 94:25
96:8,11
**57** 150:3

**6**

**6** 3:18 120:4
**60** 3:13,15
**67** 3:16

**7**

**7** 21:17 68:1 69:22
**70163** 2:8
**70808** 5:3
**70809** 1:17 2:4

**8**

**8** 77:24 80:24 94:10 103:4

**9**

**9** 81:2,16,21 90:7 92:10,11
92:12 96:23 97:11 98:5,18
107:4
**90** 3:17