## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

SJB GROUP, LLC AND
CATLIN INSURANCE CO., INC.                    CIVIL ACTION

VERSUS

NO. 12-181-SDD-RLB

TBE GROUP, INC.

### RULING

Before the Court are two motions for summary judgment.   Defendant and Plaintiff-in-Counterclaim, TBE Group, Inc. ("TBE") has filed a *Motion for Summary Judgment* on all of Plaintiffs' and Defendants-in-Counterclaim's, SJB Group, LLC ("SJB") and Catlin Insurance Co., Inc. ("Catlin), claims.[1]   TBE also seeks partial summary judgment as to liability on its breach of contract counterclaim.   SJB and Catlin (collectively "Plaintiffs") have filed an *opposition*[2] to which TBE has submitted a *reply*.[3] Plaintiffs have also filed a *Motion for Partial Summary Judgment* on TBE's counterclaim for breach of contract.[4]   In response, TBE filed an *opposition*[5] and Plaintiffs filed a *reply*,[6] to which TBE filed a *surreply*.[7]   For the following reasons, TBE's *Motion for Summary Judgment* is GRANTED IN PART and DENIED IN PART, and Plaintiffs' *Motion for Partial Summary Judgment* is DENIED.

---

[1] Rec. Doc. 34.
[2] Rec. Doc. 54
[3] Rec. Doc. 61.
[4] Rec. Doc. 35.
[5] Rec. Doc. 53.
[6] Rec. Doc. 65.
[7] Rec. Doc. 73.

I.     **UNDISPUTED FACTS**

The factual background as alleged by Plaintiffs has previously been set forth by the Court and is incorporated herein.[8]   For purposes of analyzing the summary judgment motions, the Court will set forth those facts that are not in dispute.

This matter arises out of a Louisiana Department of Transportation and Development State Project No. 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 ("Project") that involved the widening of a 1.91 mile stretch of Interstate 12 between O'Neal Lane in East Baton Rouge Parish to Range Road in Livingston Parish.[9]   TBE entered into a General Services Agreement[10] with James Construction Group, LLC ("James") dated April 29, 2009, whereby TBE agreed to provide certain Subsurface Utility Engineering ("SUE").[11]   Under the terms of the James-TBE Agreement, TBE agreed to locate and identify underground utilities that might impact the design of the Project and to provide "ASCE Quality Level 'A' Locating Services."[12]

On April 29, 2009, TBE and SJB also entered into a Subcontract for Professional Services (hereinafter "TBE-SJB Subcontract"), whereby SJB agreed to provide certain surveying services in connection with TBE's SUE work for the Project.[13]   After TBE's field crews located and marked the underground utilities, SJB's survey crews surveyed the utilities' markings made by TBE and coded each surveyed point in the field.[14]   SJB's CAD software generated the line work indicating the various utilities by connecting the

---

[8] The Court hereby incorporates the factual background set forth in its ruling granting Plaintiffs' motion to exclude expert testimony of Louis G. Fey. Rec. Doc. 74.

[9] Rec. Doc. 1, p. 2, ¶6; Rec. Docs. 34 and 54, ¶1.

[10] The General Services Agreement is dated April 2, 2009.

[11] Rec. Doc. 1, pp. 2-3, ¶¶8-9.   Plaintiffs attached a copy of the General Services Agreement to the Complaint. Rec. Doc. 34-1, p. 2, ¶5; Rec. Doc. 54-1, p. 3, ¶8.

[12] Rec. Docs. 34-1 and 54-1, p. 2, ¶6.

[13] Rec. Doc. 34-1, p. 4, ¶12; Rec. Doc. 54-1, p. 3, ¶12.

[14] Rec. Doc. 34-1, p. 4, ¶17; Rec. Doc. 54-1, p. 5, ¶17.

data points based on their coding in the field.[15]   TBE's SUE services on the Project involved seven different underground structures: a gas line, a telephone fiber optic line, a traffic signal, a water line, an unknown utility, a sewer force main, and an empty conduit.[16]   By May 11, 2009, TBE had completed all of its "ASCE Quality Level 'B' Designating" services and the first "ASCE Quality Level 'A' Test Holes."[17]   By May 13 or 14, 2009, TBE had performed its "ASCE Quality Level 'A'" work on the three remaining test holes on the Project.[18]

On May 14, 2009, John Harleaux, SJB's project manager, met TBE's SUE supervisor, Steven Abbott, in the field to receive TBE's additional SUE data relating to Test Holes 21, 22, and 23.[19]   On May 19, 2009, Harleaux emailed Jim Allen of TBE a pdf version, as opposed to the CAD file, of SJB's preliminary survey.[20]   Allen reviewed the pdf version and on May 26, 2009, asked Harleaux to finalize SJB's deliverable and forward Allen two copies and two discs.[21]   Thereafter, on May 28, 2009, Harleaux emailed the SJB CAD survey file to Evans-Graves; however, the parties dispute who—TBE or James—gave Harleaux these instructions.[22]   On May 29, 2013, Evans-Graves advised SJB and TBE that they "inserted the electronic [CAD] file quite easily into [their] topo drawing.  The edge of ramps and other topographic features fell exactly on top of [their] original survey performed in 1999.  Believe it or not, the SUE utility locations were amazingly close to the original LA One call locations."[23]   At this point, all of SJB's and

---

[15] Rec. Doc. 34-1, p. 5, ¶18; Rec. Doc. 54-1, p. 5, ¶18.
[16] Rec. Doc. 34-1, p. 5, ¶20; Rec. Doc. 54-1, pp. 6-7, ¶20.
[17] Rec. Doc. 34-1, p. 5, ¶22; Rec. Doc. 54-1, p. 6, ¶22.
[18] Rec. Doc. 34-1, p. 5, ¶22; Rec. Doc. 54-1, p. 6, ¶22.
[19] Rec. Doc. 34-1, p. 5, ¶¶21-22; Rec. Doc. 54-1, p. 6, ¶¶21-22.
[20] Rec. Doc. 34-1, p. 6, ¶24; Rec. Doc. 54-1, p, 7, ¶¶24-25.
[21] Rec. Doc. 34-1, p. 6, ¶¶ 25-26; Rec. Doc. 54-1, p. 7, ¶26.
[22] Rec. Doc. 34-1, p. 6, ¶28; Rec. Doc. 54-1, p. 7, ¶28.
[23] Rec. Doc. 34-1, p. 6, ¶29; Rec. Doc. 54-1, p. 8, ¶29.

TBE's contractual obligations on this Project were completed, and subsequently, Evans-Graves completed the design and James began construction.[24]

In late March or early April of 2011, James or one of its subcontractors discovered that a section of the sewer force main within the limits of the Project was in a different location than that shown on the SUE data relied upon by Evans-Graves in designing the Project.[25]  James immediately suspended its work on the Project.[26]  SJB, TBE, James, and other interested parties investigated the conflict and ultimately concluded that it would be more cost effective and faster to relocate the section of the sewer force main that was in conflict with the work (the "Relocation Work"), rather than redesigning, re-permitting, and otherwise delaying the Project.[27]  On April 14, 2011, James demanded that TBE "relocate the subject sewer force-main in to [sic] a location that will not interfere with the bridge construction."[28]  TBE in turn made a demand to SJB.[29]

TBE accurately located and marked Test Holes 21 and 23.[30]  SJB correctly surveyed the horizontal coordinates of these Test Holes, but coded the Test Holes differently.[31]  SJB's CAD file also had multiple layers that could be turned on and off to increase or limit the display of certain information needed for a particular project task.[32]  When SJB's finished survey file was delivered to TBE, James, and Evans-Graves, the

---

[24] Rec. Doc. 34-1, p. 7, ¶30; Rec. Doc. 54-1, p. 8, ¶30.
[25] Rec. Doc. 34-1, p. 7, ¶31; Rec. Doc. 54-1, p. 8, ¶31.
[26] Rec. Doc. 34-1, p. 7, ¶31; Rec. Doc. 54-1, p. 8, ¶31.
[27] Rec. Doc. 34-1, p. 7, ¶32; Rec. Doc. 54-1, p. 9, ¶32.
[28] Rec. Doc. 34-1, p. 7, ¶33; Rec. Doc. 54-1, p. 9, ¶33.
[29] Rec. Doc. 34-1, p. 7, ¶34; Rec. Doc. 54-1, p. 9, ¶34.
[30] Rec. Doc. 34-1, p. 9, ¶42; Rec. Doc.54-1, p.11, ¶42.
[31] Rec. Doc. 34-1, p. 7, ¶35 and p. 9, ¶42; Rec. Doc. 54-1, p. 10, ¶35 and p. 11, ¶42.
[32] Rec. Doc. 34-1, p. 7, ¶35; Rec. Doc. 54-1, p. 9, ¶35.

layer containing Test Holes 21, 22, and 23 was turned off; therefore, there was no symbol indicating the location of the data points for these Test Holes.[33]

SJB was insured by Catlin under a "Professional and Pollution Liability Policy for Design Professionals," number AED199721-1211, effective from December 23, 2010 until December 23, 2011 with policy limits of one million dollars per claim.[34]  On April 14, 2011, Catlin was notified of the TBE's demand to SJB.[35]  After investigation, evaluation, and negotiation of the conflict, Catlin and SJB undertook carrying out the Relocation Work.[36]  Catlin and SJB paid the full amount of the cost for the Relocation Work which totaled $492,984.28.[37]  Neither Catlin nor SJB sought or obtained a release from James.[38]  Before paying for the Relocation Work, Catlin had not made an evaluation of the percentage of the relocation cost for which TBE was responsible.[39]  Ultimately the Relocation Work was completed by September 2011.

In March 2012, James' drilling subcontractor, Cajun Deep Foundations, LLC ("Cajun"), made a demand on James for certain delay-related damages caused by the conflict; James in turn demanded that TBE pay this amount.[40]  TBE forwarded James' demand to SJB, but SJB refused to pay; therefore, TBE paid Cajun's claim.[41]  In consideration for payment, James gave TBE a release for any and all potential claims,

---

[33] Rec. Doc. 34-1, p. 8, ¶37; Rec. Doc. 54-1, p. 10, ¶37.
[34] Rec. Doc. 34-1, p. 9, ¶43; Rec. Doc. 54-1, p. 12, ¶43.
[35] Rec. Doc. 34-1, p. 9, ¶44; Rec. Doc. 54-1, p. 12, ¶44.
[36] Rec. Doc. 34-1, p. 9, ¶45; Rec. Doc. 54-1, p. 12, ¶45.
[37] Rec. Doc. 34-1, pp. 9-10, ¶46; Rec. Doc. 54-1, p. 12, ¶46.
[38] Rec. Doc. 34-1, p. 10, ¶48; Rec. Doc. 54-1, p. 13, ¶48.
[39] Rec. Doc. 34-1, p. 10, ¶47; Rec. Doc. 54-1, p. 13, ¶47.
[40] Rec. Doc. 34-1, p. 10, ¶50; Rec. Doc. 54-1, p. 13, ¶50.
[41] Rec. Doc. 34-1, p. 10, ¶¶50-51; Rec. Doc. 54-1, p.13, ¶¶50-51.

causes of action, damages, or losses arising out of or in any way related to Cajun's claim submitted to James on February 9, 2012.[42]

On March 28, 2012, Plaintiffs filed this suit against TBE asserting claims for breach of contract, professional negligence, detrimental reliance and/or equitable estoppel, reimbursement, indemnity, contribution and/or subrogation, and in the alternative for unjust enrichment.

Subsequently, TBE filed a counterclaim against SJB alleging that SJB was contractually obliged to provide Professional Surveying Services by a Louisiana-licensed professional engineer and that "SJB was obligated to perform all surveying services, including QA/QC of the survey work."[43]

On June 21, 2013, the parties filed their own respective summary judgment motions.

## II.   LAW AND ANALYSIS

### A. Overview of Plaintiffs' and TBE's Summary Judgment Motions

TBE seeks dismissal of Plaintiffs' claims for damages as they have failed to state a viable subrogation claim, based on the undisputed facts (i.e., agreement between SJB and TBE that required TBE be named as an additional insured on SJB's professional liability policy), under Louisiana law.  TBE asserts that Plaintiffs' claims should fail for the following additional reasons: (1) under the language of the contract, SJB has no viable breach of contract claim against TBE; (2) TBE owed SJB no duty that would serve as a basis for a professional negligence claim; (3) Plaintiffs' detrimental reliance claim fails as a matter of law; (4) Plaintiffs have no viable claims for reimbursement,

---

[42] Rec. Doc. 34-1, p. 10, ¶52; Rec. Doc. 54-1, p. 13, ¶52.
[43] Rec. Doc. 15.

indemnity, contribution, or subrogation; and (5) Plaintiffs' claims of unjust enrichment must fail as a matter of law.  TBE also seeks partial summary judgment on its counterclaim for breach of contract based on SJB's failure to name TBE as an additional insured.

Plaintiffs have filed a motion for partial summary judgment on TBE's counterclaim for breach of contract alleging that Plaintiffs owe TBE contractual and tort indemnity and for failure to name TBE as an additional insured under SJB's errors and omissions insurance policy.

The Court will address both summary judgment motions as to the breach of contract claims simultaneously herein.

### B. Caitlin's Subrogation Claims

TBE seeks dismissal of Catlin's subrogation claims arguing that under the relevant contractual language, Catlin is unable to subrogate to the rights of SJB in order to recover damages from TBE.  Because the TBE-SJB Subcontract incorporated the obligations and duties within the James-TBE Agreement, TBE contends that SJB waived its subrogation rights based on the following insurance language of the James-TBE Contract:

> Subcontractor [TBE] agrees to maintain at all times during the performance of Services described in this Agreement statutory workers' compensation insurance coverage as required by law and Employer's Liability in the amount of $500,000 per accident, $500,000 per disease-policy limit, and $100,000 per disease-each employee.  This policy shall include a waiver of subrogation against Company [James] and Client for any payment made on account of injury, including death, sustained by any employee of the insured.
>
> In addition, Subcontractor [TBE] agrees to name Company [James] and Client as additional insured and to include a waiver of subrogation against Company [James] for the following liability insurance policies:

d.      Professional Liability Insurance*   $1,000,000 per occurrence.

*Required for surveying or engineering Services.

Catlin's Professional and Pollution Liability Policy for Design Professionals Policy Declarations insuring SJB, which was effective from December 23, 2010 through December 23, 2011, also contained a separate subrogation clause which stated as follows:

A. Subrogation

> In the event of any payment of any claim under this policy, the Company will be subrogated in the amount of such payment to all of the Insured's rights of recovery against any person or organization. The Insured must do everything reasonably necessary to secure these rights and must do nothing after a claim is made to jeopardize them. The Company hereby waives such subrogation rights against any Insured under this policy, and also against the Insured's client to the extent that the Insured had, prior to the claim or circumstance, a written agreement to waive such rights.[44]

The Court has previously found that TBE failed to raise the affirmative defense of waiver of subrogation in its *Daubert* ruling regarding Dr. Fey.  The Court finds here that TBE's failure to raise this affirmative defense in its initial answer as required by Rule 8(c) of the Federal Rules of Civil Procedure, and only raising this defense in this summary judgment motion after the pre-trial deadlines lapsed, amounts to a waiver of the affirmative defense of subrogation.[45]  The Court further finds that "the prejudice to Plaintiff [Catlin] in allowing any such a late amendment to assert affirmative defenses under Louisiana law is manifest."[46]  Accordingly, TBE's *Motion for Summary Judgment*

---

[44] Rec. Doc. 34-27, Exhibit Y, p. 9, VIII (B).
[45] *Regions Bank v. Tauch*, 2011 WL 2020268, * 6 (E.D.La. May 24, 2011).
[46] *Id.*

moving for dismissal of Catlin's subrogation claim to SJB's breach of contract and professional negligence claims shall be denied.[47]

### C. Plaintiffs' and TBE's Breach of Contract Claims

1. TBE Seeks Summary Judgment Because of Plaintiffs' Failure to State a Viable Breach of Contract Claim

TBE contends that SJB has failed to present a viable breach of contract claim based on the plain language of the relevant contracts. The Court agrees.

In the *Complaint*, Plaintiffs have alleged that pursuant to the James-TBE Contract, "TBE was obligated to perform a Quality Assurance/Quality Control review of SJB's utilities sketch prior to delivery of the SUE data to James and/or its design engineer, to coordinate with TBE's markings and related information, and ultimately to finalize the SUE work required under the James-TBE Contract."[48] Plaintiffs have also alleged that TBE breached its contractual duties owed to SJB because (1) TBE failed to perform or negligently performed its QA/QC duties for which it was contractually responsible per the terms of the James-TBE Contract; and (2) TBE failed to prepare and provide the final deliverables, and to coordinate the survey work by SJB with the investigations and markings done by TBE to provide the results of the SUE to James.

Contractual interpretation is a question of law.[49] Under Louisiana law, "[t]he interpretation of a contract is the determination of the common intent of the parties with courts giving the contractual words their generally prevailing meaning unless the words have acquired a technical meaning. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search

---

[47] Rec. Doc. 74.
[48] Rec. Doc. 1, p. 7, ¶38.
[49] *Estate of Ray v. C.I. R.*, 112 F.3d 194, at 196 (5th Cir. 1997); see also, *South Cent. Bell Telephone Co. v. Allnet Communications Services, Inc.*, 986 F.2d 1418, at *3 (5th Cir. 1993).

of the intent of the parties."[50] "In addition, a contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight."[51]

It is SJB's position that "the terms of the James-TBE Contract, including TBE's Quality Assurance/Quality Control obligations, were incorporated into the TBE-SJB Subcontract by reference and thereby made a part of that agreement."[52] As to the QA/QC obligations, the James-TBE Contract stated: "The finished design cad designating diagrams will be provided to the LADOTD as part of the deliverable upon completion of QA/QC [quality assurance/quality control] of the survey and all associated forms."[53] On its face, the Court finds that this contractual language does not, standing alone, extend any QA/QC obligation existing between James and TBE to SJB.

The Court also finds no merit in SJB's contention that TBE's QA/QC duties extended to SJB based on the "flow down provision" included in the April 29, 2009, TBE-SJB Subcontract. Within the TBE-SJB Subcontract—wherein SJB Group was referred to as "Professional Subcontractor" and James Construction Company was referred to as the "Prime Client"—the following provision is included:

> 5.  ADDITIONAL  OBLIGATIONS:  The  PROFESSIONAL
> SUBCONTRACTOR shall undertake as to TBE the same duties and
> obligations which TBE has undertaken as to the PRIME CLIENT pursuant
> to the prime agreement between TBE and the PRIME CLIENT, the terms
> of which are incorporated herein by reference.[54]

---

[50] *Campbell v. Melton*, 01-C-2578 (La. 2002) 817 So.2d 69, 74 (citing La. Civ.Code arts. 2045, 2047; *see e.g., Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty Co.*, 93-0911 (La. 1994), 630 2d 759, 763; La. Civ.Code art. 2046).
[51] *Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998).
[52] Rec. Doc. 1, p. 7, ¶39.
[53] Rec. Doc. 34-6, p. 8.
[54] Rec. Doc. 34-10, TBE-SJB Group Subcontract for Professional Services, ¶5 (emphasis original).

Based on the foregoing contractual language, the Court finds that SJB assumed the same duties to TBE that TBE had undertaken with James pursuant to the James-TBE Agreement.   This language did not, however, place any additional duties on TBE in relation to SJB.     In its *Opposition*, SJB does not challenge TBE's contractual interpretation.   Therefore, the Court initially finds that SJB's claims premised on TBE's contractual QA/QC review must fail as TBE only owed this contractual obligation to James, not to SJB.

In its *Opposition*, SJB contends that TBE has "mischaracterized and misconstrued its claims" and that "Plaintiffs' claims are based on TBE's failure to perform its professional SUE services in accordance with the standard of care and that such failure constitutes a breach of the TBE-SJB Subcontract."   SJB further delineates TBE's alleged breaches as failure to: "(a) discuss and recommend the formatting of deliverables to clearly distinguish quality levels with James and/or Evans-Graves; (b) prepare a utility composite drawing or file with appropriate supporting documents that clearly identifies utilities at their desired A, B, C, and/or D quality levels; (c) place a note on the plans explaining the different utility quality levels; (d) affix and engineer's stamp on the plans that depict existing subsurface utility data at the indicated quality levels; and (e) resolve differences between the quality level A test hole data from test holes 21 and 23 on May 12 and May 13, 2009, and the earlier conflicting quality level B data that TBE had completed on the sewer main by May 7, 2009."   Although SJB has made these assertions in support of its breach of contract claim against TBE, SJB has failed to direct the Court's attention to any contractual provision that requires TBE to perform these duties.   The Court recognizes that while SJB's claims may be applicable to its

professional negligence claim against TBE, these claims fail to support SJB's breach of contract claim.    Accordingly, because SJB has not shown any genuine issues of material fact which preclude summary judgment on this claim, TBE's *Motion for Summary Judgment* as to SJB's breach of contract claim shall be granted.

2.  TBE's Breach of Contract Counterclaim[55]

Plaintiffs contend that TBE's counterclaim for contractual and tort indemnity must be dismissed because the terms of the TBE-SJB Subcontract only require indemnification of claims and attorney's fees brought by third parties against TBE.

By counterclaim, TBE has raised a breach of contract claim against Plaintiffs for failure to indemnify TBE for the costs of settling the Cajun delay damages demand and for the attorney's fees and expenses TBE has incurred in litigating SJB's negligence in this case.    TBE specifically alleged that SJB failed to perform its obligations or performed them in an unprofessional or unworkmanlike manner and breached its contractual duties; therefore, SJB and Catlin owe TBE indemnification, including reimbursement for costs and attorney fees that continue to accrue, and are estopped from suing TBE.    TBE also has alleged that SJB breached its contractual duty by failing to name TBE as an additional insured under the Catlin policy.    Additionally, TBE alleges it has a right of tort indemnity based on SJB's professional negligence.

The Louisiana Supreme Court has recognized that an indemnity agreement is a "specialized form of contract which is distinguishable from a liability insurance policy."[56] "An indemnitor is not liable under an indemnity agreement until the indemnitee 'actually

---

[55] The issue of SJB's failure to name TBE as an additional insured is asserted by TBE as a defense to Plaintiffs' *Complaint* and also by TBE in its Counterclaim for breach of contract.
[56] *Meloy v. Conoco, Inc.*, 504 So.2d 833, 839 (La. 1987).

makes payment or sustains loss.'"[57]   In other words, there must be some compensable loss sustained by an indemnitee before a claim for defense under the indemnity agreement may be made.

The Court finds that a plain reading of the indemnity agreement in the TBE-SJB Subcontract resolves the issue of whether indemnification of TBE and recovery of attorney fees is limited to third party claims, such as Cajun.   The indemnification provision of the TBE-SJB Subcontract states:

> The PROFESSIONAL SUBCONTRACTOR [SJB] shall indemnify and save harmless TBE and its agents, representatives and employees, from and against any and all suits, actions, legal proceedings, claims, demands, damages, liabilities, cost and expenses, including attorney's fees, arising out of or in connection with or claimed to arise out of or in connection with any negligent acts, errors, or omissions of the PROFESSIONAL SUBCONTRACTOR [SJB] or anyone acting in his/its behalf in connection with or incident to this Agreement.

Under this provision, SJB was contractually required to indemnify TBE "from and against any and all suits, actions, legal proceedings, claims, [or] demands" or any "cost and expenses, including attorney's fees, arising out of or in connection with . . . any negligent acts, errors, or omissions" of SJB.   The Court finds that the words of the contract are clear and unambiguous.   Because TBE's counterclaim for breach of the indemnification provision is based on SJB's negligence, the plain language of the SJB-TBE Subcontract requires indemnification.

The Court also finds that the Fifth Circuit case *Wal-Mart Stores, Inc. v. Qore, Inc.*[58] offers additional guidance even though it arises out of Mississippi.   In *Qore*, Wal-Mart had an indemnification agreement with three firms it had hired to design and build

---

[57] *Suire v. Lafayette City-Parish Consol. Government*, 04-C-1459, 04-C-1460, 04-C-1466 (La. 2005) 907 So.2d 37, 51 (citing *Id.*)

[58] 647 F.3d 237 (5th Cir. 2011).

a new store.  After finding a defect in the structure, Wal-Mart sued each of the firms for breach of contract and negligence.  Once the jury rendered its verdict, finding that Qore was negligent, Wal-Mart sought attorney fees pursuant to the indemnification agreement what stated:

> The Testing and Inspection Firm [Qore] further agrees to indemnify and hold Wal-Mart free and harmless from any claim, demand, loss, damage, or injury (including Attorney's fees) caused by any negligent act or omission by the Testing and Inspection Firm, its agents, servants, or employees.[59]

Before the Fifth Circuit was Qore's contention that the foregoing indemnity provision only applied to actions brought by third parties against Wal-Mart and did not authorize an award of attorney's fees in first-party disputes between Qore and Wal-Mart.  In response, Wal-Mart argued that the plain language of the agreement authorized attorney's fees in any case, including cases involving the contracting parties.  The district court applied a plain reading of the contractual language and found attorney's fees were allowed.[60]  In affirming the district court's finding, the Fifth Circuit also relied on the plain language of the contract.  Additionally, the Fifth Circuit noted the district court's explanation that "there [had been] a jury finding that Qore was negligent, that negligence caused 'loss, damage, or injury' to Wal-Mart, and that Wal-Mart was forced to sue Qore to recover."[61]

---

[59] *Id.* at. 243
[60] Louisiana and Mississippi law regarding contractual interpretation are similar in that "where the words of a contract are clear and explicit and lead to no absurd consequences, the intent of the parties must be sought within the four corners of the document." *Id.*; *Campbell v. Melton*, 01-C-2578 (La. 2002) 817 So.2d 69.
[61] *Id.*

Accordingly, the Court finds that first-party disputes, such as TBE's indemnification claim against SJB based on SJB's alleged negligence, are viable under the indemnification language of the TBE-SJB Subcontract.

Moreover, an exception to the general prohibition under Louisiana law against the recovery of attorney's fees exists in this case:  the TBE-SJB Subcontract expressly authorizes attorney fees.[62]   The cases relied upon by Plaintiffs are distinguishable because they involve either factually different indemnification language[63] or arise out of third-party indemnity claims.[64]  Accordingly, the Court finds that the express language of the SJB-TBE Subcontract expressly authorizes TBE to recover, by way of indemnity, attorney fees arising out of or in connection with SJB's negligence.

The Court further finds that the record contains evidence that could lead a reasonable trier of fact to conclude that TBE has already paid monetary damages, specifically to Cajun Deep Foundations, Inc., for which SJB was responsible.[65] Likewise, the Court further finds that the record contains evidence that could also lead the trier of fact to conclude that SJB was negligent:  an SJB employee testified to miscoding the survey data for at least three test holes (21, 22, and 23); another SJB employee testified that the leader point or end for test hole 23 was inaccurately placed; and SJB's insurer Catlin, after conducting its own investigation, determined that "SJB

---

[62] *Maloney v. Oak Builders, Inc., et al.*, 256 La. 85, 97 (La. 1970).
[63] *Richey v. Moore*, 36,785 (La.App. 2 Cir. 2003) 840 So.2d 1265, 1268 (where the indemnity or hold harmless clause in lease agreement did not specifically provide for an award of attorney fees in enforcing indemnity provision); *Pro-Boll Chemical & Fertilizer Co., Inc. v. U.S. Fire & Guar. Co.*, 2004 WL 3495323, *9 (W.D.La. 11/15/04)(the hold harmless provision did not expressly authorize attorneys' fees or court costs associated with litigation).
[64] *Dowling v. Georgia-Pacific Corp.*, 302 Fed.Appx. 283 (5th Cir. 2008).
[65] The parties do not dispute the fact that in March 2012, James' drilling subcontractor, Cajun Deep Foundations, LLC, made a demand on James for certain delay related damages caused by the conflict. TBE ultimately paid the monetary demand of $31,336.66.

had depicted [CAD] information incorrectly."[66]  The degree to which those damages may be attributable to the negligence of SJB is a finding reserved for the trier of fact.

Moreover, the Court further finds that while this lawsuit is still pending, and until a determination of liability or negligence on the part of SJB has been made, there can be no determination as to what, if any, fees and expenses associated with the pending litigation Plaintiffs owe to TBE.

For the foregoing reasons, Plaintiffs' *Motion for Partial Summary Judgment* seeking dismissal of TBE's counterclaim for tort and/or contractual indemnity shall be denied.

### 3.   SJB's Failure to Name TBE as Additional Insured

The parties filed cross Motions for Summary Judgment on TBE's breach of contract counterclaim for Plaintiffs failure to name TBE as an additional insured under its insurance policy with Caitlin.  Plaintiffs contend they are entitled to partial summary judgment on TBE's claim because while they admit to not naming TBE as an additional insured, it is their position that this fact alone does not end the analysis of whether they are liable to TBE for breach of contract.   Plaintiffs argue that TBE cannot meet its burden of proof at trial because it cannot show that additional insured status was available and would have provided coverage for TBE's claims against the Plaintiffs. Essentially, Plaintiff argues that TBE cannot establish that TBE was damaged by the failure to name it as an additional insured.

To prevail on a breach of contract claim, the plaintiff must demonstrate three elements: "(1) that the obligor undertook an obligation to perform; (2) that the obligor failed to perform the obligation (the breach); and (3) that the failure to perform resulted

---

[66] Rec. Doc. 34-18, pp. 133; Rec. Doc. 34-26, pp. 166-168; Rec. Doc. 34-28, pp. 56-57.

in damages to the obligee."[67] Therefore, TBE bears burden of proving its breach of contract claim by a preponderance of evidence.

> Section 3 of the TBE-SJB Subcontract states:
>
> INSURANCE: The PROFESSIONAL SUBCONTRACTOR shall procure and maintain for a period of two years beyond the terms of this Agreement the following insurance in amounts acceptable to TBE but not less than the limits set forth herein, and shall, upon executing this Agreement, provide to TBE a certificate(s) of insurance evidencing the same, and showing TBE as an additional insured.
>
> 3. Unless otherwise provided for herein, Errors and Omissions Liability Insurance with a limit of $1,000,000 per claim and aggregate, and a deductible not in excess of $10,000 per claim."

Plaintiffs contend that "coverage for an additional insured is typically limited to liability arising out of the named insured's work or operations."[68] The Court agrees that TBE must prove that if it had been named as an additional insured by SJB, the additional insured status would have provided coverage. Plaintiffs rely on the Louisiana Court of Appeal for the Second Circuit decision, *Waste Management of Louisiana, L.L.C. v. Labor Finders International*.[69] However the Court finds that the operative insurance policy discussed in *Waste Management* is inopposite.[70]

The Additional Insured Endorsement to the Catlin liability policy, that would have applied, had TBE been so named provides:

---

[67] *Walker v. Pelican Pub. Co., Inc.*, 2011 WL 2976271, at *6 (E.D. La. July 22, 2011) (citing *Graco, Inc. v. Rob's Cleaning & Powerwash, Inc.*, 08–1249, p. 7 (La.App. 4 Cir.2009); 12 So.3d 386, 391).

[68] *Waste Mgmt. of Louisiana, L.L.C. v. Labor Finders Int'l*, 43,052 (La.App. 2 Cir. 2/27/08), 978 So. 2d 1058, 1061, citing 3 *Couch on Insurance* 3d § 40:25.

[69] 43,052 (La.App. 2 Cir.2/27/08), 978 So.2d 1058.

[70] In *Waste Management*, "a phrase that would include coverage for injuries or damages caused by the negligence of Waste Management or its employees was marked out and therefore not part of the contract. The Court concluded that this appeared "to show an intent not to provide coverage for negligent acts of Waste Management employees." *Id.* at 1061.

ADDITIONAL INSURED(S)

This endorsement modifies insurance provided under the following:

PROFESSIONAL AND POLLUTION LIABILITY POLICY FOR DESIGN PROFESSIONALS  It is understood and agreed that the following entities are included as Additional Insured(s), but solely as respects to liability arising out of professional services.

The policy defined "Professional services" as "those services that the Insured is legally qualified to perform for others in the Insured's capacity as an architect, engineer, land surveyor, landscape architect" and "includes ordinary technology services provided to others in the course of professional services previously described."[71]  The term Insured is defined by the policy, but the definition does not specifically include the "Additional Insured's."   However, Catlin, through its corporate representative, testified that the endorsement would cover liability arising out of professional services that "Additional Insured's" render, and not just "Named Insured's."[72]

Catlin interprets its own policy in a way that establishes that had TBE been named as an "additional Insured" coverage would have resulted. The Court finds that TBE. Hence, TBE has established all three elements of a breach of contract claim. Namely, SJB had a duty to name TBE as an "Additional Insured."  SJB breached this duty and the breach of this duty resulted in a loss of coverage that would have otherwise been available to TBE.  Under Louisiana law, parties who fail to comply with their contractual duty to procure liability insurance for an additional insured have been held responsible for all damages from said breach of contract.[73]  Therefore, inasmuch as TBE has been exposed to liability arising out of its professional services for which it

---

[71] Rec. Doc. 53-9, p. 7.
[72] Rec. Doc. 34-28, pp. 47-48
[73] *Lopez v. Hartford Acc. & Indem. Co.*, 495 So.2d 375, 378 (La.App. 3 Cir. 1986).

will not been insured, the Court finds that SJB's failure to name TBE as an additional insured is a breach of the parties' contract and SJB is liable for the damages arising therefrom. TBE's Motion for Summary Judgment is granted and SJB's cross Motion is denied.

### D. Plaintiffs' Professional Negligence Claim

Plaintiffs allege that because of TBE's negligence, they sustained monetary damages equal to the cost of the Relocation Work and related costs and expenses. Plaintiffs contend that TBE breached its duty by (1) either failing or negligently performing its QA/QC review of its subcontractor's utility sketch, and (2) failing to prepare and provide the final deliverables, and coordinate the survey work by SJB with the investigations and markings done by TBE, and to provide the results of the SUE data to James; in the alternative, Plaintiffs argue that TBE performed these tasks in an unprofessional manner.   In its motion for summary judgment, TBE contends that Plaintiffs' cannot establish a professional negligence claim because TBE had no duty to protect SJB from its own negligence because SJB was TBE's consultant.

Under Louisiana law, any negligence action must be based upon a duty, breach of that duty, a sufficient causal link (cause-in-fact plus legal cause or proximate cause) between the breach and the injury, and the injury itself.   Whether a party owes a duty to another is a question of law; questions of law are for the court.[74]   Plaintiffs argue that the Louisiana Court of Appeal for the First Circuit decision, *Standard Roofing Co. of*

---

[74] *Faucheaux v. Terrebonne Consol. Government*, 615 So.2d 289 (La. 1993). The Louisiana Supreme Court has stated that the appropriate question to ask as to the first element of a negligence claim is "given the relationship and circumstances of the parties, does the law impose upon the defendant a duty of reasonable conduct for the benefit of the plaintiff, the violation of which is considered to be fault"? *Pitre v. Opelousas General Hosp.*, 530 So.2d 1151, 1155 (La. 1988).

*New Orleans v. Elliot Construction Company, Inc.*,[75] establishes that TBE owed a duty of professional care and skill customarily employed by other SUEs not only to James, the party with whom TBE contracted, but also to SJB as it relied on TBE's expertise. The Court, however, does not.

In *Standard Roofing*, a roofing subcontractor brought a suit against the general contractor and its insurer, as well as a third party demand against others, including an architect, with whom the roofing subcontractor had no contract.   In its reasoning, the First Circuit explained that a design professional, such as an architect,

> may be subject to an action in tort brought by a [subcontractor] even in the absence of the privity of contract.  Such an action arises when there is a breach of duty owed independently of the contract between the owner and the architect.  An architect is deemed to know that his services are for the protection of the owner's interest, as well as the protection of other third parties who have no supervisory power whatsoever and must rely on the architect's expertise in providing adequate supervision, plans, and specifications.[76]

The Court finds that Plaintiffs have misapplied the facts of *Standard Roofing* to those parties involved in this case.   SJB is more analogous to the architect in *Standard Roofing*, who could be subject to suit by a third party, such as James, with whom SJB had no privity of contract, who had no supervisory power over SJB, and who had to rely on SJB's expertise in providing surveying information.   Accordingly, the Court finds that *Standard Roofing* offers no authority for Plaintiffs' contention that TBE owed SJB any duty to review SJB's work.   Therefore, as a matter of law, TBE's *Motion for Summary Judgment* shall be granted as to Plaintiffs' claim for negligence.

---

[75] 535 So.2d 870 (La.App. 1 Cir. 1988).
[76] *Id.* at 880 (internal citations omitted).

### 4. Plaintiffs' Detrimental Reliance/Equitable Estoppel Claim[77]

TBE contends that summary judgment is appropriate on Plaintiffs' detrimental reliance/equitable estoppel claim because Plaintiffs have failed to provide any evidence supporting their claim under Louisiana law. In their *Opposition*, Plaintiffs argue that they did, in fact, present evidence showing that TBE made a representation that it would perform a QA/QC review of SJB's sketch prior to the delivery of the final SUE data by TBE to James. SJB contends its reliance was justified and as a result of TBE's representation, SJB and Catlin have suffered damages related to funding the Relocation Work and related costs and expenses.

The theory of detrimental reliance is codified in article 1967 of the Louisiana Civil Code and provides that "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise."[78] A plaintiff must prove three elements by a preponderance of the evidence in order to establish a claim for detrimental reliance: "(1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance."[79] "The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence."[80] "Detrimental reliance 'usually functions when no written

---

[77] Under Louisiana law, the terms detrimental reliance and equitable estoppel are used interchangeably. *19th Judicial Dist. Court Bldg. Com'n v. Level 3 Communications, LLC*, 659 F.Supp.2d 766, 773 (M.D.La. 2009)(quoting *Garber v. Badon & Ranier*, 981 So.2d 92, 105 (La.App. 3 Cir. 2008)).
[78] La. C.C. art. 1967 (West 2013).
[79] *Doss v. Cuevas*, 07-CA-1803 (La.App. 1 Cir. 2008), 985 So.2d 740, 743 (quoting *Suire v. Lafayette City-Parish Consolidated Government*, 2004-1459, p. 31 (La.4/12/05), 907 So.2d 37, 59).
[80] *Id.*

contract or an unenforceable contract exists between the parties.'"[81]   The doctrine of detrimental reliance is disfavored by the law and all claims must be analyzed carefully and strictly.[82]

The Court finds that the Plaintiffs have failed to provide any evidence to satisfy the first element of a detrimental reliance claim: a representation by conduct or word. On April 15, 2009, James R. Allen ("Allen") of TBE emailed Garner Morales ("Morales") of SJB with the scope of SUE service, which indicated that SJB would be providing the survey work.[83]   In the Deliverables section of TBE's scope of SUE service document the following language was included:  "[t]he finished design cad designating diagrams will be provided to the LADOTD as part of the deliverable upon completion of QA/QC of the survey and all associated forms."[84]   In his affidavit, Morales attested that based on his prior dealings with TBE, specifically on the Weeks Island Project years earlier, in conjunction with an email sent by TBE's Mark Pitchford ("Pitchford") on the same date, he "understood this provision to mean that TBE would perform a QA/QC review of the AutoCAD survey deliverable provided by SJB, and that TBE, the prime subsurface utility engineering consultant, would prepare the final deliverable to be provided to the LADOTD or James."[85]

However, in Pitchford's email to Allen and Morales, he wrote: "We'll be furnishing the deliverable to Contractor for his designer to use.  We need to provide a description of what electronic deliverable SJB will be providing along with ours."[86]   In response,

---

[81] *Caplan v. Ochsner Clinic, LLC*, 799 F.Supp.2d 648, 651 (E.D.La. 2011)(citing *Drs. Bethea, Moustoukas and Weaver LLC. v. St. Paul Guardian Ins. Co.*, 376 F.3d 399, 403 (5th Cir. 2004)).
[82] *May v. Harris Management Corp.*, 04-CA-2657 (La.App.1 Cir. 12/22/05), 928 So.2d 140, 145.
[83] Rec. Doc. 56-3, pp. 2-3.
[84] Rec. Doc. 56-4, p. 5.
[85] Rec. Doc. 56-4, pp. 1-2, ¶1.
[86] Rec. Doc. 34-9, p. 2.

Morales explained that SJB's electronic deliverable would be presented in AutoCAD 2007.[87]   Pitchford's statement expressly instructs SJB to provide the electronic deliverable SJB will be using separate and apart from TBE's electronic deliverable. Moreover, there is no mention of TBE performing any quality control or quality assurance review of SJB's work.  The Court finds that neither Morales' "understanding" about the meaning of the scope of deliverables nor Pitchford's correspondence provide evidentiary support for Plaintiffs' contention that TBE made representations that it would perform a QA/QC review of SJB's work prior to delivery.

The Court also finds Plaintiffs' emphasis on SJB's prior relationship with TBE on the Weeks Island Project fails to show that TBE made any representation that it would perform a QA/QC review of SJB's work.  In Pitchford's deposition, he explained that for the Weeks Island Project he had served as the principal, Allen had served as the project manager, it was an LADOTD project, and the scope of the project had been subsurface utility engineering.[88]   In his testimony, Pitchford also stated that it was his belief that when SJB submitted its digital CAD file to TBE's licensed, registered professional surveyor in Florida, Mike Patterson, for the Weeks Island Project: "[Patterson] put it into a Cardno TBE template and probably titled a cover page for submittal to DOT."[89] However, when asked if Patterson or anyone else with TBE "reviewed the SJB digital CAD filed on the Weeks Island project before incorporating that into a plan sheet with the Cardno TBE logo" Pitchford responded that he "did not know."[90]  Allen testified similarly in his deposition that he did not know whether any review, including a QA/QC,

---

[87] Rec. Doc. 34-9, p. 2.
[88] Rec. Doc. 55-4, pp. 420-422.
[89] Rec. Doc. 55-4, pp. 423; 427.
[90] Rec. Doc. 55-4, p. 427.

had been performed on SJB's AutoCAD survey before the final TBE survey deliverable was created for the Weeks Island Project.[91]  The Court finds that neither Pitchford's nor Allen's deposition testimony offers evidentiary support for SJB's position that TBE had previously performed QA/QC review of SJB's CAD file on the Weeks Island Project. Accordingly, the Court finds that Plaintiffs have failed to produce any evidence creating a genuine issue of material fact that TBE made representations that it would perform a QA/QC review of SJB's work prior to delivery.

In the alternative, the Court further finds even if Plaintiffs had been able to satisfy the first element necessary for a detrimental reliance/equitable estoppel claim, they would not have been able to show that their reliance was reasonable.  "Whether a plaintiff reasonably relied on a promise is generally a fact-bound determination."[92] These factual circumstances that may be examined include the commercial sophistication of the party claiming detrimental reliance and/or documents upon which the party relied.[93]  "However, Louisiana law recognizes certain situations where a plaintiff's reliance on a promise is unreasonable as a matter of law."[94]  The Court finds that the United States Court of Appeals for the Fifth Circuit's reasoning in *Omnitech International, Inc. v. Clorox Company*[95] is instructive in this case.

In *Omnitech* the Fifth Circuit, applying Louisiana's law of detrimental reliance, held that a party's reliance on promises made outside of an unambiguous, fully-

---

[91] Rec. Doc. 34-20, p. 499.
[92] *Drs. Bethea, Moustoukas and Weaver LLC v. St. Paul Guardian Insurance, Co.*, 376 F.3d 399, 403 (5th Cir. 2004).
[93] *Water Craft Management, L.L.C. v. Mercury Marine*, 361 F.Supp.2d 518, 556 (M.D.La. 2004).
[94] *Drs. Bethea, Moustoukas and Weaver LLC v. St. Paul Guardian Insurance, Co.*, 376 F.3d 399, 403 (5th Cir. 2004).
[95] *Omnitech Intern., Inc. v. Clorox Co.*, 11 F.3d 1316 (5th Cir. 1994).

integrated agreement was unreasonable as a matter of law.[96]   Omnitech brought its
detrimental reliance claim against Clorox contending that it had reasonably relied on
extra-contractual representations and "repeated assurances" made by Clorox that "it
would include Omnitech in any venture into the insecticide market."[97]   However, the
*Omnitech* Court found that the written agreements between Omnitech and Clorox
included "an express integration clause, reflecting that the entire agreement between
the parties had been reduced to writing in those instruments and that it [could] only be
modified by written agreement executed by authorized representatives of the parties
hereto."[98]   Concluding that any promises made to Omnitech "were outside the scope of
the fully-integrated, written agreements between Omnitech and Clorox," the Court
"refuse[d] to look past the written terms of the agreements."[99]

The James-TBE contract, which was made applicable to SJB pursuant to the
"flow down provision" via the TBE-SJB Subcontract, contained the following integration
clause:  "This Agreement contains the entire agreement of the parties, and there are no
other promises or conditions in any other agreement whether written or oral."  The Court
recognizes that while there is no per se rule "that an integration clause nullifies any
claim for detrimental reliance" the Plaintiffs have failed to offer any evidentiary support
showing that the contract was ambiguous, that they asked specific questions about
matters of particular importance to representatives of TBE, or that they were given
certain representations that caused Plaintiffs to take a different course of action to their

---

[96] *Id.* at 1329.
[97] *Id.*
[98] *Id.* at 1328.
[99] *Id.* at 1330.

detriment.[100] Therefore, the Court further finds that Plaintiffs were unreasonable to rely on an employee's interpretation of TBE's contractual language considering the integration clause applicable to TBE-SJB's Subcontract.

Accordingly, the Court finds that TBE's *Motion for Summary Judgment* as to Plaintiffs' detrimental reliance/equitable estoppel claim shall be granted.

### 5. Plaintiffs' Claims for Reimbursement Under the Theories of Indemnity, Contribution, and/or Subrogation

In their *Complaint*, Plaintiffs have made claims for reimbursement, indemnity, contribution, and/or subrogation from TBE for the cost of the Relocation Work and related expenses because TBE either failed to perform or negligently performed its obligations (1) of performing QA/QC review of SJB's utilities sketch prior to the delivery of the SUE data by TBE to James and/or its design engineer and (2) of preparing and providing the final deliverables, coordinating SJB's sketch with TBE's investigations and markings, and finalize the SUE work as required under the James-TBE Contract. TBE contends that Plaintiffs' reimbursement claims cannot survive a summary judgment motion because SJB failed to name TBE as an additional insured under the Catlin policy; TBE's fault, if any, can only be viewed as constructive or derivative from that of its subcontractor, SJB, which prepared the survey; and since Plaintiffs have failed to provide any evidence that they are solidarily liable with TBE, their claim for contribution must fail.

Plaintiffs contend that they have a viable indemnification claim; the Court, however, finds to the contrary.

---

[100] *Water Craft Management, LLC v. Mercury Marine*, 361 F.Supp.2d 518, 556 (M.D.La. 2004) ("A per se rule that an integration clause nullifies any claim for detrimental reliance contradicts the very nature of a claim for detrimental reliance.")

While the Court finds that Plaintiffs have correctly cited the law of indemnification, specifically that a party seeking indemnification must be without fault, the Plaintiffs have erred in their application of the law to their own case.[101] SJB has failed to present any evidence or argument demonstrating SJB's lack of fault or that SJB's liability was solely "technical, constructive, vicarious [or] derivative."[102]   Instead, Plaintiffs have focused solely on TBE's fault or alleged professional negligence for failure to review SJB's survey as part of the QA/QC SUE process and submitting SJB's CAD file to the design engineer for the final SUE drawing.[103]   The Court finds that SJB has failed to demonstrate a genuine issue of material fact as to its lack of fault, which prevents SJB from overcoming TBE's summary judgment motion on SJB's indemnification claim.   In contrast, the Court finds that there is evidence that could lead a reasonable trier of fact to determine that SJB incorrectly depicted survey information in the CAD file.[104]   For instance, SJB's Project Manager, John Harleaux, testified that although he was responsible for overseeing projects and CAD he failed to make sure the codes on the survey data for test holes 21, 22, and 23 were consistent.[105]   Stephen Estopinal, past Assistant Director of SJB's Survey Division, also testified that the leader point for test hole 23 did not go to the leader point or end at the horizontal location for test hole 23 and was off by six or seven feet.[106]   Moreover, we find that TBE's fault, if any, may only be viewed as constructive or derivative from that of its subcontractor, SJB, who

---

[101] *Nassif v. Sunrise Homes, Inc.*, 98-C-3193 (La. 6/29/99), 739 So.2d 183, 185.
[102] *Id.* citing *Bewley Furniture Co., Inc. v. Maryland Cas. Co.*, 285 So.2d 216, 219 (La. 1973). "[I]ndemnity … has been allowed a contractor from his subcontractor and/or supplier, so long as the exclusive fault producing liability has been that of such subcontractor and/or supplier." *Id.*
[103] Rec. Doc. 56-5, Affidavit of Joe Anderson, P.E., p. 3, ¶¶9-11.
[104] Rec. Doc. 34-26, pp. 166-168.
[105] Rec. Doc. 34-18, pp.133-134.
[106] Rec. Doc. 34-26, pp. 167; 247.

DM No. 702                                        27

prepared the survey data.   Accordingly, TBE's *Motion for Summary Judgment* on Plaintiffs' claim for indemnity shall be granted.

Plaintiffs also contend that they are entitled to contribution because there was a joint and indivisible obligation to perform the Relocation Work necessary to relocate the sewer force main.   In other words, because the remediation of the conflict—the section of the sewer force main within the limits of the Project that was in a different location than that shown on the SUE data submitted to James—was an indivisible obligation, the rules of solidary obligations, including contribution, apply.

Under Louisiana law, "[t]he substantive basis for the right to claim contribution is subrogation to the plaintiff's rights against the remaining tortfeasors."[107]   "The doctrine of contribution serves to mitigate the harsh effects of solidary liability by permitting a tortfeasor who has paid more than his share of a solidary obligation to seek reimbursement from the other tortfeasors for their respective shares of the judgment."[108] "An obligation is *solidary* for the obligors when each obligor is liable for the whole performance."[109]   "When different obligors owe together just one performance to one obligee, but neither is bound for the whole, the obligation is *joint* for the obligors."[110] "When a joint obligation is *indivisible*, joint obligors or obligees are subject to the rules governing solidary obligors and obligees."[111]   "An obligation is indivisible when the object of the performance, because of its nature or because of the intent of the parties,

---

[107] *Hamway v. Braud*, 01-CA-2364 (La.App. 1 Cir. 2002), 838 So.2d 803, 806.  *See also, Dennis v. The Finish Line, Inc.,* 99-CA-1413, 99-CA-1414 (La.App. 1 Cir. 2000), 781 So.2d 12, 44 ("The source of the right to claim contribution is subrogation to the plaintiff's rights to the remaining tortfeasors." (citing *Farbe v. Casualty Reciprocal Exch.,* 00-0076 (La. 2000), 765 So.2d 994, 996)).

[108] *Dennis v. The Finish Line, Inc.,* 99-CA-1413, 99-CA-1414 (La.App. 1 Cir. 2000), 781 So.2d 12, 43-44.

[109] La. C.C. art. 1794. (emphasis added). ("A performance rendered by one of the solidary obligors relieves the others of liability toward the obligee.").

[110] La. C.C. art. 1788(emphasis added).  *See also,* La. C.C. art. 1818 ("An indivisible obligation with more than one obligor or obligee is subject to the rules governing solidary obligations.").

[111] La. C.C. art. 1789 (emphasis added).

is not susceptible of division."[112]   Importantly, "[i]n 1996, La. C.C. art. 2324 was amended to eliminate solidary liability, except where the tortfeasors conspire to commit an intentional or willful act."[113]   In contrast, "[n]on-intentional tortious acts are now considered joint and divisible, and each joint tortfeasor is liable only for the degree of fault attributed to his actions."[114]

The Court finds that Plaintiffs' reliance on *Sweet Lake Land & Oil Co., LLC v. Exxon Mobil Corp.*[115] to support their contribution claim is improper because it is distinguishable from the facts herein.   In *Sweet Lake Land & Oil Co., LLC,* the defendants were parties to a mineral lease that obligated them to restore Plaintiffs' property.   In the pending matter, the parties have not produced any evidence of a similar contractual obligation placed upon TBE, much less SJB, to relocate the sewer force main.   Instead, the parties have stipulated that SJB, TBE, James, and other interested parties investigated the conflict and ultimately concluded that it would be more cost effective and faster to relocate the section of the sewer force main that was in conflict with the Relocation Work, rather than redesigning, re-permitting, and otherwise delaying the Project.[116]   Importantly, the Court notes that the record is devoid of any evidence indicating who, of these interested parties, would assume the financial responsibilities for the Relocation Work.

Instead, the record contains evidence that this particular aspect was unresolved based upon a series of demands made by the interested parties.   Initially, James made a demand to TBE to relocate the sewer force-main, who, in turn, placed this demand on

---

[112] La. C.C. art. 1815.
[113] *Hamway v. Braud,* 01-CA-2364 (La.App. 1 Cir. 2002), 838 So.2d 803, 807.
[114] *Id.*
[115] 2011 WL 4591084 (Sept. 29, 2011).
[116] Rec. Doc. 34-1, p. 7, ¶32; Rec. Doc. 54-1, p. 9, ¶32.

SJB.[117] Plaintiffs have alleged that SJB and TBE were unable to reach an agreement relating to the payment of the Relocation Work, therefore, SJB and Caitlin decided to "mitigate their damages by avoiding a claim by James for delays" and paid for the Relocation Work.[118]

The Court finds that while the parties may have agreed that relocating the sewer force main was more advantageous, there is no evidence in the record that shows that the Plaintiffs and TBE entered into any agreement or had any meeting of the minds regarding who would be responsible for paying for the Relocation Work to satisfy James' demand.   In other words, the Court does not find the existence of any contractual obligation binding any party to relocate the sewer force main.

Instead, the Court finds that the deposition testimony of Laila Lorraine Santana, Director of Professional Construction Claims at Catlin, demonstrates that the decision to pay for the relocation of the sewer force main was made as a unilateral "business decision" by Catlin after TBE refused to contribute monetarily to the Relocation Work, and Catlin's own investigation determined that "SJB had depicted [CAD] information incorrectly."[119] Santana explained that during its independent investigation, Catlin determined that its insured, SJB, while not being totally responsible for the conflict, owed some legal obligation to contribute monetarily to correct the conflict, and if the parties proceeded to trial there would be some finding of fault against SJB due to their erroneous depictions on the CAD file.[120]

---

[117] Rec. Doc. 34-1, p. 7, ¶¶33-34; Rec. Doc. 54-1, p. 9, ¶¶33-34.
[118] Rec. Doc. 1, pp. 5-6, ¶¶29-30; 32.
[119] Rec. Doc. 34-28, pp. 57-60.
[120] Rec. Doc. 34-28, pp. 56-57. Santana further explained that Catlin never made an allocation of percentage of responsibility or fault attributable to either SJB or TJB for the conflict. Rec. Doc. 34-28, p. 58.

The Court also finds no merit in Plaintiffs' argument that the Relocation Work amounted to an indivisible obligation.[121]   An obligation is indivisible when the object of the performance, because of its nature or because of the intent of the parties, is not susceptible of division; such obligations are governed by the rules of solidary obligations.[122]  Plaintiffs contend that the nature of the obligation—relocating the entire section of the sewer force main—makes it an indivisible obligation.  Plaintiffs argue they "could not have paid to have only a certain section of the conflicting force main relocated because that would not have mitigated the potential damages."[123]  Plaintiffs have alleged that they paid James in an attempt to mitigate damages by avoiding a claim in tort by James.   Santana also testified that, "Catlin made a business decision to protect SJB from what could have been potentially a much larger claim had the project come to a screeching halt and not continued and not been fixed within the small window of opportunity where it wouldn't have caused a greater delay that could have potentially exposed it to damages far greater than the policy limit."[124]

The Court finds that the obligation to relocate the sewer force main was a joint and divisible obligation, whereby "[a] joint tortfeasor shall not be liable for more than his degree of fault," and therefore, the theory of comparative fault under Louisiana law applies to Plaintiffs' recovery of damages.[125]   However, what amount of fault is attributable to SJB has yet to be determined at this stage.

---

[121] Rec. Doc. 54, pp. 23-24.
[122] La. C.C. art. 1818.   The parties are in agreement that they did not conspire together to commit an intentional or willful act to be held liable in solido under La. C.C. 2324(A).
[123] Rec. Doc. 54, p. 25.
[124] Rec. Doc. 34-28, pp. 108-109.
[125] La. C.C. art. 2324.

Accordingly, Plaintiffs' claims for contribution survive summary judgment, but only under the theory of comparative fault because the parties' liability is joint and divisible.

The parties agree that the Plaintiffs do not have a right to subrogate to any of James's potential claims as to the Relocation Work and that this issue is not before the Court.[126]   Therefore, this argument shall not be considered by the Court.   However, in their *Opposition*, Plaintiffs maintain that they are suing for their own damages and rights to subrogate because "SJB and Catlin are the original creditor and only obligor/creditor in this case" under Catlin's insurance policy.[127]   They further argue that their subrogation claims arise from the damages allegedly caused by TBE's breach of contract and breach of negligence.

### F. In the Alternative, Plaintiffs' Unjust Enrichment Claim

The Plaintiffs claim that TBE is bound to compensate them under the theory of unjust enrichment.  Plaintiffs have alleged that TBE--who they contend is liable, in whole or in part, for the conflict and for the resulting cost for Relocation Work--has been enriched without cause by Plaintiffs' funding of the Relocation Work at Plaintiffs' sole cost.  Article 2298 of the Louisiana Civil Code codifies Louisiana's doctrine of unjust enrichment:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person.  The term 'without cause' is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law.  The remedy declared her is subsidiary and shall not be available if the law provides another remedy for impoverishment or declares a contrary rule.

---

[126] Rec. Doc. 54, p. 26.  In their *Opposition*, Plaintiffs argue that "James did not suffer any damages, paid by SJB and Catlin, which resulted from TBE's breach of contract and professional negligence.  Id. at p. 27.

[127] Rec. Doc. 54, p. 27.

> The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less.[128]

To support a claim for unjust enrichment under Louisiana law, a plaintiff must show five elements: "(1)there must be an enrichment; (2) there must be an impoverishment; (3) there must be a connection between the enrichment and the resulting impoverishment; (4) there must be an absence of 'justification' or 'cause' for the enrichment and impoverishment; and (5) there must be no other remedy at law available to the plaintiff."[129]   Unjust enrichment is a remedy of "last resort" and "only applicable to fill a gap in the law where no express remedy is provided."[130]   Moreover, "it is not the success or failure of other causes of action, but rather the *existence* of other causes of action, that determine whether unjust enrichment can be applied."[131]

In this case, the Court has found that Plaintiffs have other remedies at law available to them—Catlin's claim of subrogation of SJB's rights and Plaintiffs' contribution claim.   It matters not if Plaintiffs are unable to prevail on these claims. Because unjust enrichment is a remedy of "last resort" where the law affords no other remedy, the Court finds that Plaintiffs' unjust enrichment claims must be dismissed. TBE's *Motion for Summary Judgment* as to Plaintiffs' unjust enrichment claims shall be granted.

---

[128] La. C.C. art. 2298.
[129] *JP Mack Industries LLC v. Mosaic Fertilizer, LLC, et al.*, 2013 WL 4776502, *3 (E.D.La. Sept. 4, 2013)(citing *Carriere v. Bank of Louisiana*, 702 So.2d 648 (La. 12/13/96)).
[130] *Port of South La. v. Tri-Parish Industries, Inc.*, 927 F.Supp.2d 332, 341 (E.D.La. 2013); *Walters v. MedSouth Record Management, LLC*, 10-CC-0352 (La. 2010), 38 So.2d 341, *2 (quoting *Mouton v. State*, 525 So.2d 1136, 1142 (La.App. 1 Cir. 1988), *writ denied*, 526 So.2d 1112 (La. 1988)).
[131] *Garber v. Badon & Ranier*, 07-1497, (La.App. 3 2008), 981 So.2d 92, 100 (emphasis original).

III.   **CONCLUSION**

Accordingly, Plaintiffs' *Motion for Partial Summary Judgment* is hereby DENIED.[132]   The *Motion for Summary Judgment* filed by Defendant and Plaintiff-in-Counterclaim, TBE, is GRANTED IN PART and DENIED IN PART.[133]   TBE's *motion* is granted as to Plaintiffs' claims of breach of contract, breach of professional negligence, equitable estoppel/detrimental reliance, indemnity, and unjust enrichment.   TBE's *motion* is also granted as to TBE's breach of contract counterclaim seeking partial summary judgment of liability.   TBE's *motion* is denied as to Catlin's subrogation claim and Plaintiffs' contribution claim.

With the trial in this matter set to begin on December 9, 2013, the remaining claims are as follows:  Catlin's subrogation claim; Catlin and SJB's contribution claim; TBE's claims for breach of indemnification in contract and tort; professional negligence; and the damages portion of TBE's breach of contract claim related to the failure to name TBE as an additional insured.

Baton Rouge, Louisiana, this _____26_____ day of November, 2013.

*Shelly Dick*

SHELLY D. DICK, DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA

---

[132] Rec. Doc. 35.
[133] Rec. Doc. 34.